# Appendix 1



# GRÜNECKER
### PATENT- UND RECHTSANWÄLTE

MÜNCHEN
Patentanwälte
European Patent Attorneys
Hans Hilgers
Thomas Schuster
Dr. Klara Goldbach
Martin Aufenanger, LL.M., MM '
Dr. Heike Vogelsang-Wenke
Reinhard Knauer
Dietmar Kuhl
Dr. Franz-Josef Zimmer
Bettina K. Reichelt
Dr. Anton K. Pfau
Dr. Udo Weigelt, LL.M.
Rainer Bertram
Jens C. Koch, M.S. (U of PA)
Bernd Rothaemel
Thomas W. Laubenthal, LL.M.
Dr. Andreas Kayser
Dr. Jens Hammer
Dr. Thomas Eickelkamp
Dr. Peter Mitényi ²
Dr. Moritz Höfle, LL.M.
Gero Maatz-Jansen
Michael Heise
Christian Meisinger
Dr. Martin Ahr
Dr. Wolfgang Neubeck
Steven M. Zeman, Ph.D.
André Nickel
Felix Kahr
Dr. Alexander Sturwold, LL.M.
Dr. Stefano Marchini ³
Dr. Thomas Kronberger
Yifin Jin
Dr. Georg Seisenberger
Dr. Olivia Nemethova, LL.M.
Dr. Rainer Plaggenborg
Victor Lopes Aguiar
Dr. Sabine Koch
Wolfram Thomas
Dr. Markus Grammel
Jagannath Korukottu, Ph.D. '

Rechtsanwälte
Attorneys-at-Law
Dr. Ulrich Blumenröder, LL.M.
Prof. Dr. Maximilian Kinkeldey, LL.M. '
Dr. Karsten Brandt
Anja Franke, LL.M.
Ute Stephani
Dr. Bernd Allekotte, LL.M. '
Dr. Elvira Bertram, LL.M.
Babett Ertle
Christine Neuhierl
Sabine Brandstätter
Cornelia Schmitt
Petra Lübbe
Dr. Holger Gauss
Dr. Nicolás Schmitz
Marina Schlumberger
Kirsten Hammerstingl
Sebastian Clotten, LL.M.
Jennifer Rosenhäger, LL. M
Mark Peters, LL.M.
Dr. Nicola Busch
Jutta Bitner, LL.M.
Sebastien Ochs
Philipp Strommer
Jan Rether
Karin Lochner
Swetlana Frese

BERLIN
Patentanwälte
European Patent Attorneys
Dr. Patrick P. Erk, M.S. (MIT)
Dr. Svenja Sethmann
Tino Rumpold

KÖLN
Patentanwälte
European Patent Attorneys
Dr. Martin Dropmann

PARIS
Conseil en Propriété Industrielle
European Patent Attorney
Dr. Wolfgang Neubeck

OF COUNSEL
Patentanwälte
European Patent Attorneys
Gottfried Klitzsch

Rechtsanwälte
Attorneys-at-Law
Dr. Helmut Eichmann
Gerhard Barth

Grünecker PartG mbB   Leopoldstr. 4   80802 München   Germany

**Via beA**

Landgericht Mannheim
- Patentstreitkammer -
A1,1
68159 Mannheim

| Ihr Zeichen / Your Ref. | Unser Zeichen / Our Ref. | Datum / Date |
|---|---|---|
| | **K28096BAMHhaf** | 12. Februar 2019 |

> Wir beantragen Zuweisung zur 7. Zivilkammer, da (1) diese bereits
> derzeit mit einem Klageverfahren der hiesigen Klägerin aus dem
> hiesigen Klagepatent EP 1 177 531 unter dem Aktenzeichen 7 O 62/18
> befasst ist und (2) die hiesige Klägerin einen weiteren Autohersteller
> aus dem hiesigen Klagepatent EP 1 177 531 wegen Systemen mit
> teils derselben zur Verletzung beitragenden GPU verklagt hat
> (Zuweisung zur 7. Zivilkammer beantragt, Aktenzeichen noch
> unbekannt).

## KLAGE

in Sachen

**Broadcom Corporation, 5300 California Avenue, Irvine, CA 92617, USA,**
**gesetzlich vertreten durch ihr Board of Directors, ebenda**          **- Klägerin -**

<u>Prozessbevollmächtigte:</u>     Rechtsanwälte der Grünecker PartG mbB, insbeson-
dere RA Dr. Bernd Allekotte, Leopoldstraße 4, 80802
München

<u>mitwirkend:</u>     Patentanwälte der Grünecker PartG mbB, insbeson-
dere PA Dr. Moritz Höfle, Leopoldstraße 4, 80802
München

gegen die

**Bayerische Motoren Werke Aktiengesellschaft, Petuelring 130, 80788 Mün-**
**chen, gesetzlich vertreten durch den Vorstand Harald Krüger (Vorsitzender), Mi-**
**lagros Caiña Carreiro-Andree, Klaus Fröhlich, Pieter Nota, Nicolas Peter, Peter**
**Schwarzenbauer, Andreas Wendt, Oliver Zipse**
**(im Folgenden auch: BMW)**

**- Beklagte zu 1) -**

Grünecker Patent- und Rechtsanwälte PartG mbB
Leopoldstr. 4          Tel.  +49 (0) 89 21 23 50      Amtsgericht: München        Deutsche Bank München
80802 München        Fax  +49 (0) 89 22 02 87        Partnerschaftsregister:      SWIFT / BIC-code: DEUT DE MM
Germany                Mail  info@grunecker.de        PR 1397                        IBAN: DE47 7007 0010 0175 173400

' auch/also: Mediator  ' auch/also: Agente de la Propiedad Industrial (España)  ² auch/also: Consulente in Brevetti (Italia)
' auch/also: UK Patent Attorney  ' Professor an der Fachhochschule für angewandtes Management
' auch/also: Attorney-at-Law, New York  ' in Kooperation/in cooperation

2

und die

**BMW Bank GmbH,** Heidemannstr. 164, 80939 München, gesetzlich vertreten durch die Geschäftsführer Hans-Jürgen Cohrs (Vorsitzender), Hans-Peter Mathe, Markus Walch und Thomas Weber

- **Beklagte zu 2) -**

wegen: Patentverletzung
Streitwert: EUR 1.000.000,00 (vorläufige Schätzung)

Wir zeigen an, dass die im Rubrum aufgeführten Rechtsanwälte die Klägerin vertreten und die Patentanwälte der Grünecker Patent- und Rechtsanwälte PartG mbB als Patentanwälte auf Seiten der Klägerin mitwirken.

Namens und im Auftrag der Klägerin erheben wir

**Klage**

und kündigen die folgenden

**Anträge**

an:

Die Beklagten werden verurteilt,

I.    es bei Meldung eines für jeden Fall der Zuwiderhandlung fälligen Ordnungs-
      geldes von bis zu EUR 250.000,00, ersatzweise Ordnungshaft bis zu sechs
      Monaten, oder Ordnungshaft bis zu sechs Monaten, im Wiederholungsfalle
      Ordnungshaft bis zu zwei Jahren, bei den Beklagten zu vollstrecken an ihren
      jeweiligen Vorständen bzw. Geschäftsführern, zu unterlassen

      a)   Systeme zur Verarbeitung von Texturen für eine Grafikabbildung auf einer
           Anzeige, wobei die Grafikabbildung ein Objekt umfasst, das Objekt eine
           Mehrzahl von Fragmenten umfasst und das System beinhaltet:

      -    eine Mehrzahl von Texturprozessoren zur Verarbeitung eines Teils der
           Mehrzahl der Fragmente;

97/129

3

in der Bundesrepublik Deutschland anzubieten, in Verkehr zu bringen, zu gebrauchen, und/oder zu den vorgenannten Zwecken einzuführen oder zu besitzen, wenn

- das System einen Speicher zum Speichern eines Teils eines Programms zur Verarbeitung einer Mehrzahl von Texturabschnitten für die Mehrzahl der Fragmente aufweist;

- wobei der Abschnitt des Programms eine Mehrzahl von Anweisungen umfasst;

- wobei die Mehrzahl der Texturprozessoren mit dem Speicher gekoppelt ist, und

- jeder der Mehrzahl der Texturprozessoren zur Verarbeitung eines Teils der Mehrzahl der Texturabschnitte für ein Fragment der Mehrzahl der Fragmente gemäß dem Programm eingerichtet ist,

- wobei die Mehrzahl der Texturprozessoren in der Lage ist, einen zweiten Abschnitt der Mehrzahl der Texturabschnitte parallel zu verarbeiten, und

- die Mehrzahl der Texturprozessoren ein Abschnitt der Mehrzahl der Anweisungen implementiert.

(Anspruch 1 von EP 1 177 531/ DE 600 07 521)

insbesondere sofern diese in Automobilen der Beklagten zu 1) verbaut sind;

und / oder

b)   Systeme zur Verarbeitung von Texturen für eine Grafikabbildung auf einer Anzeige, wobei jedes System eine Mehrzahl von Texturprozessoren aufweist,

welche dazu geeignet sind,

ein Verarbeitungsverfahren durchzuführen, bei dem

4

- das Grafikabbild ein Objekt beinhaltet, das Objekt eine Mehrzahl von Fragmenten beinhaltet,

- die Mehrzahl von Texturprozessoren zur Verarbeitung eines Teils der Mehrzahl der Fragmente umfasst, und

- das Verfahren durch die Mehrzahl der folgenden Schritte gekennzeichnet ist:

  • Liefern einer Mehrzahl von Texturabschnitten für die Mehrzahl von Fragmenten an eine Mehrzahl von Texturprozessoren

    und

  • paralleles Verarbeiten der Mehrzahl von Texturabschnitten in der Mehrzahl von Texturprozessoren auf der Grundlage von wenigstens einem Programm, wobei das wenigstens eine Programm eine Mehrzahl von Anweisungen aufweist, die Mehrzahl von Texturprozessoren einen Abschnitt der Mehrzahl der Anweisungen implementiert und wenigstens ein Programm auf diese Weise das Verarbeiten der Mehrzahl der Texturabschnitte mittels der Mehrzahl der Texturprozessoren steuert

    (Anspruch 8 von EP 1 177 531 / DE 600 07 521)

  Abnehmern im Gebiet der Bundesrepublik Deutschland anzubieten und / oder an solche zu liefern,

  insbesondere sofern diese in Automobilen der Beklagten zu 1) verbaut sind;

II.   der Klägerin in einem geordneten – auch elektronischen – Verzeichnis darüber Auskunft zu erteilen, in welchem Umfang die Beklagten die zu Ziffer I. bezeichneten Handlungen seit dem 02.02.2004 begangen haben, und zwar unter Angabe

5

a) der Namen und Anschriften der Hersteller, Lieferanten und anderer Vorbesitzer,

b) der Namen und Anschriften der gewerblichen Abnehmer sowie der Verkaufsstellen für die die Erzeugnisse bestimmt waren,

c) der Menge der ausgelieferten, erhaltenen und/oder bestellten Erzeugnisse sowie der Preise, die für die betreffenden Erzeugnisse bezahlt wurden;

wobei zum Nachweis der Angaben die entsprechenden Kaufbelege (nämlich Rechnungen, hilfsweise Lieferscheine) in Kopie vorzulegen sind, wobei geheimhaltungsbedürftige Details außerhalb der auskunftspflichtigen Daten geschwärzt werden dürfen;

III. der Klägerin in einem geordneten – auch elektronischen – Verzeichnis darüber Rechnung zu legen, in welchem Umfang die Beklagten die zu Ziffer I. bezeichneten Handlungen seit dem 02.02.2004 begangen haben, und zwar unter Angabe

a) der einzelnen Lieferungen, aufgeschlüsselt nach Liefermengen, -zeiten, -preisen und Typenbezeichnungen sowie Namen und Anschriften der gewerblichen Abnehmer,

b) der einzelnen Angebote, aufgeschlüsselt nach Angebotsmengen, -zeiten, -preisen und Typenbezeichnungen sowie den Namen und Anschriften der gewerblichen Angebotsempfänger,

c) der betriebenen Werbung, aufgeschlüsselt nach Werbeträgern, deren Auflagenhöhe, Verbreitungszeitraum und Verbreitungsgebiet,

d) der nach den einzelnen Kostenfaktoren aufgeschlüsselten Gestehungskosten und des erzielten Gewinns,

wobei den Beklagten vorbehalten bleibt, die Namen und Anschriften der nicht gewerblichen Abnehmer und der Angebotsempfänger statt der Klägerin einem

6

von der Klägerin zu bezeichnenden, ihr gegenüber zur Verschwiegenheit verpflichteten, in der Bundesrepublik Deutschland ansässigen, vereidigten Wirtschaftsprüfer mitzuteilen, sofern die Beklagten dessen Kosten tragen und ihn ermächtigen und verpflichten, der Klägerin auf konkrete Anfrage mitzuteilen, ob ein bestimmter Abnehmer oder Angebotsempfänger in der Aufstellung enthalten ist;

IV.   die im unmittelbaren oder mittelbaren Besitz oder Eigentum der Beklagten befindlichen, unter I. bezeichneten Erzeugnisse an einen von der Klägerin zu benennenden Gerichtsvollzieher zum Zwecke der Vernichtung auf Kosten der Beklagten herauszugeben;

V.   die vorstehend zu Ziffer I. bezeichneten, seit dem 30.04.2006 im Besitz Dritter befindlichen Erzeugnisse aus den Vertriebswegen zurückzurufen, indem diejenigen Dritten, denen durch die Beklagten oder mit deren Zustimmung Besitz an den Erzeugnissen eingeräumt wurde, unter Hinweis darauf, dass die Kammer mit dem hiesigen Urteil auf eine Verletzung des Klagepatents erkannt hat, ernsthaft aufgefordert werden, die Erzeugnisse an die Beklagten zurückzugeben, und den Dritten für den Fall der Rückgabe der Erzeugnisse eine Rückzahlung des gegebenenfalls bereits gezahlten Kaufpreises sowie die Übernahme der Kosten der Rückgabe zugesagt wird;

Weiter werden wir beantragen:

VI.   festzustellen, dass die Beklagten verpflichtet sind, der Klägerin allen Schaden zu ersetzen, der ihr durch die zu Ziffer I. bezeichneten, seit dem 02.02.2004 begangenen Handlungen entstanden ist und noch entstehen wird;

VII.   den Beklagten die Kosten aufzuerlegen;

VIII.   für jeden zuerkannten Anspruch Teilsicherheiten festzusetzen, und zwar wie folgt:

-   für den Anspruch auf Unterlassung (Ziffer I.) wird die Sicherheitsleistung auf EUR 800.000,00 festgesetzt.

-   für die Ansprüche auf Rückruf / Entfernung und Vernichtung (Ziffern IV.

7

und V.) ist eine weitere Teilsicherheit von EUR 50.000,00 zu leisten.

- für die Ansprüche auf Auskunft / Rechnungslegung (Ziffern II. und III.) wird die Sicherheitsleistung auf EUR 50.000,00 festgesetzt.

- für die Kosten bzw. den Schadensersatz (Ziffern VI. und VII.) wird die Sicherheitsleistung auf 120 % des jeweils zu vollstreckenden Betrages festgesetzt.

8

## Begründung:

## I.

## Parteien und Schutzrechtslage

1.     Die Klägerin ist ein weltweit führendes Unternehmen auf dem Gebiet der Halbleiter-technologie und hält Patente auf diesem Gebiet.

2.     Die Beklagte zu 1) ist ein gerichtsbekannter deutscher Automobilkonzern.

3.     Die Beklagte zu 2) vermietet (verleast) Autos der Beklagten zu 1).

## II.

## Das Klagepatent

1.     **Formalia**

Die Klägerin ist Inhaberin des auf die Anmeldung vom 02.05.2000 erteilten europäi-schen Patents EP 1 177 531 B1, das u. a. auch mit Wirkung für die Bundesrepublik Deutschland erteilt wurde und beim Deutschen Patentamt unter der Nummer DE 600 07 521 geführt wird (nachstehend: **Klagepatent**).

Das Klagepatent nimmt die Priorität US-Patentanmeldung Nr. 09/306,877 vom 07.05.1999 in Anspruch und steht in Kraft. Die Anmeldung wurde am 16.02.2002, der Hinweis auf die Patenterteilung am 02.01.2004 veröffentlicht.

Wir legen eine Kopie des Klagepatents als

- Anlage K 1 -

sowie der deutschen Übersetzung – veröffentlicht als DE 600 07 521 T2 –als

- Anlage K 2 -

und einen Registerauszug mit Status als

**- Anlage K3 -**

vor. Verweise auf Bezugsstellen in den folgenden Ausführungen beziehen sich auf die DE 600 07 521 T2, sofern nicht anders angegeben.

**2.   Technischer Hintergrund**

Das Klagepatent betrifft ein System und ein Verfahren zum Verarbeiten von Texturen einer Grafikabbildung (Klagepatent, Absatz [0001]).

Herkömmliche Computergrafiksysteme stellen grafische Bilder von Objekten auf einer Anzeige bzw. einem Display dar. Das Display umfasst eine Mehrzahl von Displayelementen, sogenannten Pixeln, die üblicherweise in einem Gitter angeordnet sind. Ein Pixel ist die kleinste darstellbare Einheit auf einem Display. Um Objekte anzuzeigen, unterteilt ein herkömmliches Grafiksystem jedes Objekt in eine Mehrzahl von Polygonen (Vielecken, häufig Dreiecken), die dann in einer bestimmten Reihenfolge wiedergegeben („gerendert") werden (Klagepatent, Absatz [0003]).

Die Polygonunterteilung wird anhand nachfolgend eingeblendeter Figur gezeigt:



**Figure 3 Triangle Mesh on a three dimensional image**

Jedes Polygon, gelegt über ein Gitter aus Pixeln, überdeckt oder schneidet eine Anzahl von Pixeln. Die überdeckten bzw. geschnittenen Pixel werden dem Polygon zugeordnet und als „Fragment" bezeichnet. Jedes Polygon umfasst typischerweise

mehrere Fragmente. Jedes Fragment enthält Daten zum Polygon für den Pixel, den das Fragment überdeckt bzw. schneidet. Die Daten betreffen typischerweise die Farbe, Mischungsmodus („blending mode") und Textur.

Zur schnelleren Orientierung der Kammer blenden wir nachfolgende Darstellung ein:



Polygon

Pixelgitter

vom Polygon
geschnittener
Pixel

vom Polygon
überdeckter
Pixel

"Fragment"
(mit Daten
wie Farbe
und Textur)

Um ein Fragment darzustellen (zu „rendern"), muss das Grafikverarbeitungssystem Farbe und Textur für das Fragment verarbeiten (Klagepatent, Absatz [0004]). Dies geschieht beispielsweise durch ein Mischen der Farbe und der Textur, um einen endgültigen Farbwert für das Fragment an dem entsprechenden Pixel zu erhalten (Klagepatent, Absatz [0005]).

Für den englischen Begriff „texture" im Original des Klagepatents verwendet die T2-Schrift den Begriff „Struktur", was in diesem Zusammenhang gleichbedeutend mit „Textur" ist. Beide Begriffe meinen dasselbe: Strukturen/Texturen bezeichnen eine

11

Art Überzug eines 3D-Modells eines Objekts, der dem Objekt gewissermaßen eine „Oberflächenstruktur" verleiht (daher die deutsche Übersetzung). Abweichend von der T2-Schrift wird hier – in stärkerer Anlehnung an die Wortwahl im englischen Original – der Begriff „Textur" verwendet.

Eine Textur kann man sich auch als eine andere Farbe vorstellen, die typischerweise aus einer Texturabbildung oder Texturkarte („texture map") abgeleitet wird (Klagepatent, Absatz [0005]). Zur Veranschaulichung blenden wir nachfolgend ein Beispielbild für ein 3D-Modell mit darauf gelegter Textur sowie der zugehörigen Texturkarte ein, die dem Eintrag „Textur (Computergrafik)" aus der Online-Enzyklopädie „Wikipedia" entstammt (https://de.wikipedia.org/wiki/Textur_(Computergrafik)):



Die linke Abbildung zeigt das texturierte bzw. strukturierte 3-D Modell während die rechte Abbildung die entsprechende Texturkarte („texture map") wiedergibt.

Im Rahmen des Klagepatents geht es grundsätzlich darum, den Fragmenten eines abzubildenden Objektes entsprechende Texturwerte zuzuordnen. Ein Objekt wird letztlich auf einer Anzeigevorrichtung dargestellt, die eine Mehrzahl von Pixeln aufweist. Deshalb ist es zum Zwecke der Darstellung erforderlich, die Daten eines Fragments so zu verarbeiten (verrechnen), dass daraus ein Farbwert für den jeweiligen Pixel der Anzeigevorrichtung erhalten wird.

13

che Mischoperationen auf einfache Weise verwirklicht werden. Aufgrund der Verarbeitung auf <u>parallelen</u> Texturprozessoren kann außerdem gewährleistet werden, dass die Leistung nicht nachteilig beeinflusst wird (vgl. Absätze [0048] und [063] des Klagepatents).

In Form einer **Merkmalsanalyse** lässt sich der Hauptanspruch 1 des Klagepatents wie folgt darstellen:

1.      System zur Verarbeitung von Texturen für eine Grafikabbildung auf einer Anzeige, wobei die Grafikabbildung ein Objekt umfasst und das Objekt eine Mehrzahl von Fragmenten umfasst, und das System beinhaltet:

1.1     eine Mehrzahl von Texturprozessoren zur Verarbeitung eines Teils der Mehrzahl der Fragmente;

                                        - Oberbegriff -

1.2     einen Speicher zum Speichern eines Teils eines Programms zur Verarbeitung einer Mehrzahl von Texturabschnitten für die Mehrzahl der Fragmente;

1.3     wobei der Abschnitt des Programms eine Mehrzahl von Anweisungen umfasst;

1.4     wobei die Mehrzahl der Texturprozessoren mit dem Speicher gekoppelt ist; und

1.5     jeder der Mehrzahl der Texturprozessoren zur Verarbeitung eines Teils der Mehrzahl der Texturabschnitte für ein Fragment der Mehrzahl der Fragmente gemäß dem Programm eingerichtet ist,

1.6     wobei die Mehrzahl der Texturprozessoren in der Lage ist, einen zweiten Abschnitt der Mehrzahl der Texturabschnitte parallel zu verarbeiten und

1.7     die Mehrzahl der Texturprozessoren einen Abschnitt der Mehrzahl der Anweisungen implementiert.

                                        - Kennzeichen -

12

Aus dem Stand der Technik bekannte Texturverarbeitungseinheiten werden im Klagepatent in Zusammenhang mit den Figuren 2 bis 5 erläutert. Hier werden die einzelnen Fragmente eines Objekts seriell verarbeitet. Auch eine sogenannte mehrfache Texturabbildung ist möglich, indem entweder mehrere herkömmliche Texturmischeinheiten hintereinander geschaltet werden (Figur 3) oder das Ergebnis der Texturmischung so lange wieder zurück an die Texturmischeinheit geführt wird, bis das gewünschte Ergebnis erzielt wurde (Figur 4). Die herkömmlichen Texturmischeinheiten stehen jeweils mit einer Texturkarte/-abbildung in Verbindung und implementieren eine vorgegebene Mischoperation (vgl. Absatz [0031] des Klagepatents).

Das Klagepatent kritisiert an solchen und ähnlichen herkömmlichen Grafiksystemen, dass sie entweder in ihrer Funktion zu beschränkt und zu unflexibel sind, oder aber einen komplexen Aufbau erfordern (siehe Absatz [0008] des Klagepatents). Dies liegt daran, dass sowohl mehrere Fragmente als auch mehrere Texturen nur hintereinander abgearbeitet werden können und die Texturmischeinheiten speziell auf bestimmte Mischoperationen ausgebildet werden müssen.

## 3.   Aufgabe und Lösung

Vor diesem Hintergrund stellt sich die Erfindung die **Aufgabe**, ein System und ein Verfahren bereitzustellen, das einen

> *„adaptierbaren Mechanismus zum Bereitstellen einer Texturverarbeitung ohne nachteilige Auswirkung auf die Leistung des Systems"* (Absatz [0009] des Klagepatents)

ermöglicht.

Das Klagepatent löst diese Aufgabe u.a. durch das System gemäß <u>Anspruch 1.</u>

Danach ist eine Mehrzahl von Texturprozessoren vorgesehen, welche Texturabschnitte der Fragmente parallel verarbeiten können, und zwar durch das Implementieren entsprechender Anweisungen eines Programms, welches in einem Speicher hinterlegt ist. Dadurch, dass zur Bearbeitung der Texturen der Fragmente auf ein in einem Speicher <u>hinterlegtes Programm</u> zurückgegriffen wird, können unterschiedli-

14

Eine Leseabschrift dieser Merkmalsanalyse überreichen wir als

- Anlage K4-.

4.    **Erläuterung des Gegenstands des Anspruchs 1**

Fachmann ist ein Informatiker mit Universitäts- oder Fachhochschulabschluss, der mit Computergrafiksystemen sowie den zur Generierung grafischer Bilder auf Bildschirmen erforderlichen Verfahren vertraut ist, mit mehreren Jahren Erfahrung auf diesem technischen Gebiet.

Die Erfindung lässt sich anhand der Figur 7 des Klagepatents erläutern, die wir nachstehend einblenden:



Figur 7

Die Figur zeigt ein System zur Verarbeitung von Texturen für eine Grafikabbildung auf einer Anzeige einer Mehrzahl von Texturprozessoren („Strukturprozessoren") 154-1, 154-2 bis 154-k **(Merkmal 1.1)**, die über einen Verteiler 152 mit einem Speicher 156 verbunden sind. Üblicherweise wird ein solches System als Teil eines Grafikprozessors verwirklicht (vgl. Bilderzeugungseinheit 120 in Figur 6 des Klagepatents). Das darzustellende Objekt wird, wie oben erwähnt, aus einer Vielzahl von Fragmenten gebildet **(Merkmal 1.)**.

Der in Figur 7 erkennbare Speicher 156 ist dafür vorgesehen, wenigstens einen Teil eines Programmes zu speichern. Das Programm dient der Verarbeitung einer Mehrzahl von Texturabschnitten für die Mehrzahl der Fragmente (Merkmal 1.2).

Unter einem „Texturabschnitt" versteht das Klagepatent dabei einen Teil einer Textur, der einem Fragment zugeordnet ist. Im Englischen verwendet das Klagepatent den Begriff „texture portion". Solch ein Texturabschnitt kann auch als „Elementarmuster" oder „Texel" bezeichnet werden (vgl. Absatz [0005] des Klagepatents).

Der wenigstens eine Teil des Programms umfasst mehrere Anweisungen, beispielsweise zum Einlesen von Daten, zum Verarbeiten der Daten und zur Ausgabe der verarbeiteten Daten (Merkmal 1.3).

Damit die Mehrzahl der Texturprozessoren wenigstens einen Abschnitt der Mehrzahl der Anweisungen implementieren kann, sind diese mit dem Speicher gekoppelt (Merkmal 1.4).

Anspruchsgemäß ist des Weiteren vorgesehen, dass mit jedem der Texturprozessoren wenigstens ein Teil der Texturabschnitte für ein gegebenes Fragment verarbeitet werden kann (Merkmal 1.5). Außerdem sollen die Texturprozessoren in der Lage sein, einen zweiten Abschnitt der Mehrzahl der Texturabschnitte parallel zu verarbeiten (Merkmal 1.6). Durch Rückgriff auf Teile des gespeicherten Programms implementiert die Mehrzahl der Texturprozessoren einen Abschnitt der Mehrzahl der Anweisungen.

Wie in Abschnitt [0032] mit Blick auf das Ausführungsbeispiel gem. Figur 7 des Klagepatents ausgeführt wird, kann ein Texturprozessor bevorzugt die gesamte Texturverarbeitung für ein bestimmtes Fragment durchführen. Alternativ kann aber auch nur ein Teil der Texturverarbeitung für ein Fragment durch einen Texturprozessor durchgeführt werden. Der verbleibende Teil der Texturverarbeitung für das eine Fragment kann dann von einem der anderen Texturprozessoren bereitgestellt werden:

> „The distributor 152 distributes fragments to the texture processors 154-1 through 154-k for texture processing. The texture processors 154-1 through 154-k can, therefore, process k fragments in parallel. In a preferred embodiment, a texture processors 154-1 through 154-k performs all of the texture processing for a particular fragment. However, in an alternate embodiment, a texture processor 154-1 through 154-k may perform only a portion of the texture

*processing for a fragment. The remainder of the texture processing may be provided by another one of the texture processors 154-1 through 154-k".*

(Unterstreichung diesseits)

Übersetzt:

*„Der Verteiler 152 verteilt Fragmente auf die Strukturprozessoren 154-1 bis 154-k zur Strukturverarbeitung. Die Strukturprozessoren 154-1 bis 154-k können daher k Fragmente prallel verarbeiten. In einem bevorzugten Ausführungsbeispiel führt ein Strukturprozessor 154-1 bis 154-k die gesamte Struktuverarbeitung für ein bestimmtes Fragment durch. In einem alternativen Ausführungsbeispiel jedoch kann ein Strukturprozessor 154-1 bis 154-k nur einen Teil der Strukturverarbeitung für ein Fragment durchführen. Der verbleibende Teil der Strukturverarbeitung kann von einem anderen Strukturprozessor 154-1 bis 154-k bereitgestellt werden."*

(Unterstreichung und Auslassung diesseits)

Es können mit Hilfe der Texturprozessoren also sowohl mehrere Fragmente jeweils in Gänze parallel als auch mehrerer Texturabschnitte eines gegebenen Fragments parallel verarbeitet werden.

Zusammenfassend erlaubt es das geschützte System also, mehrere Texturabschnitte parallel zu verarbeiten, indem es Sätze von Anweisungen aus einem Speicher parallel ausführt. Das Programm teilt den Prozessoren die entsprechenden Anweisungen zur Verarbeitung der Fragmente zu, und die Prozessoren implementieren entsprechend diese Anweisungen.

**5.   Verfahrensanspruch 8**

Das Klagepatent löst die vorgenannte Aufgabe auch durch das Verfahren gemäß Anspruch 8. Anspruch 8 lautet in Form einer Merkmalsanalyse wie folgt:

8.   Ein Verfahren zur Texturverarbeitung für eine Grafikabbildung auf einer Anzeige, wobei das Grafikabbild ein Objekt beinhaltet und das Objekt eine Mehrzahl von Fragmenten beinhaltet;

8.1   Das System umfasst eine Mehrzahl von Texturprozessoren zur Verarbeitung eines Teils der Mehrzahl der Fragmente und das Verfahren ist durch die Mehrzahl der Schritte gekennzeichnet:

8.2    (a) Bereitstellen einer Mehrzahl von Texturabschnitten für die Mehrzahl von Fragmenten an eine Mehrzahl von Texturprozessoren;

8.3    (b) paralleles Verarbeiten der Mehrzahl von Texturabschnitten in der Mehrzahl von Texturprozessoren auf der Grundlage von wenigstens einem Programm;

    8.3.1    das wenigstens eine Programm weist eine Mehrzahl von Anweisungen auf;

    8.3.2    die Mehrzahl von Texturprozessoren implementiert einen Abschnitt der Mehrzahl der Anweisungen;

    8.3.3    wenigstens ein Programm steuert auf diese Weise das Verarbeiten der Mehrzahl der Texturabschnitte mittels der Mehrzahl der Texturprozessoren.

Eine Leseabschrift dieser Merkmalsanalyse überreichen wir als

**- Anlage K 5 -.**

Der Verfahrensanspruch ist vor dem Hintergrund der Erläuterungen zum Systemanspruch aus sich heraus verständlich. Im Vergleich zum Systemanspruch sei hervorgehoben:

-    In Merkmal 8.3 (b) fehlt die Bezugnahme auf Texturabschnitte „für ein Fragment", wie sie sich in Merkmal 1.5 findet.

-    Der Verfahrensanspruch lässt zudem (in Merkmalen 8.3.1 und 8.3.3) offen, ob und ggf. wo das Programm gespeichert ist. Bestimmungen wie in Merkmal 1.2 (wonach ein „Speicher" zur Aufnahme des Programms vorgesehen ist) und Merkmal 1.4 (wonach der Speicher mit dem Texturprozessor gekoppelt wird) fehlen.

18

### III.
### Beschaffenheit der angegriffenen Ausführungsformen und Patentverletzung

**1.    Angegriffene Ausführungsformen**

Die Beklagten verletzen Ansprüche 1 und 8 des Klagepatents. Lediglich beispielhaft und ohne Beschränkung hierauf verweisen wir auf die im X1, der 1er-Reihe und der 5er-Reihe zur Anwendung kommende Infotainment-Systeme mit Navigationssystem und Display. Die Infotainment-Systeme werden ohne Zustimmung der Klägerin in der Bundesrepublik Deutschland angeboten und in Verkehr gebracht.

Die Infotainment-Systeme werden nur exemplarisch gewählt. Die Erfindung mag auch in anderen Systemen der Beklagten verwendet werden.

Beispielhaft greifen wir zwei Ausführungsformen heraus, die folgende Chips verwenden:

- **Ausführungsform I: Texas Instruments DRA746 mit PowerVR SGX544 - dual core**

- **Ausführungsform II: Texas Instruments OMAP5432 mit PowerVR SGX544 - dual core**

Kernstück beider Ausführungsformen ist der auf dem jeweiligen Texas Instruments-Chip verbaute Grafikprozessor („Graphical Processing Unit", kurz: „GPU") **„PowerVR SGX544 - dual core"**, weshalb wir die Verletzung **gemeinsam** für beide Ausführungs-formen gemeinsam abhandeln, und zwar am Beispiel der **Ausführungsform I**, ver-baut im BMW X1:

Beispielhaft blenden wir eine Abbildung des Navigationsdisplays im BMW X1 ein:



Nachfolgende im BMW X1 verbaute Headunit mit darauf angebrachter Produktions-
nummer und weiteren - vorliegend nicht interessierenden - technischen Angaben



wurde von der Klägerin untersucht, und Folgendes konnte festgestellt werden:

Im Inneren der Headunit befindet sich u.a. ein Board mit einem „JACINTO"-Prozessor der Serie „DRA746" des Herstellers Texas Instruments:



Den Chip blenden wir nachfolgend vergrößert noch einmal ein:

22



In der BMW 5er-Reihe wird ein anderer Texas Instruments-Chip, nämlich ein „OMAP5432" (**Ausführungsform II**), eingebaut und verwendet. Dieses Navigationssystem gemäß Ausführungsform II bietet die Beklagte zu 1) unter Hinweis auf

„3D-Darstellung, [...] 3D Landmarks mit Gebäuden in Realdarstellung"

an.

Teil der beiden vorgenannten Texas Instruments-Chips ist stets die GPU „PowerVR SGX544 - dual core". Die GPU hat zwei Kerne („cores"), weshalb sie den Zusatz „Dual Core" trägt. Die PowerVR-GPU stammt von Imagination Technologies.

Den Aufbau eines Texas Instruments-Chips der Serie „DRA74x" (Ausführungsform I) (Hinweis: Das „x" ist ein Platzhalter, somit fällt der „DRA746" hierunter), auf dem die vorerwähnte GPU verbaut ist, blenden wir nachfolgend ein. Die besonders interessierende GPU ist farblich hervorgehoben.



Auch im „OMAP5432" (Ausführungsform II) kommt diese GPU zum Einsatz.

Den näheren Aufbau der GPU zeigt die von der Herstellerin Imagination Technologies stammende und nachfolgend eingeblendete Abbildung. Hervorzuheben ist die (grün umrandete) „Universal Scalable Shader Engine 2", die mehrere (rot umrandete) „Multi-Threaded Execution Units" enthält:



**Unified Scalable Shader Engine 2 (USSE2) mit Multi-Threaded Execution Units**

Nähere Hinweise auf die Funktionsweise der PowerVR-GPU ergeben sich aus dem als

**- Anlage K 6 -**

auszugsweise überreichten „Technical Reference Manual" von Texas Instruments für den „DRA75x" und „DRA74x" sowie dem „Architecture Guide for Developers" für die „PowerVR Series5" des Herstellers Imagination Technologies, überreicht als

**- Anlage K 7-,**

sowie ein Übersichtsblatt zur „PowerVR SGX Series 5XP",

**- Anlage K 8 -.**

25

**2.    Verletzung**

**2.1   Anspruch 1**

  **i)    Merkmal 1:**

Aus den Untersuchungen der Klägerin ergibt sich im Einzelnen Folgendes:

Die GPU ist zweifelsfrei ein System zur Verarbeitung von Texturen für eine Grafikabbildung auf einer Anzeige (dem Display des Autos). Die Beklagte zu 1) selbst spricht von „Realdarstellung", was die Wiedergabe von Texturen voraussetzt. Die Grafikabbildung umfasst ein Objekt, und das Objekt umfasst eine Mehrzahl von Fragmenten.

**Merkmal 1.** ist daher verwirklicht.

  **ii)   Merkmal 1.1:**

Die oben eingeblendeten USSE2 werden im „Technical Reference Manual" (s. S. 371 unter Ziffer 1.3.9 der **Anlage K 6**) beschrieben als

> „*Second-generation universal scalable shader engines (USSE2), <u>multithreaded engines</u> incorporating <u>pixel</u> and <u>vertex shader functionality</u>*"

sowie auf S. 3710 unter Ziffer 12.1.1 der **Anlage K 6**:

> "*Universal Scalable Shader Engine (USSE<sup>TM</sup>):*
> *- <u>Multithreaded engine</u> incorporating vertex and pixel <u>shader functionality</u>*
> *- Automatic load balancing of vertex and pixel processing tasks*"

Die USSE2 mit darin enthaltenen „multithreaded engines" sind patentgemäße Texturprozessoren. Die den „multithreaded engines" zugewiesene „pixel shader functionality" belegt die in der USSE2 ausgeführte Texturverarbeitung für einen Teil der Fragmente. Dies ergibt sich z.B. aus dem Wikipedia-Eintrag für „Shader", überreicht als

- Anlage K 9 -

26

Dort wird den „Shadern" bzw. "Pixel-Shadern" die Funktion der Texturverarbeitung für jedes Fragment zugewiesen, wenn es heißt:

- "Shaders replace a section of the graphics hardware typically called the Fixed Function Pipeline (FFP), so-called because it performs lighting and texture mapping in a hard-coded manner. Shaders provide a programmable alternative to this hard-coded approach."

  (Hervorhebung diesseits)

- "2D shaders act on digital images, also called textures in computer graphics work. They modify attributes of pixels. 2D shaders may take part in rendering 3D geometry. Currently the only 2D shader types are pixel shaders."

  (Hervorhebung diesseits)

- „Pixel shaders, also known as fragment shaders, compute color and other attributes of each "fragment"

  (Hervorhebung diesseits)

In Übereinstimmung damit heißt es im Übersichtsblatt **Anlage K 8** (erste Seite, rechte Spalte, Mitte):

„Shader-based architecture enables near photo realistic image quality".

Dazu führt der "Architectural Guide for Developers" (**Anlage K 7**) unter Ziffer 2.5. näher aus:

„Once the iteration has been performed, the TSP can submit groups of visible fragments to the USSE via the CGS to be textured and shaded …."

(Hervorhebung diesseits)

Dies belegt, dass die einzelnen Fragmente in der USSE texturiert werden.

Der GPU wird auch die Zuständigkeit für Bildverarbeitung zugewiesen, s. Übersichtsblatt **Anlage K 8** (erste Seite, rechte Spalte, unten):

27

„Applications: ... • In-car navigation and information"

Damit ist **Merkmal 1.1** verwirklicht.

iii)   **Merkmal 1.2:**

Die GPU unterstützt die Standards „OpenGL ES 2.0" (vgl. „Architectural Guide for Developers", **Anlage K 7**, S. 10, unter 2.5. am Ende) sowie "OpenCL 1.1" (vgl. Technical Reference Manual, **Anlage K 6**, S. 371 unter 1.3.9). Die USSE2-Einheiten sind ausweislich der **Anlage K 8** (zweite Seite, linke Spalte, zweiter Absatz) programmierbar.

Da die USSE2 „programmierbar" sind, ist implizit auch ein Speicher zum Speichern eines Teils eines Programms zur Verarbeitung einer Mehrzahl von Fragmenten vorhanden.

**Merkmal 1.2** ist somit ebenfalls verwirklicht.

iv)   **Merkmal 1.3:**

Jedes Programm enthält zwangsläufig eine Mehrzahl von Anweisungen, was sich auch unmittelbar aus Anlage K 8 (zweite Seite, linke Spalte, zweiter Absatz) ergibt. **Merkmal 1.3** ist somit verwirklicht.

v)   **Merkmal 1.4:**

Auch eine Kopplung der USSE2 mit dem Speicher ist implizit Voraussetzung. **Merkmal 1.4** ist somit verwirklicht.

vi)   **Merkmale 1.5 und 1.6:**

Nachfolgend blenden wir einen Auszug aus dem „Architectural Guide for Developers", **Anlage K 7**, S. 11 ein.

28



Figure 12. SGX-MP example tile distribution

Danach wird das darzustellende Objekt (vorliegend: Segelschiff auf Wasser vor Insel) in einer Anzahl von Kacheln (jeweils enthaltend Fragmente) aufgeteilt, die dann jeweils individuell und parallel zu anderen Kacheln (enthaltend Fragmente) verarbeitet werden. Dies belegt der Hinweis:

„During the rasterization, texturing and shading process, each additional graphics core allows another tile to be processed in parallel, as shown in Figure 12."

(aus **Anlage K 7,** S. 11, 2.7., 4. Absatz)

Hier werden also mehreren jeweils Kacheln (mit Fragmenten) zur parallelen Texturverarbeitung zugewiesen. Dabei wird auch, a.a.O., die Textur und das Shading ausdrücklich erwähnt:

„A tile task submitted to a graphics core includes HSR, texturing and shading."

(Hervorhebung diesseits)

123/129

Diese Art der Verarbeitung wird als besonders effizient beschrieben (a.a.O.). In jeder Kachel sind unterschiedliche Fragmente enthalten, die mit unterschiedlichen Texturabschnitten gemischt werden.

Damit ist belegt, dass jeder USSE2 ein Teil der Texturabschnitte für ein Fragment zur Verarbeitung zugewiesen wird, wobei die Verarbeitung parallel erfolgt. Damit sind **Merkmale 1.5 und 1.6** verwirklicht.

### vii) Merkmal 1.7:

Wie oben gezeigt, verarbeitet eine patentverletzende GPU Programmbefehle und Instruktionen in mehreren „Threads" und operiert gemäß einem Programm. Das Programm definiert die Funktionen bzw. die auszuführenden Programmbefehle jedes Threads. Wie ebenfalls oben gezeigt, werden die Kacheln („tiles") und die darin enthaltenen Fragmenten parallel verarbeitet. Folglich implementieren die Texturprozessoren einen Abschnitt der (Mehrzahl der) Anweisungen, womit **Merkmal 1.7** verwirklicht ist.

Die Verletzungsformen machen folglich von sämtlichen Merkmalen des Anspruchs 1 Gebrauch.

Lediglich vorsorglich bieten wir hierfür als

**Beweis:**                Sachverständigengutachten

an.

## 2.2   Anspruch 8

Auch der Verfahrensanspruch 8 ist verwirklicht:

### i) Merkmal 8:

Wie oben gezeigt, erlaubt das in Automobilen der Beklagten zu 1) zum Einsatz kommende Infotainment-System die Texturverarbeitung für eine Grafikabbildung auf eine Anzeige, wobei das Grafikbild ein Objekt beinhaltet und das Objekt eine Mehrzahl von Fragmenten beinhaltet. Wir verweisen vollumfänglich auf unsere Ausführungen unter Ziffer III.2.1i). Damit ist **Merkmal 8** verwirklicht.

- **Merkmal 8.1:**

Auch umfasst, wie oben, Ziffer III.2.1ii), ausgeführt, das System eine Mehrzahl von Texturprozessoren zur Verarbeitung eines Teils der Fragmente, sodass **Merkmal 8.1** verwirklicht ist.

- **Merkmal 8.2:**

Oben, Ziffer III.2.1iii), wurde auch dargelegt, dass jeder Texturprozessor (in Form der USSE, diese enthaltend „Multi-Threaded Execution Units" zur Verarbeitung eines Teils der Mehrzahl der Texturabschnitte für ein Fragment der Mehrzahl der Fragmente gemäß dem Programm eingerichtet ist. Tatsächlich wird die Mehrzahl von Texturabschnitten für die Mehrzahl von Fragmenten der Mehrzahl von Texturprozessoren bereitgestellt. Damit ist **Merkmal 8.2** verwirklicht.

- **Merkmal 8.3:**

Auch erfolgt ein paralleles Verarbeiten der Mehrzahl der Texturabschnitte in der Mehrzahl von Texturprozessoren, wie oben unter Ziffer III.2.1vii) ausgeführt. Damit ist **Merkmal 8.2** verwirklicht.

- **Merkmal 8.3.1:**

Auch weist das Programm eine Mehrzahl von Anweisungen auf, wie bereits oben unter Ziffer III.2.1iv) ausgeführt. Damit ist **Merkmal 8.3.1** verwirklicht.

- **Merkmal 8.3.2:**

Wie ebenfalls oben, Ziffer III.2.1viii), dargestellt, implementiert die Mehrzahl von Texturprozessoren einen Abschnitt der Mehrzahl der Anweisungen. Damit ist **Merkmal 8.3.2** verwirklicht.

- **Merkmal 8.3.3:**

Auch ist (wie bereits oben, Ziffer III.2.1vi) dargestellt), ein (in einem Speicher hinterlegtes) Programm vorhanden, dass das Verarbeiten der Mehrzahl der

31

Texturabschnitte mittels der Mehrzahl der Texturprozessoren steuert. Damit ist Merkmal 8.3.3 verwirklicht.

Höchst vorsorglich für all das vorstehend unter Ziffer III.2.2 dargelegte als

**Beweis:**                Sachverständigengutachten

an.

32

# IV.

## Rechtsausführungen

Der geltend gemachte Unterlassungsanspruch findet seine Grundlage in § 139 Abs. 1 i.V.m. § 9 Satz 2 Nr. 1 PatG. Die Beklagten vertreiben die beispielhaft beschriebenen Systeme, die unter Anspruch 1 des Klagepatents fallen, diesen mithin unmittelbar verletzen. Wiederholungsgefahr ist gegeben. Die Beklagten bieten an und vertreiben die dargestellten Produkte in Deutschland. Die Beklagte zu 2) vertreibt im Wege des Leasing.

Zudem verwirklichen die Beklagten auch Anspruch 8, indem sie Mittel (nämlich die vertriebenen Systeme, verbaut in den Autos der Beklagten zu 1)) anbieten und liefern, die geeignet sind, ein Verfahren gemäß Anspruch 8 auszuführen. Es ist davon auszugehen, dass die Abnehmer der Beklagten diese Systeme auch entsprechend verwenden und entsprechend patentverletzend in Gebrauch nehmen. Dabei ist die Eignung zur patentgemäßen Nutzung der Beklagten auf Grund ihrer Fachkenntnisse im Markt und der Verantwortung für verbaute Komponenten in den Autos bewusst. Für eine patentfreie Benutzung gibt es keine Anzeichen. Im Übrigen ist die Verwendungsbestimmung auch offensichtlich, denn es steht zu erwarten, dass Komponenten in Autos - vorliegend die vorstehend beschriebenen Systeme - auch tatsächlich von den Erwerbern der Autos genutzt werden. Damit wird Anspruch 8 unter dem Aspekt der mittelbaren Patentverletzung (§ 10 PatG) verletzt.

Die Beklagten sind verpflichtet, sich über die maßgeblichen gewerblichen Schutzrechte Dritter zu informieren und diese zu beachten. Damit handeln die Beklagten in jedem Fall fahrlässig.

Darüber hinaus sind die Beklagten zum Schadenersatz verpflichtet, § 139 Abs. 2 PatG. Da eine ausreichende Wahrscheinlichkeit besteht, dass der Klägerin aufgrund der Verletzungshandlungen der Beklagten ein Schaden entstanden ist, hat die Klägerin ein berechtigtes Interesse an einer Feststellung der Schadenersatzpflicht in Bezug auf das Klagepatent. Die Klägerin ist nicht in der Lage, die Beträge zu beziffern, weshalb ihr die ebenfalls geltend gemachten Ansprüche auf Auskunft und Schadenersatz (resultierend aus § 140b Abs. 1 PatG bzw. § 242 BGB) zustehen.

Darüber hinaus steht der Klägerin das Recht zu, den Rückruf und die Entfernung der Verletzungsprodukte aus den Vertriebskanälen zu verlangen, § 140a Abs. 3 PatG.

33

Der geltend gemachte Anspruch auf Vernichtung folgt aus § 140a Abs. 1 PatG.

Schließlich haben die Beklagten gemäß § 140b Abs. 1 PatG die Verpflichtung, der Klägerin Auskunft über Herkunft und Vertriebswege der patentverletzenden Erzeugnisse zu geben.

Die Zuständigkeit des angerufenen Landgerichts Mannheim ergibt sich aus dem Gesichtspunkt bundesweiter Verletzung (§ 32 ZPO) sowie der Tatsache, dass es sich um eine Patentstreitigkeit handelt (§ 143 PatG).

Dr. Bernd Allekotte
 - Rechtsanwalt -

Anlagen
K 1   EP 1 177 531 B1
K 2   DE 600 07 521
K 3   Registerauszug für DE 600 07 521
K 4   Merkmalsanalyse Anspruch 1
K 5   Merkmalsanalyse Anspruch 8
K 6   Technical Reference Manual von Texas Instruments für DRA75x, DRA74x
        (auszugsweise)
K 7   Architectural Guide for Developers von Imagination Technologies
K 8   Übersichtsblatt zur PowerVR SGX Series 5XP
K 9   Wikipedia-Auszug für "Shader"