# Appendix 3

# GRÜNECKER
PATENT- UND RECHTSANWÄLTE

MÜNCHEN
Patentanwälte
European Patent Attorneys
Thomas Schuster
Dr. Klara Goldbach
Martin Aufenanger, LL.M., MM [*]
Dr. Heike Vogelsang-Wenke
Reinhard Knauer
Dietmar Kuhl
Dr. Franz-Josef Zimmer
Bettina K. Reichelt
Dr. Anton K. Pfau
Dr. Udo Weigelt, LL.M.
Rainer Bertram
Jens C. Koch, M.S. (U of PA)
Bernd Rothaemel
Thomas W. Laubenthal, LL.M.
Dr. Andreas Kayser
Dr. Jens Hammer
Dr. Thomas Eickelkamp
Dr. Peter Miltényi [*]
Dr. Moritz Höffe, LL.M.
Gero Maatz-Jansen
Michael Herse
Christian Messinger
Dr. Martin Ahr
Dr. Wolfgang Neubeck
Steven M. Zeman, Ph.D.
André Nickel
Felix Kahr
Dr. Alexander Stunvoll, LL.M.
Dr. Stefano Marchini [*]
Dr. Thomas Kronberger
Yilin Jin
Dr. Georg Seitenberger
Dr. Olivia Nemethova, LL.M.
Dr. Rainer Plaggenborg
Victor Lopes Aguiar
Dr. Sabine Koch
Wolfram Thomas
Dr. Markus Grammel
Dr. Jegannath Korukottu [*]

Rechtsanwälte
Attorneys-at-Law
Dr. Ulrich Blumenröder, LL.M.
Prof. Dr. Maximilian Kinkeldey, LL.M. [*]
Dr. Karsten Brandt
Anja Franke, LL.M.
Ute Stephani
Dr. Bernd Allekotte, LL.M. [*]
Dr. Elvira Bertram, LL.M.
Babett Erfle
Christine Neuhierl
Sabine Brandstätter
Cornelia Schmitt
Petra Lübbe
Dr. Holger Gauss
Dr. Nicolas Schmitz
Manna Schlumberger
Kirsten Hammerstingl
Sebastian Clotten, LL.M.
Jennifer Rosenhäger, LL.M.
Mark Peters, LL.M.
Dr. Nicola Busch
Julia Bittner, LL.M.
Sebastian Ochs
Philipp Strommer
Jan Rether
Karin Lochner
Swetlana Frese

BERLIN
Patentanwälte
European Patent Attorneys
Dr. Patrick P. Erk, M.S. (MIT)
Tino Rumpold

KÖLN
Patentanwälte
European Patent Attorneys
Dr. Martin Dropmann

PARIS [*]
Conseil en Propriété Industrielle
European Patent Attorney
Dr. Wolfgang Neubeck

OF COUNSEL
Patentanwälte
European Patent Attorneys
Gottfried Klitzsch
Rechtsanwälte
Attorneys-at-Law
Dr. Helmut Eichmann
Gerhard Barth

Grünecker PartG mbB   Leopoldstr. 4   80802 München   Germany

**Per beA**

Landgericht Mannheim
- Patentstreitkammer -
A1,1
68159 Mannheim

| Ihr Zeichen / Your Ref. | Unser Zeichen / Our Ref | Datum / Date |
|---|---|---|
| | **K28965BASO063** | 19. Juli 2019 |

*Wir regen Zuweisung zur 7. ZK an, weil diese bereits unter Az: 7 O 33/19 und 7 O 39/19 eine Klage der hiesigen Klägerin aus demselben Klagepatent führt.*

## KLAGE

in Sachen

**Avago Technologies International Sales Pte. Limited,** 1 Yishun Avenue 7, Singapore 768923, vertreten durch die Geschäftsführer

- Klägerin -

<u>Prozessbevollmächtigte:</u>   Rechtsanwälte der Grünecker PartG mbB, insbesondere RA Dr. Bernd Allekotte und RA Sebastian Ochs, Leopoldstraße 4, 80802 München

<u>mitwirkend:</u>   Patentanwälte der Grünecker PartG mbB, insbesondere PA Dr. Udo Weigelt und European Patent Attorney Dr. André Crusius, Leopoldstraße 4, 80802 München

gegen die

**BMW AG**, Petuelring 130, 80788 München, vertreten durch den Vorstand: Harald Krüger (Vorsitzender), Milagros Caiña Carreiro-Andree, Klaus Fröhlich, Pieter Nota, Nicolas Peter, Peter Schwarzenbauer, Andreas Wendt, Oliver Zipse

- Beklagte zu 1) -

und die

Grünecker Patent- und Rechtsanwälte PartG mbB
Leopoldstr. 4      Tel.  +49 (0) 89 21 23 50     Amtsgericht: München           Deutsche Bank München
80802 München     Fax   +49 (0) 89 22 02 87     Partnerschaftsregister:        SWIFT / BIC-code: DEUT DE MM
Germany           Mail  info@grunecker.de       PR 1397                        IBAN: DE 47 7007 0010 0175 173400

[*] auch/also: Mediator   [*] auch/also: Agente de la Propiedad Industrial (España)   [*] auch/also: Consulente in Brevetti (Italia)
[*] European Patent Attorney and UK Chartered Patent Attorney   [*] Professor an der Fachhochschule für angewandtes Management
[*] auch/also  Attorney-at-Law, New York   [*] in Kooperation/in cooperation

39/76

2

**BMW Bank GmbH,** Lilienthalallee 26, 80939 München, vertreten durch die Geschäftsführer Hans-Jürgen Cohrs (Vorsitzender), Hans-Peter Mathe, Markus Walch und Thomas Weber

- Beklagte zu 2) -

**wegen:**    Patentverletzung

**Streitwert:**    EUR 1.000.000,00 (vorläufige Schätzung)

Wir zeigen an, dass die im Rubrum aufgeführten Rechtsanwälte die Klägerin vertreten und die Patentanwälte der Grünecker Patent- und Rechtsanwälte PartG mbB als Patentanwälte auf Seiten der Klägerin mitwirken.

Namens und im Auftrag der Klägerin erheben wir

**Klage**

und kündigen die folgenden

**Anträge**

an:

Die Beklagten werden verurteilt,

I.    es bei Meidung eines für jeden Fall der Zuwiderhandlung fälligen Ordnungsgel-
des von bis zu EUR 250.000,00, ersatzweise Ordnungshaft bis zu sechs Mo-
naten, oder Ordnungshaft bis zu sechs Monaten, im Wiederholungsfalle Ord-
nungshaft bis zu zwei Jahren, bei den Beklagten zu vollstrecken an ihren jewei-
ligen gesetzlichen Vertretern, zu unterlassen

a)    Systeme zur Energiedetektierung mit automatischer Drahtpaarauswahl

in der Bundesrepublik Deutschland anzubieten, in Verkehr zu bringen, zu
gebrauchen, und/oder zu den vorgenannten Zwecken einzuführen oder
zu besitzen, wenn das System umfasst:

40/76

3

- eine Vorrichtung, welche dazu geeignet ist, Energiedetektierung mit automatischer Drahtpaarauswahl durchzuführen,

- eine Vielzahl von Drahtpaaren, die kommunikativ an die Vorrichtung gekoppelt sind

und worin

- die Vorrichtung eine modifizierte Energie erzeugt, indem eine Energie, die mit mindestens zwei Drahtpaaren innerhalb einer Vielzahl von Drahtpaaren verknüpft ist, betrachtet wird,

- die Vorrichtung die modifizierte Energie verwendet, um zu bestimmen, ob mindestens eine zusätzliche Vorrichtung über mindestens ein Drahtpaar innerhalb einer Vielzahl von Drahtpaaren kommunikativ an die Vorrichtung gekoppelt ist

und

- die Vorrichtung einen automatischen Abschaltvorgang durchführt, wenn keine Vorrichtung über das Drahtpaar kommunikativ an die Vorrichtung gekoppelt ist,

(Anspruch 1 von EP 1 316 181 B1 / DE 601 10 612 T2)

insbesondere sofern diese in Automobilen der Beklagten verbaut sind;

II.    der Klägerin in einem geordneten – auch elektronischen – Verzeichnis darüber Auskunft zu erteilen, in welchem Umfang die Beklagten die zu Ziffer I. bezeichneten Handlungen seit dem 15.03.2017 begangen haben, und zwar unter Angabe

a)    der Namen und Anschriften der Hersteller, Lieferanten und anderer Vorbesitzer,

b)    der Namen und Anschriften der gewerblichen Abnehmer sowie der Verkaufsstellen für die die Erzeugnisse bestimmt waren,

c)    der Menge der ausgelieferten, erhaltenen und/oder bestellten Erzeugnisse sowie der Preise, die für die betreffenden Erzeugnisse bezahlt wurden;

wobei zum Nachweis der Angaben die entsprechenden Kaufbelege (nämlich

41/76

4

Rechnungen, hilfsweise Lieferscheine) in Kopie vorzulegen sind, wobei ge-
heimhaltungsbedürftige Details außerhalb der auskunftspflichtigen Daten ge-
schwärzt werden dürfen;

III.   der Klägerin in einem geordneten – auch elektronischen – Verzeichnis darüber
Rechnung zu legen, in welchem Umfang die Beklagten die zu Ziffer I. bezeich-
neten Handlungen seit dem 15.03.2017 begangen haben, und zwar unter An-
gabe

a)   der einzelnen Lieferungen, aufgeschlüsselt nach Liefermengen, -zeiten, -
preisen und Typenbezeichnungen sowie Namen und Anschriften der ge-
werblichen Abnehmer,

b)   der einzelnen Angebote, aufgeschlüsselt nach Angebotsmengen,
-zeiten, -preisen und Typenbezeichnungen sowie den Namen und An-
schriften der gewerblichen Angebotsempfänger,

c)   der betriebenen Werbung, aufgeschlüsselt nach Werbeträgern, deren
Auflagenhöhe, Verbreitungszeitraum und Verbreitungsgebiet,

d)   der nach den einzelnen Kostenfaktoren aufgeschlüsselten Gestehungs-
kosten und des erzielten Gewinns,

wobei den Beklagten vorbehalten bleibt, die Namen und Anschriften der nicht-
gewerblichen Abnehmer und der Angebotsempfänger statt der Klägerin einem
von der Klägerin zu bezeichnenden, ihr gegenüber zur Verschwiegenheit ver-
pflichteten, in der Bundesrepublik Deutschland ansässigen, vereidigten Wirt-
schaftsprüfer mitzuteilen, sofern die Beklagten dessen Kosten tragen und ihn
ermächtigen und verpflichten, der Klägerin auf konkrete Anfrage mitzuteilen, ob
ein bestimmter Abnehmer oder Angebotsempfänger in der Aufstellung enthal-
ten ist;

IV.   die im unmittelbaren oder mittelbaren Besitz oder Eigentum der Beklagten be-
findlichen, unter I. bezeichneten Erzeugnisse an einen von der Klägerin zu be-
nennenden Gerichtsvollzieher zum Zwecke der Vernichtung auf Kosten der Be-
klagten herauszugeben;

42/76

5

V.   die vorstehend zu Ziffer I. bezeichneten, seit dem 15.03.2017 im Besitz Dritter
     befindlichen Erzeugnisse aus den Vertriebswegen zurückzurufen, indem dieje-
     nigen Dritten, denen durch die Beklagten oder mit deren Zustimmung Besitz an
     den Erzeugnissen eingeräumt wurde, unter Hinweis darauf, dass die Kammer
     mit dem hiesigen Urteil auf eine Verletzung des Klagepatents erkannt hat, ernst-
     haft aufgefordert werden, die Erzeugnisse an die Beklagten zurückzugeben,
     und den Dritten für den Fall der Rückgabe der Erzeugnisse eine Rückzahlung
     des gegebenenfalls bereits gezahlten Kaufpreises sowie die Übernahme der
     Kosten der Rückgabe zugesagt wird.

Weiter werden wir beantragen:

VI.   festzustellen, dass die Beklagten verpflichtet sind, der Klägerin allen Schaden
      zu ersetzen, der ihr durch die zu Ziffer I. bezeichneten, seit dem 15.03.2017
      begangenen Handlungen entstanden ist und noch entstehen wird;

VII.  den Beklagten die Kosten des Rechtsstreits aufzuerlegen;

VIII. für jeden zuerkannten Anspruch Teilsicherheiten festzusetzen, und zwar wie
      folgt:

      -   für den Anspruch auf Unterlassung (Ziffer I.) wird die Sicherheitsleistung
          auf EUR 800.000,00 festgesetzt;

      -   für die Ansprüche auf Rückruf / Entfernung und Vernichtung (Ziffern IV.
          und V.) ist eine weitere Teilsicherheit von EUR 50.000,00 zu leisten;

      -   für die Ansprüche auf Auskunft / Rechnungslegung (Ziffern II. und III.) wird
          die Sicherheitsleistung auf EUR 50.000,00 festgesetzt;

      -   für die Kosten bzw. den Schadensersatz (Ziffern VI. und VII.) wird die Si-
          cherheitsleistung auf 120 % des jeweils zu vollstreckenden Betrages fest-
          gesetzt.

43/76

6

**Begründung:**

**I.**

**Die Parteien**

1. Die Klägerin ist ein weltweit führendes Unternehmen auf dem Gebiet der Halbleiter-
technologie und hält Patente auf diesem Gebiet. Sie ist Teil von Broadcom. Der Kon-
zernverbund, zu dem die Klägerin gehört, wurde über die letzten Jahre durch Akqui-
sitionen stetig vergrößert. Nach Umsatz handelt es sich um das drittgrößte Halbleiter-
unternehmen der Welt (ohne Auftragsfertiger und Speicherchip-Unternehmen) mit
weltweit mehr als 15.000 Mitarbeitern. Die Klägerin investiert pro Jahr mehr als 3 Mrd.
Euro in Forschung und Entwicklung und verfügt über ein reichhaltiges Patentportfolio.
In letzter Zeit beobachtet die Klägerin, dass insbes. Autos in zunehmendem Maße
Komponenten aufweisen, die eine Vielzahl ihrer Patente verletzt.

2. Die Beklagte zu 1) ist ein gerichtsbekannter deutscher Automobilkonzern.

3. Die Beklagte zu 2) ist eine Konzerngesellschaft der Beklagten zu 1) und vermietet
(verleast) Autos der Beklagten zu 1).

**II.**

**Das Klagepatent**

**1. Formalia**

Die Klägerin ist Inhaberin des auf die Anmeldung vom 13.08.2001 erteilten europäi-
schen Patents EP 1 316 181 B1, das u. a. auch mit Wirkung für die Bundesrepublik
Deutschland erteilt wurde und beim Deutschen Patent- und Markenamt (DPMA) unter
der Nummer DE 601 10 612 T2 geführt wird (nachstehend: **Klagepatent**).

Das Klagepatent nimmt die **Priorität** der US-Provisional Nr. 224846 P vom
**11.08.2000** in Anspruch **und steht in Kraft**.

44/76

7

Die Anmeldung wurde am 04.06.2003, der Hinweis auf die Patenterteilung am 04.05.2005 veröffentlicht.

Wir legen eine Kopie des Klagepatents als

**- Anlage K 1 -**

sowie der deutschen Übersetzung – veröffentlicht als DE 601 10 612 T2 – als

**- Anlage K 2 -**

und einen Registerauszug des DPMA mit Status als

**- Anlage K 3 -**

vor. Verweise auf Bezugsstellen in den folgenden Ausführungen beziehen sich auf die DE 601 10 612 T2, sofern nicht anders angegeben.

Bereits jetzt weisen wir auf eine zwischenzeitlich erfolgte und auch im Register dokumentierte Gesamtrechtsnachfolge auf Klägerseite hin: Mit Wirkung zum 05.09.2018 wurde die vormals (seit 15.03.2017) eingetragene Avago Technologies General IP (Singapore) Pte. Ltd., im Wege der Aufnahme auf die Klägerin, die Avago Technologies International Sales Pte. Limited, verschmolzen. Die Klägerin ist somit Gesamtrechtsnachfolgerin der vormaligen Patentinhaberin, der Avago Technologies General IP (Singapore) Pte. Ltd. Folge hiervon ist, dass das Klagepatent im Wege der Gesamtrechtsnachfolge auf die Klägerin übergegangen ist. Dies wurde dem DPMA am 29.10.2018 angezeigt (Verfahrensstandstag); die Veröffentlichung der Änderung erfolgte am 06.12.2018.

**2.    Technischer Hintergrund**

Die technische Lehre des Klagepatents bezieht sich allgemein auf ein System/eine Vorrichtung und ein Verfahren zur **Energiedetektierung und automatischen Abschaltung** (vgl. [0001] des Klagepatents). Sie zeigt insbesondere eine Möglichkeit, wie bei fehlender Kenntnis der Verkabelung (auch „Konnektivität der Drahtpaare" ge-

8

nannt) Energiesparmaßnahmen durchgeführt werden können. Energiesparmaßnah-
men können beispielsweise die vollständige oder teilweise Abschaltung der Vorrich-
tung sein.

Das Klagepatent geht dabei von einem **Stand der Technik** aus, wonach Systeme
bekannt sind, die Energiesparmaßnahmen durchführen konnten (vgl. [0002]). Das
vom Klagepatent adressierte Problem liegt darin, dass die vorbekannten Systeme je-
doch

> „von einer a priori-Kenntnis der Konnektivität von Drähten und Drahtpaaren in-
> nerhalb ihrer jeweiligen System abhängig"

waren (vgl. Klagepatent a. a. O.). Vereinfacht gesagt musste das System/die Vorrich-
tung wissen, wie sie mit anderen Vorrichtungen verbunden ist. Denn nur so konnte
diese ermitteln („detektieren"), ob die anderen Vorrichtungen aktiv sind (also, ob Ener-
gie von diesen an das System geschickt wird, bspw. bei einem Datenaustausch).
Energiesparsysteme funktionieren nach der Prämisse, dass dann, wenn keine Ener-
gie von den anderen Systemen detektiert wird, Energiesparmaßnahmen, bspw. eine
Abschaltung des Systems, vorgenommen werden kann. Lässt sich aber nicht verläss-
lich feststellen, ob die anderen Vorrichtungen aktiv sind, funktioniert das System nicht
fehlerfrei.

Probleme stellten sich bei dem Stand der Technik daher bspw. dann, wenn „*die
Drähte unsachgemäß verbunden worden sind*" (vgl. [0002]). Weiß das System nicht,
wie die anderen Vorrichtungen verbunden sind, kann es die Energiedetektierung nicht
korrekt durchführen. Es funktioniert dann schlicht nicht wie vorgesehen.

Dabei verließen sich die im Stand der Technik bekannten Systeme darauf, genau zu
wissen,

> „welches Drahtpaar das Empfängerpaar ist, um korrekte Stromsteuerung
> durchzuführen"

(vgl. [0007] des Klagepatents).

Derartige Szenarien konnten beispielsweise auch bei Netzwerken auftreten. Vor al-
lem dann, wenn so genannte „Kreuzverbindungen" in bestehende Systeme eingefügt

9

worden sind, konnte es zu falschen Verkabelungen kommen (beispielsweise Sender auf Sender und Empfänger auf Empfänger).

## 3. Einschlägiger Fachmann

Der einschlägige **Fachmann** ist ein

**Elektrotechnikingenieur (Universität oder Fachhochschule) mit mehrjähriger Erfahrung bei der Gestaltung von Systemen zur Energiedetektierung.**

## 4. Aufgabe und Lösung

Vor diesem Hintergrund stellt sich das Klagepatent die **Aufgabe**, den Nutzen einer Energiesparmaßnahme zu erweitern und insbesondere eine **Lösung** zu zeigen, die

*„in Verbindung mit automatischen medienabhängigen Schnittstellenbündelknoten (MDIX = media-dependent interface crossover) genutzt werden kann"*

(vgl. [0007] des Klagepatents).

Zu *„automatischen medienabhängigen Schnittstellenbündelknoten"* und „MDIX" siehe noch weiter unten.

Das Klagepatent löst diese Aufgabe insbesondere mit einer technischen Lehre nach Anspruch 1 (System), die geeignet ist,

*„die korrekte Funktion jeder Energiedetektierungs- und Abschaltschaltung zu erfüllen, ohne dabei irgendeine Kenntnis davon zu besitzen, welches Paar das Sendepaar und welches Paar das Empfängerpaar ist".*

Die vorliegende Erfindung ist nämlich in der Lage,

*„die Anwesenheit eines Verbindungspartners festzustellen, gleichgültig, ob die Verdrahtung korrekt installiert wurde oder nicht"*

(vgl. [0009] des Klagepatents).

10

In Form einer **Merkmalsanalyse** lässt sich Anspruch 1 des Klagepatents wie folgt darstellen:

1.  System zur Energiedetektierung mit automatischer Drahtpaarauswahl.

2.  Das System umfasst:

    2.1  eine Vorrichtung, welche dazu geeignet ist, Energiedetektierung mit automatischer Drahtpaarauswahl durchzuführen;

    2.2  eine Vielzahl von Drahtpaaren, die kommunikativ an die Vorrichtung gekoppelt sind.

3.  Die Vorrichtung

    3.1  erzeugt eine modifizierte Energie, indem eine Energie, die mit mindestens zwei Drahtpaaren innerhalb der Vielzahl von Drahtpaaren verknüpft ist, betrachtet wird;

    3.2  verwendet die modifizierte Energie, um zu bestimmen, ob mindestens eine zusätzliche Vorrichtung über mindestens ein Drahtpaar innerhalb der Vielzahl von Drahtpaaren kommunikativ an die Vorrichtung gekoppelt ist;

    3.3  führt einen automatischen Abschaltvorgang durch, wenn keine Vorrichtung über das Drahtpaar kommunikativ an die Vorrichtung gekoppelt ist.

Eine Leseabschrift dieser Merkmalsanalyse überreichen wir als

- Anlage K 4 -.

5.  **Erläuterung des Gegenstands des Anspruchs 1**

5.1  **Merkmal 1**

1.  System zur Energiedetektierung mit automatischer Drahtpaarauswahl.

Nach **Merkmal 1** ist ein System zur Energiedetektierung mit automatischer Drahtpaarauswahl gezeigt. Die nähere Ausgestaltung des Systems wird durch die Merkmalsgruppen 2 und 3 vorgegeben.

11

### 5.2   Merkmalsgruppe 2

2.   Das System umfasst:

2.1   eine Vorrichtung, welche dazu geeignet ist, Energiedetektierung mit automatischer Drahtpaarauswahl durchzuführen;

2.2   eine Vielzahl von Drahtpaaren, die kommunikativ an die Vorrichtung gekoppelt sind.

### a)   Merkmal 2.1

Nach **Merkmal 2.1** ist eine Vorrichtung von dem System umfasst, **die dazu geeignet ist,** Energiedetektierung mit automatischer Drahtpaarauswahl durchzuführen. Die näheren Einzelheiten zur Detektierung zeigt die **Merkmalsgruppe 3**.

### (1)   Teilmerkmal „automatische Drahtpaarauswahl"

Um zu verstehen, was „Energiedetektierung mit automatischer Drahtpaarauswahl" meint, hilft es, sich den Stand der Technik und die bestehenden technischen Probleme vor Augen zu führen:

Für eine Übertragung von Signalen ist es (denklogisch) nötig, dass die Signale sowohl versandt als auch empfangen werden. Im Stand der Technik war es dafür nötig, dass die Geräte richtig angeschlossen („verkabelt") waren, um Signale von einem zum anderen zu übertragen. Dies lag vor allem daran, dass die Schnittstellen fest vorgegeben waren. D.h., dass die Sendeschnittstelle immer nur für das Senden von Signalen vorgesehen war; die Empfangsschnittstelle immer nur für das Empfangen von Signalen.

Das an der fest vorgegebenen Sendeschnittstelle des sendenden Gerät angeschlossene Kabel musste an der fest vorgegebenen Empfangsschnittstelle (bspw. der Buchse) des empfangenden Geräts angeschlossen sein – der Ausgang des einen Geräts musste mit dem Eingang des anderen Geräts verbunden sein. Das konnte jedoch – wie nachfolgend erläutert – zu Situationen führen, in denen die Sendeschnittstelle des einen Geräts – das eigentlich sendende Gerät – mit der Sendeschnittstelle des anderen (für den Empfang vorgesehenen) Geräts verbunden ist. Dann kann das

12

für den Empfang vorgesehene Gerät aber das Signal nicht empfangen (da die Sendeschnittstelle nicht für den Empfang ausgelegt ist). Ein Grund hierfür ist die Ausrichtung der Drahtpaare im Kabel.

In einem Kabel gab und gibt es mindestens zwei Drahtpaare, eines für das Senden, eines für das Empfangen von Signalen. Bei „normalen" Kabeln laufen die Drähte „einfach gerade" von der einen Schnittstelle zur anderen. Bei Netzwerken unter Einschaltung mehrerer Geräte wurde (und wird) ein sogenannter „Switch" verwendet, der für die richtige Übertragung sorgt. Ein Switch kann eine Netzwerkweiche sein, die es ermöglicht, Daten zwischen mehreren Geräten eines Netzwerks auszutauschen. Im Zusammenhang mit einem Switch können „normale" Kabel verwendet werden. Bei Direktverbindung (ohne Switch) zwischen zwei Geräten war das aus den zuvor genannten Gründen nicht möglich. Daher hat man gekreuzte Kabel (sogenannte „Crossover"-Kabel) verwendet, um die „richtigen" Schnittstellen zu verbinden. Durch die Kreuzung der Kabelpaare wurden die Drahtpaare „umgekehrt", sodass das mit der Sendeschnittstelle verbundene Kabelpaar dann mit der Empfangsschnittstelle verbunden werden konnte. Veranschaulichen lässt sich dies wie folgt:



Ausgehend hiervon mussten sich Energiedetektierungssysteme des Stands der Technik darauf verlassen, dass *„eine klar umrissene Kenntnis darüber vorlag, welches Drahtpaar das Empfängerdrahtpaar"* war (siehe [0007]).

Das klagepatentgemäße System ist aber (auch) dazu geeignet, eine Energiedetektierung samt Abschaltung vorzunehmen, wenn nicht bekannt ist, welches das Senderdrahtpaar und welches das Empfängerdrahtpaar ist (vgl. [0009]). Nach der tech-

13

nischen Lehre des Klagepatents wählt das System selbständig aus, welches das rich-
tige Drahtpaar zum Senden/Empfangen ist – dies bezeichnet man als „automatische
Drahtpaarauswahl". So kann das System auch dann funktionieren, wenn nicht *a priori*
bekannt ist, welches das Empfänger- und welches das Senderdrahtpaar ist.

Das Klagepatent greift im Zusammenhang mit der „automatischen Drahtpaarauswahl"
bspw. in [0007] insbesondere auf den Begriff der *„automatischen medienabhängigen
Schnittstellenbündelknoten (MDIX = media dependent interface crossover)"* zurück.
MDIX bezeichnet eine Anschlussart im Rahmen einer Ethernetverbindung.

Bei der „normalen MDIX-Schnittstelle" (ohne den Zusatz „auto"), sind in der Schnitt-
stelle intern gekreuzte Anschlüsse vorhanden (diese ersetzen quasi die oben erwähn-
ten gekreuzten Kabel). Das Klagepatent stellt demgegenüber auf *„automatische me-
dienabhängige Schnittstellenbündelknoten"* ab, kurz „auto MDIX". Bei „auto MDIX"
wird software-seitig das Problem der falschen Verkabelung verhindert. Wie dies ge-
nau funktioniert, ist für den Rechtsstreit nicht relevant.

„auto MDIX" ist ein feststehender Begriff, den der Fachmann kennt und ihn mit einer
„automatischen Drahtpaarauswahl" verbindet. Häufig sind „MDIX"-Schnittstellen
heute auch „auto MDIX" fähig. Das heißt, dass selbst dann, wenn auch eine hard-
ware-seitige Kreuzung (MDIX) in der Schnittstelle vorhanden ist, zusätzlich „auto
MDIX" angewandt wird. So kann sichergestellt werden, dass in jedem Fall einer fal-
schen Verkabelung (bspw. bei einer Verwendung einer „doppelten" Kreuzung durch
ein gekreuztes Kabel und die Kreuzung durch MDIX in der Schnittstelle) die richtigen
Drahtpaare zugeordnet werden.

Abs. [0022] führt zu „auto MDIX" aus (Auslassungen und Hervorhebung diesseits):

> *„Die vorliegende Erfindung ist zumindest eine, die innerhalb von Systemen be-
> triebsfähig ist, die Ethernet-basierte medienabhängige Schnittstellenbündelkno-
> ten (MDIX) einsetzen. [...] Eine auto MDIX Lösung kompensiert automatisch
> jedes/jegliche nicht vorschriftsmäßig installierte(n) Kabelpaare. [...] Die
> vorliegende Erfindung nimmt eine elegante Modifikation vor, um einwandfreie
> Funktionalität von jeder Energiedetektierungs-/Abschaltschaltung sicherzustel-
> len, auch dann, wenn auto MDIX implementiert ist."*

Dies schließt natürlich nicht aus, dass die technische Lehre auch bei korrekter Ver-
kabelung angewandt wird, und das Klagepatent beinhaltet diese Anwendung auch.

**(2)   Teilmerkmal Vorrichtung**

Als „Vorrichtung" sieht das Klagepatent jedenfalls einen *„Chip, eine Leiterplatte mit einzelnen Komponenten oder Chipgruppen"* an. Aber jede *„Vorrichtung mit logischer und operativer Konfigurierfähigkeit"* fällt darunter (vgl. [0023]).

**b)   Merkmal 2.2**

Gemäß **Merkmal 2.2** umfasst das System eine Vielzahl von Drahtpaaren, die kommunikativ an die Vorrichtung gekoppelt sind.

Die „kommunikative" Koppelung beschreibt, dass die Drahtpaare so beschaffen sein müssen, dass sie zum Senden und/oder Empfangen von Signalen mit der Vorrichtung verbunden sind und auch eine entsprechende Verbindung mit einer anderen Vorrichtung ermöglichen (siehe auch unten **Merkmal 3.3**).

Es soll möglich sein, bei angeschlossenen anderen Vorrichtungen ermitteln zu können, ob diese aktiv sind, bspw. indem man von diesen ausgehende Energie detektiert.

**5.3   Merkmalsgruppe 3**

3.   Die Vorrichtung

3.1   erzeugt eine modifizierte Energie, indem eine Energie, die mit mindestens zwei Drahtpaaren innerhalb der Vielzahl von Drahtpaaren verknüpft ist, betrachtet wird;

3.2   verwendet die modifizierte Energie, um zu bestimmen, ob mindestens eine zusätzliche Vorrichtung über mindestens ein Drahtpaar innerhalb der Vielzahl von Drahtpaaren kommunikativ an die Vorrichtung gekoppelt ist;

3.3   führt einen automatischen Abschaltvorgang durch, wenn keine Vorrichtung über das Drahtpaar kommunikativ an die Vorrichtung gekoppelt ist.

**a)   Merkmal 3.1**

Nach dem zugegebenermaßen etwas sperrig formulierten **Merkmal 3.1** soll die Vorrichtung eine modifizierte Energie erzeugen, indem eine Energie **betrachtet wird**, die

15

mit mindestens zwei Drahtpaaren innerhalb der Vielzahl von Drahtpaaren verknüpft ist.

In der Beschreibung des Klagepatents wird die „modifizierte Energie" synonym als „geeignete Energie" bezeichnet (siehe bspw. Abs. [0037]).

Das Teilmerkmal „erzeugen" bedeutet nicht, dass die Vorrichtung selbst Energie hervorbringt.

**„Modifizierte"/"geeignete" Energie ist im Ergebnis schlicht ein Indikator dafür, ob Energie von der Vorrichtung über eine Leitung empfangen wird. Dies zeigt neben dem Wortlaut von Merkmal 3.1 auch das Zusammenspiel von Merkmal 3.1 mit Merkmal 3.2. Danach soll über die „modifizierte"/"geeignete" Energie bestimmt werden, ob eine kommunikative Kopplung vorhanden ist.**

Für die Frage, wie „modifizierte"/"geeignete" Energie „erzeugt" wird, hält das Klagepatent unter anderem Hinweise im Zusammenhang mit zwei bevorzugten Ausführungsformen bereit.

**Danach kann es sich einfach um das Ermitteln davon handeln, ob überhaupt Energie auf einer Leitung vorhanden ist – ggf. zu einem bestimmten Zeitpunkt. Daneben kann aber „modifizierte"/"geeignete" Energie auch unter Verwendung eines von der Vorrichtung erfassten Impulses und dessen Weiterverarbeitung erzeugt werden. In allen Fällen ist das „Erzeugen" nichts Anderes als das „Betrachten" von Energie eines Kabelpaares. Diese Definition enthält bereits Merkmal 3.1 selbst und wird durch „indem" noch verdeutlicht (Hervorhebung dieseits):**

> „3.   Die Vorrichtung
>
> > 3.1   *erzeugt eine modifizierte Energie, indem eine Energie, die mit mindestens zwei Drahtpaaren innerhalb der Vielzahl von Drahtpaaren verknüpft ist, **betrachtet wird**"*

Die Unteransprüche 4 und 6 zeigen die erwähnten bevorzugten Ausführungsformen.

**Unteranspruch 4:**

> „*System zur Energiedetektierung mit automatischer Drahtpaarauswahl gemäß*

16

> *Anspruch 1, worin die Vorrichtung von der Energie eine Verbindungsimpulse-*
> *nergie abzieht, wenn die Vorrichtung einen Verbindungsimpuls überträgt, um*
> *die modifizierte Energie zu erzeugen und die Verbindungsimpulsenergie mit ei-*
> *nem Verbindungsimpuls verknüpft ist, welcher von der Vorrichtung übertragen*
> *wird."*

Danach ist klargestellt, dass im Falle eines ausgesandten Impulses dessen Energie

wieder von der empfangenen Energie abgezogen werden muss, um zu ermitteln, ob

eine weitere (aktive) Vorrichtung gekoppelt ist. Denn andernfalls könnte stets Energie

(nämlich die des eigens erzeugten Impulses) detektiert werden. So wäre keine Aus-

sage darüber möglich, ob tatsächlich eine weitere (aktive) Vorrichtung vorhanden ist.

**Unteranspruch 6:**

> *„System zur Energiedetektierung mit automatischer Drahtpaarauswahl gemäß*
> *Anspruch 1, worin die Vorrichtung die Energie, welche mit jedem von mindes-*
> *tens einem Drahtpaar innerhalb der Vielzahl von Drahtpaaren verknüpft ist, als*
> *die modifizierte Energie benutzt, wenn die Vorrichtung keinen Verbindungsim-*
> *puls überträgt"*

Unteranspruch 6 zeigt eine andere Möglichkeit der „Erzeugung" der „modifizier-

ten"/"geeigneten" Energie. Dieser umfasst sowohl den Fall, dass überhaupt kein Im-

puls von der Vorrichtung gesendet wird, als auch den Fall, dass beispielsweise in

zeitlichen Intervallen ein Impuls gesendet wird. In letzterem Fall wird nach Unteran-

spruch 6 derjenige Zeitpunkt bei der Betrachtung der Energie auf dem Drahtpaar au-

ßer Betracht gelassen wird, der im Zusammenhang mit dem Impuls steht. In diesem

Fall nutzt die Vorrichtung die vorhandene Energie der Drahtpaare als „modifi-

zierte"/"geeignete" Energie.

Im Ergebnis reicht es aber nach Anspruch 1 aus, wenn überprüft wird, ob irgendeine

Energie von einem Verbindungspartner auf den Drahtpaaren vorhanden ist. Hierzu

führt [0021] Folgendes aus (Hervorhebung diesseits):

> *„Eine Energiedetektierungsschaltung, die geeignet ist, eine automatische Ab-*
> *schaltung durchzuführen, **überwacht einen angeschlossenen Draht**. Diese*
> *Energiedetektierungsschaltung **stellt fest, ob irgendein eingehendes Signal,**
> ***oder irgendeine Energie auf dem Draht vorhanden ist,** welcher melden wird,*
> ***dass ein Verbindungspartner am anderen Ende des Drahtes angeschlos-***
> ***sen ist."***

Dies bestätigt auch ein Rückgriff auf die englischsprachige Formulierung des erteilten Europäischen Patents (**Anlage K 1**). Das **Merkmal 3.1** lautet in seiner Verfahrenssprache wie folgt (Hervorhebung diesseits):

> „*wherein the device **generates a qualified energy by considering an energy associated with** at least **two wire pairs** within the plurality of wire pairs*"

Der englische Wortlaut spricht von „*qualified energy*" – also „qualifizierte Energie". Ferner heißt es „*generates [...] by considering an energy associated with [...] wire pairs*" – was wie folgt verstanden werden kann: „*erzeugt [die qualifizierte Energie] durch berücksichtigen von Energie, die mit Drahtpaaren verknüpft ist*".

Dies zeigt, dass **Merkmal 3.1** nicht darauf abstellt, dass Energie tatsächlich von der Vorrichtung hervorgebracht wird, sondern dass auf den Drahtpaaren vorhandene Energie bei der Energiedetektierung berücksichtigt wird. Es zeigt weiter, dass es darum geht, einer vorhandenen Energie eine gewisse Qualifikation/Eigenschaft zuzuordnen („*generate [...] a qualified energy*").

Diese so „erzeugte" „modifizierte"/"geeignete"/"qualifizierte" Energie nutzt die Vorrichtung, um zu bestimmen (siehe **Merkmal 3.2**), ob eine weitere (aktive) Vorrichtung angeschlossen ist.

b)   **Merkmal 3.2**

Der Bestimmungsschritt nach **Merkmal 3.2** erfolgt in Abhängigkeit davon, ob eine solche „erzeugte" „modifizierte"/"geeignete" Energie überhaupt vorhanden ist. Ist dies der Fall, schließt das System darauf, dass mindestens eine zusätzliche Vorrichtung über mindestens ein Drahtpaar innerhalb der Vielzahl von Drahtpaaren kommunikativ an die Vorrichtung gekoppelt ist.

Hierzu heißt es in [0021] (Fettdruck diesseits):

> „*Eine Energiedetektierungsschaltung, die geeignet ist, eine automatische Abschaltung durchzuführen, **überwacht einen angeschlossenen Draht**. Diese Energiedetektierungsschaltung **stellt fest, ob irgendein eingehendes Signal, oder irgendeine Energie auf dem Draht vorhanden ist**, welcher melden wird, dass **ein Verbindungspartner am anderen Ende des Drahtes angeschlossen ist. Wenn dort kein Draht am anderen Ende angeschlossen ist, oder kein Verbindungspartner am anderen Ende des Drahtes angeschlossen ist**, welcher mit einer Vorrichtung verbunden ist, **dann ist keine Energie auf*

18

*dem Draht vorhanden und die Energiedetektierungsschaltung (der Detektor) zeigt diesen Zustand an. Eine Zustandsmaschine, die auch in verschiedenen Beispielen beschrieben wird, ist geeignet, verschiedene Formen von Übertragung zu erkennen."*

In Abhängigkeit von dem Ergebnis des Bestimmungsschritts führt die Vorrichtung nach **Merkmal 3.3** einen Abschaltvorgang durch – oder nicht.

c)   **Merkmal 3.3**

Nach **Merkmal 3.3** soll dann ein automatischer Abschaltvorgang durchgeführt werden, wenn keine Vorrichtung über das Drahtpaar kommunikativ an die Vorrichtung gekoppelt ist (siehe soeben schon **Merkmal 3.2**).

Nach [0031] werden jedenfalls folgende Situationen erfasst:

-   es ist keine Vorrichtung angeschlossen,

-   es ist eine Vorrichtung angeschlossen aber inaktiv.


*„[0031] Wenn die Vorrichtung 210 kommunikativ mit einer eingeschalteten Vorrichtung, wie die eingeschaltete Vorrichtung 230, verbunden ist, erkennt die Vorrichtung 210 dies und bleibt für vollen Betrieb eingeschaltet. Dann, wenn die eingeschaltete Vorrichtung 230 jemals ausgeschaltet wird, dann erkennt die Vorrichtung 210 dieses Ereignis und geht in eine automatische Abschaltsequenz über. Es könnten auch Situationen auftreten, in denen ein Paar mit der Vorrichtung 210 verbunden ist, aber keine weitere Vorrichtung kommunikativ mit dem anderen Ende des Paares verbunden ist. Hier ist die Vorrichtung 210 geeignet, festzustellen, dass es keine weitere Vorrichtung gibt, und führt daraufhin eine automatische Abschaltfunktionalität durch."*


Die Vorrichtung kann dabei **ganz oder teilweise abschalten** (vgl. [0044] und Unteranspruch 2).

19

### III.

**Beschaffenheit der angegriffenen Ausführungsform und Patentverletzung**

**1.    Angegriffene Ausführungsform**

Die Beklagten verletzen Anspruch 1 des Klagepatents. Lediglich beispielhaft und ohne Beschränkung hierauf verweisen wir auf das in den Modellen BMW i3 und i8 (und jedenfalls auch in der BMW 5er Reihe) zur Anwendung kommende System für Navigation, Kommunikation und Entertainment. Das System für Navigation, Kommunikation und Entertainment wird ohne Zustimmung der Klägerin in der Bundesrepublik Deutschland angeboten und in Verkehr gebracht.

Das System für Navigation, Kommunikation und Entertainment wird nur exemplarisch gewählt. Die Erfindung mag auch in anderen Systemen der Beklagten verwendet werden.

Das System für Navigation, Kommunikation und Entertainment besteht im Kern aus einer sog. „Headunit" sowie hiermit gekoppelten Peripheriegeräten.

Nachfolgend blenden wir Abbildungen einer Draufsicht mit – vorliegend nicht interessierenden – technischen Angaben sowie einer Frontansicht mit darauf angebrachter Produktionsnummer einer in den Modellen BMW i3 und i8 verbauten Headunit ein:

57/76

20



(Draufsicht)



(Frontansicht)

## 2.    Headunit mit Chip

Im Inneren der Headunit befinden sich mehrere Boards, u.a. ein Board mit einem Chip des Herstellers MICREL (rot eingekreist).



Vergrößert und aus vorstehendem Bild herauskopiert, sieht der Chip mit der Bezeichnung KSZ8864RMNU (nachfolgend: 8864-Chip) wie folgt aus:

22



Wir legen als

### - Anlage K 5 -

das Datenblatt zu diesem Chip – ein Ethernet-Chip – vor (Stand 26.03.2015, Revision 1.6). Laut „Ordering Information" (**Seite 3, Anlage K 5**) ist der Chip mit der Bezeichnung KSZ8864RMNU lediglich eine insbesondere für automobile Anwendungen – beispielsweise in Bezug auf den Temperaturbereich – ausgelegte Version des 8864-Chip:

**Ordering Information**

| Part Number | Temperature Range | Package | Lead Finish/Grade |
|---|---|---|---|
| KSZ8864RMN | 0°C to 70°C | 64-Pin QFN | Pb-Free/Commercial |
| KSZ8864RMNI | −40°C to +85°C | 64-Pin QFN | Pb-Free/Industrial |
| KSZ8864RMNU (Automotive AEC-Q100 Qualified) | −40°C to +85°C | 64-Pin QFN | Pb-Free/Automotive |

Deshalb gelten die technischen Angaben der **Anlage K 5** gleichermaßen für den Chip KSZ8864RMNU.

Auf der anderen Seite dieses Boards ist ein Ethernet-Anschluss angebracht und mit dem 8864-Chip verdrahtet. Dieser Ethernet-Anschluss ist auf der Rückseite der Headunit mit der Bezeichnung „OABR" gekennzeichnet. Mit OABR (Open Alliance BroadR Reach) wird ein für Kommunikations-Netzwerke in Automobilen ausgelegter

23

Ethernet-Standard bezeichnet, welcher auch unter der Bezeichnung 100BASE-T1 be-
kannt ist. Der Ethernet-Anschluss ist in nachfolgenden Bildern blau umrandet.

Rückseite der Headunit mit Ethernet-Anschluss:





Ausgebautes Board mit Ethernet-Anschluss:



An diesen Ethernet-Anschluss des Boards ist im in das Fahrzeug eingebauten Zu-
stand der Headunit ein Ethernet-Stecker eines Kabelbaums in den Modellen BMW i3
und i8 angeschlossen. Hier wird angemerkt, dass ein Board mit den gleichen Kom-
ponenten auch in Headunits der BMW 5er-Reihe eingesetzt wird.

Der 8864-Chip ist über einen Ethernet-Trennübertrager (Pulse HX1188NL, in obiger
Abbildung gelb umrandet) auf dem Board mit dem Ethernet-Anschluss des Boards
verbunden.

**Beweis:**       **Sachverständigengutachten**

25

3.   **Headunit verwirklicht Anspruch 1**

Die im System für Navigation, Kommunikation und Entertainment der Beklagten verwendete Headunit mit dem oben gezeigten Board mit dem 8864-Chip verwirklicht Anspruch 1 **(angegriffene Ausführungsform)**.

Das Datenblatt zum 8864-Chip **(Anlage K 5)** belegt, dass der 8864-Chip die patentgemäßen Funktionen (gemäß Anspruch 1) implementiert hat. Dies führen wir nachfolgend im Einzelnen aus.

Dabei sei auch hier vorsichtshalber festgehalten, dass diese Klage nicht auf eine Ausgestaltung des Systems für Navigation, Kommunikation und Entertainment mit diesem speziellen Chip beschränkt ist, sondern sämtliche Vorrichtungen erfasst, die von der technischen Lehre des Klagepatents Gebrauch machen.

a)   **Merkmal 1 und Merkmalsgruppe 2 verwirklicht**

   1.   System zur Energiedetektierung mit automatischer Drahtpaarauswahl.

   2.   Das System umfasst:

      2.1   eine Vorrichtung, welche dazu geeignet ist, Energiedetektierung mit automatischer Drahtpaarauswahl durchzuführen;

      2.2   eine Vielzahl von Drahtpaaren, die kommunikativ an die Vorrichtung gekoppelt sind.

Die Headunit ist ein System zur Energiedetektierung mit automatischer Drahtpaarauswahl nach **Merkmal 1**, was sich aus der nachfolgenden Darstellung ergibt.

Der 8864-CHIP ist eine Vorrichtung nach **Merkmal 2.1** und dazu geeignet, Energiedetektierung mit automatischer Drahtpaarauswahl durchzuführen. Hierzu näher wie folgt:

(1)   **Eignung zur Energiedetektierung – Merkmal 2.1**

Die **Eignung zur Energiedetektierung** legen wir im Zusammenhang mit der Merkmalsgruppe 3 weiter unten näher dar, wollen aber an dieser Stelle bereits auf Seite 2, **Anlage K 5** verweisen. Dort werden die Funktionalitäten des 8864-Chips aufgelistet. Darunter findet sich auch ein Hinweis auf einen „Energy-detect mode", also einen

26

Energiedetektierungsmodus, der im Zusammenhang mit dem Vorzug des 8864-Chips „geringer Energieverlust" („Low Power Dissipation") erwähnt ist:

### Low-Power Dissipation:

- **Full-chip software power-down and per port software power down.**
- **Energy-detect mode support <0.1W full-chip power consumption when all ports have no activity.**

(2)   „automatische Drahtpaarauswahl" – Merkmal 2.1

Der 8864-Chip verfügt auch über eine automatische Drahtpaarauswahlfunktionalität.

Das Klagepatent nennt als Beispiel für eine automatische Drahtpaarauswahl beispielsweise die oben erläuterte „auto MDI/MDI-X" Funktionalität, vgl. bspw. [0022]. Diese ist auch bei dem 8864-Chip implementiert, wie der nachfolgende Auszug aus dem Datenblatt **(Seite 2, Anlage K 5)** zeigt:

- **Half-duplex back pressure flow control.**
- **HP Auto MDI/MDI-X and IEEE Auto crossover support.**
- **MII interface of MAC supports both MAC mode and PHY mode.**

Der 8864-Chip ist damit geeignet, eine klagepatentgemäße automatische Drahtpaarauswahl durchzuführen.

**Merkmal 2.1 ist verwirklicht.**

(3)   „**Vielzahl von Drahtpaaren, die kommunikativ mit der Vorrichtung gekoppelt sind" – Merkmal 2.2**

Die Headunit verfügt auch über eine Vielzahl von Drahtpaaren, die nach **Merkmal 2.2** kommunikativ an die Vorrichtung gekoppelt sind. Der 8864-Chip weist eine Vielzahl von Anschlussstellen (sog. Ports) auf, über die der Chip bspw. mit dem Board ver-

bunden ist. Diese Verbindung zwischen Board und 8864-Chip erfolgt über eine Vielzahl von Drahtpaaren, die kommunikativ mit der Vorrichtung gekoppelt sind (andernfalls gäbe es keinen Datenaustausch).

Dabei sind vor allem die Anschlüsse für die patentgemäße Kopplung mit dem 8864-Chip interessant, die auch einen Zusammenhang mit der „automatischen Drahtpaarauswahl" nach Merkmal 2.1 haben. Eine solche Funktionalität besteht an den „auto MDI/MDIX fähigen" Ports des 8864-Chips.

Hierzu lichten wir nachfolgend ein Bild der „auto MDI/MDIX fähigen" Ports des 8864-Chips, ein Blockschaltbild von Seite 1 der **Anlage K 5**, ein. In rot haben wir die „auto MDI/MDIX fähigen" Ports hervorgehoben. Die Darstellung zeigt zwei Ports, die über die Abkürzung „PHY" der Schicht 1 (Layer 1) des OSI-Modells zugewiesen sind. Daraus entnimmt der Fachmann, dass es sich dabei um Anschlussstellen handelt. Einen weiteren Hinweis erhält er über den Bezug auf „Auto MDI/MDIX", geht es ja dabei gerade um das Thema (physischer) Verkabelung. „PHY1" identifiziert Port 1 und „PHY 2" identifiziert Port 2.



28

Der 8864-Chip ist mittels Pins mit dem Board (einer Leiterplatte) verbunden und kann über diese Pins Daten austauschen. Die Ports des 8864-Chips sind über Pins mit dem Board verbunden. Insbesondere ist Port 2 des 8864-Chips mit dem Ethernet-Anschluss des Boards kommunikativ gekoppelt. Port 2 des 8864-Chip ist mit den Pins 9 und 10 für den Empfang und den Pins 11 und 12 für das Senden von Daten gekoppelt, wie sich aus dem Abschnitt „Pin Description" gemäß nachfolgendem Auszug aus dem Datenblatt (**Seite 10, Anlage K 5**) ergibt:

### Pin Description

| Pin Number | Pin Name | Type[1] | Port | Pin Function[3] |
|---|---|---|---|---|
| 1 | RXP1 | I | 1 | Physical receive signal + (differential). |
| 2 | RXM1 | I | 1 | Physical receive signal – (differential). |
| 3 | TXP1 | O | 1 | Physical transmit signal + (differential). |
| 4 | TXM1 | O | 1 | Physical transmit signal – (differential). |
| 5 | VDDA12 | P | | 1.2V analog power. |
| 6 | GND | GND | | Ground with all grounding of die bottom. |
| 7 | ISET | | | Set physical transmit output current. Pull-down resistor. |
| 8 | VDDAT | P | | 3.3V analog $V_{DD}$. |
| 9 | RXP2 | I | 2 | Physical receive signal + (differential). |
| 10 | RXM2 | I | 2 | Physical receive signal - (differential). |
| 11 | TXP2 | O | 2 | Physical transmit signal + (differential). |
| 12 | TXM2 | O | 2 | Physical transmit signal – (differential). |

Die Nummerierung der Pins des 8864-Chip geht aus der nachfolgenden Darstellung aus dem Datenblatt (**Seite 9, Anlage K 5**) hervor, worin die Pins 9, 10 und 11, 12 gelb markiert sind und wobei zur Identifizierung der Pins des 8864-Chip auf dem Board die kreisförmige Markierung als Bezugspunkt in der Darstellung unten links zu beachten ist, die sich auch auf dem 8864-Chip findet:

29

**Pin Configuration**



64-Pin QFN

Die Pins 9, 10 und 11, 12 des Port 2 sind über den Ethernet-Trennübertrager (Pulse HX1188NL) mit zwei Drahtpaaren des Ethernet-Anschlusses gekoppelt. Diese beiden Drahtpaare sind im nachfolgenden Bild blau umrandet.

30



In der nachfolgenden Rückansicht des Ethernet-Anschlusses sind die Anschluss-drähte nummeriert (von links oben [1] nach links unten [2] und in dieser Weise von oben nach unten weiterlaufend bis hin zu rechts oben [19] nach rechts unten [20], ungerade Ziffern in der oberen Reihe und gerade Ziffern in der unteren Reihe).



31

Die Empfangspins 9, 10 des 8864-Chip sind über den Ethernet-Trennübertrager mit dem Anschlussdrahtpaar 18, 20 (die beiden benachbarten Anschlussdrähte unten rechts) gekoppelt, und die Sendepins 11, 12 des 8864-Chip sind über den Ethernet-Trennübertrager mit dem Anschlussdrahtpaar 17, 19 (die beiden benachbarten Anschlussdrähte ober rechts) gekoppelt.

Der 8864-Chip ist so in den BMW i3 und i8 Modellen mit den Anschlussdrahtpaaren des Ethernet-Anschlusses gekoppelt, die ihrerseits mit dem Kabelbaum verbunden sind.

Die Vorrichtung verfügt über kommunikativ gekoppelte Drahtpaare nach **Merkmal 2.2**.

b)   **Merkmalsgruppe 3 verwirklicht**

3.   Die Vorrichtung

3.1   erzeugt eine modifizierte Energie, indem eine Energie, die mit mindestens zwei Drahtpaaren innerhalb der Vielzahl von Drahtpaaren verknüpft ist, betrachtet wird;

3.2   verwendet die modifizierte Energie, um zu bestimmen, ob mindestens eine zusätzliche Vorrichtung über mindestens ein Drahtpaar innerhalb der Vielzahl von Drahtpaaren kommunikativ an die Vorrichtung gekoppelt ist;

3.3   führt einen automatischen Abschaltvorgang durch, wenn keine Vorrichtung über das Drahtpaar kommunikativ an die Vorrichtung gekoppelt ist.

Der 8864-Chip arbeitet entsprechend **Merkmalsgruppe 3**.

Der 8864-Chip verfügt, wie bereits erwähnt, über die Möglichkeit eines Energy-Detect Mode – eines Energiedetektierungsmodus. Wir verweisen nochmals auf Seite 2, **Anlage K 5**, wo es heißt:

32

### Low-Power Dissipation:

- Full-chip software power-down and per port software power down.
- Energy-detect mode support <0.1W full-chip power consumption when all ports have no activity.

Im Energy-Detect-Mode werden alle Ports („all ports"), einschließlich Ports 1 und 2, auf Aktivität („activity") überwacht. Ein Port ist aktiv, wenn über ihn Energie fließt. So vermag der 8864-Chip zu erkennen, ob eine aktive weitere Vorrichtung daran angeschlossen ist (Merkmale 3.1 und 3.2). Es ist daher möglich, zu überwachen, ob Energie über den Ethernet-Anschluss (an Port 2), an den der Kabelbaum angeschlossen ist, empfangen wird.

Welche Funktionen mit dem Energy Detect Mode des 8864-Chip verknüpft sind, wird auf Seite 24 von Anlage K 5 beschrieben, und zwar unter der Überschrift „Energy Detect Mode":

**Energy Detect Mode**

The energy detect mode provides a mechanism to save more power than in the normal operation mode when the KSZ8864RMN is not connected to an active link partner. In this mode, if the cable is not plugged, then the KSZ8864RMN can automatically enter to a low power state, i.e., the energy detect mode In this mode, KSZ8864RMN will keep transmitting 120ns width pulses at 1 pulse/s rate. Once activity resumes due to plugging a cable or attempting the far end to establish link, the KSZ8864RMN can automatically power up to normal power state in energy detect mode.

Energy detect mode consists of two states, normal power state and low power state. While in low power state, the KSZ8864RMN reduces power consumption by disabling all circuitry except the energy detect circuitry of the receiver. The energy detect mode is entered by setting bit [4:3] = 01 in register 14. When the KSZ8864RMN is in this mode, it will monitor the cable energy. If there is no energy on the cable for a time longer than pre-configured value at bit [7:0] Go-Sleep time in register 15, then the KSZ8864RMN will go into a low power state. When KSZ8864RMN is in low power state, it will keep monitoring the cable energy. Once the energy is detected from the cable, KSZ8864RMN will enter normal power state. When KSZ8864RMN is at normal power state, it is able to transmit or receive packet from the cable.

Im Einzelnen heißt es dort:

Energy detect mode consists of two states, normal power state and low power state. While in low power state, the KSZ8864RMN reduces power consumption by disabling all circuitry except the energy detect circuitry of the receiver. The energy detect mode is entered by setting bit [4:3] = 01 in register 14. When the KSZ8864RMN is in this mode, it will monitor the cable energy. If there is no energy on the cable for a time longer than pre-configured value at bit [7:0] Go-Sleep time in register 15, then the KSZ8864RMN will go into a low power state. When KSZ8864RMN is in low power state, it will keep monitoring the cable energy. Once the energy is detected from the cable, KSZ8864RMN will enter normal power state. When KSZ8864RMN is at normal power state, it is able to transmit or receive packet from the cable.

Der 8864-Chip kann demnach im „energy detect mode" die Energie, die mit der Verkabelung an den Ports verknüpft ist („it will monitor the cable energy") überwachen. Damit „erzeugt er eine modifizierte Energie, indem eine Energie, die mit mindestens

*zwei Drahtpaaren innerhalb der Vielzahl von Drahtpaaren verknüpft ist, betrachtet wird"* – gemäß **Merkmal 3.1**.

Er kann dann diese „betrachtete", d.h. „modifizierte Energie", benutzen, um *„zu bestimmen, ob mindestens eine zusätzliche Vorrichtung über mindestens ein Drahtpaar innerhalb der Vielzahl von Drahtpaaren kommunikativ an die Vorrichtung gekoppelt ist"* – **Merkmal 3.2**. So leitet **Anlage K 5** (Seite 24) zum Energy Detect Mode wie folgt ein:

**Energy Detect Mode**
The energy detect mode provides a mechanism to save more power than in the normal operation mode when the KSZ8864RMN is not connected to an active link partner. In this mode, if the cable is not plugged, then the KSZ8864RMN can automatically enter to a low power state, i.e., the energy detect mode. In this mode, KSZ8864RMN will keep transmitting 120ns width pulses at 1 pulse/s rate. Once activity resumes due to plugging a cable or attempting by the far end to establish link, the KSZ8864RMN can automatically power up to normal power state in energy detect mode.

Dort wird beschrieben, dass abhängig von der Aktivität am Port – also dem Vorhandensein eines „aktiven Verbindungspartners" („active link partner") über den Energy Detect Mode eine Abschaltung (siehe sogleich) durchgeführt werden kann. Wie zu **Merkmal 3.1** festgestellt, kann das Vorhandensein von Energie an den Ports überwacht werden. Mit dieser so „erzeugten modifizierten Energie" kann dann beim 8864-Chip bestimmt werden, ob eine kommunikative Kopplung eines Drahtpaares an die Vorrichtung vorliegt – er kann erkennen, ob ein aktiver Verbindungspartner vorhanden ist.

Je nach Ergebnis der Bestimmung kann dann – entsprechend **Merkmal 3.3** – ein automatischer Abschaltvorgang durchgeführt werden, wodurch der 8864-Chip in den „low power state" versetzt werden kann.

Im „low power state" können alle Schaltkreise des 8864-Chip bis auf den für die Energiedetektierung abgeschaltet werden. Dieser sogenannte „low power state" des 8864-Chip führt nicht aus der Verwirklichung heraus. Denn damit wird, wie soeben gezeigt, nichts Anderes bezeichnet als der „Überwachungs-"/Detektionsmodus.

Nach alledem steht fest, dass der 8864-Chip geeignet ist, mit seinem Energy Detect Mode einen klagepatentgemäßen Energiedetektierungsprozess nach **Merkmal 2.1** i.V.m. **Merkmalsgruppe 3** durchzuführen. Dies gilt nicht nur in Bezug auf Port 2 und den darüber verbundenen Ethernet-Anschluss (was aber bereits für die Verletzung

34

genügt). Vielmehr ist auch eine entsprechende Eignung in Zusammenhang mit Port 1 gegeben und den darüber an den 8864-Chip kommunikativ gekoppelten Ethernet-Chip KSZ8051MNLU, der auf dem gleichen Board angeordnet ist. Wir behalten uns hierzu weitere Ausführungen vor, sollten die Beklagten dies bestreiten.

**Merkmalsgruppe 3** ist **verwirklicht.**

**Anspruch 1** ist **verwirklicht.**

## IV.

### Rechtsausführungen

1. Die Klägerin ist als eingetragene Inhaberin des Klagepatents aktivlegitimiert. Die vor der Klägerin eingetragene Inhaberin, die Avago Technologies General IP (Singapore) Pte. Ltd., ist im Wege der Gesamtrechtsnachfolge auf die im Rubrum genannte Klägerin, die Avago Technologies International Sales Pte. Limited, mit Wirkung zum 05.09.2018 verschmolzen worden. Das Klagepatent und sämtliche Ansprüche daraus sind im Wege der Gesamtrechtsnachfolge auf die Klägerin übergegangen.

2. Der geltend gemachte Unterlassungsanspruch findet seine Grundlage in § 139 Abs. 1 i.V.m. § 9 Satz 2 Nr. 1 PatG. Die Beklagten vertreiben die beispielhaft beschriebenen Systeme für Navigation, Kommunikation und Entertainment mit den 8864-CHIPs, die unter Anspruch 1 des Klagepatents fallen, diesen mithin unmittelbar verletzen. Wiederholungsgefahr ist gegeben. Die Beklagten bieten an und vertreiben die dargestellten Produkte in Deutschland. Die Beklagte zu 2) vertreibt im Wege des Leasing.

3. Die Beklagten sind verpflichtet, sich über die maßgeblichen gewerblichen Schutzrechte Dritter zu informieren und diese zu beachten. Damit handeln die Beklagten in jedem Fall fahrlässig.

4. Darüber hinaus sind die Beklagten zum Schadenersatz verpflichtet, § 139 Abs. 2 PatG. Da eine ausreichende Wahrscheinlichkeit besteht, dass der Klägerin aufgrund der Verletzungshandlungen der Beklagten ein Schaden entstanden ist, hat die Klägerin ein berechtigtes Interesse an einer Feststellung der Schadenersatzpflicht in Bezug auf das Klagepatent. Die Klägerin ist nicht in der Lage, die Beträge zu beziffern,

35

weshalb ihr die ebenfalls geltend gemachten Ansprüche auf Auskunft und Schaden-
ersatz (resultierend aus § 140b Abs. 1 PatG bzw. § 242 BGB) zustehen.

5.   Darüber hinaus steht der Klägerin das Recht zu, den Rückruf und die Entfernung der
Verletzungsprodukte aus den Vertriebskanälen zu verlangen, § 140a Abs. 3 PatG.

6.   Der geltend gemachte Anspruch auf Vernichtung folgt aus § 140a Abs. 1 PatG.

7.   Schließlich haben die Beklagten gemäß § 140b Abs. 1 PatG die Verpflichtung, der
Klägerin Auskunft über Herkunft und Vertriebswege der patentverletzenden Erzeug-
nisse zu geben.

8.   Die Zuständigkeit des angerufenen Landgerichts Mannheim ergibt sich aus dem Ge-
sichtspunkt bundesweiter Verletzung (§ 32 ZPO) sowie der Tatsache, dass es sich
um eine Patentstreitigkeit handelt (§ 143 PatG).


*R. Amh.*

Dr. Bernd Allekotte
- Rechtsanwalt -


Anlagen
K 1   EP 1 316 181 B1
K 2   DE 601 10 612 T2
K 3   Registerauszug für DE 601 10 612
K 4   Merkmalsanalyse Anspruch 1
K 5   Datenblatt zu 8864-Chipp