# Appendix 4

38/76   #6 I Suit K28965 19.07.19 EP1361181.pdf |19.07.2019 10:52

# GRÜNECKER

PATENT ATTORNEYS AND ATTORNEYS AT LAW

Grünecker PartG mbB Leopoldstr 4          80802 Munich Germany

**Via beA**

Mannheim District Court
- Patent Litigation Chamber -
A1.1
68159 Mannheim

| Your Ref. | Our Ref | Date |
|---|---|---|
| | K28965BASO063 | 19 July 2019 |

*We suggest assignment to 7 ZK because an action brought by the present Plaintiff is already filed under the same patent in suit under Az: 7 O 33/19 and 7 O 39/19.*

## LEGAL ACTION

in the case of

**Avago Technologies International Sales Pte. Limited**, 1 Yishun Avenue 7, Singapore 768923, represented by the managing director

- Plaintiff -

<u>Represented by:</u>    Attorneys of Grünecker PartG mbB, in particular Bernd Allekotte, Attorney at Law and Sebastian Ochs, Attorney at Law Leopoldstrasse 4, 80802 Munich

---

**Grünecker Patent Attorneys and Attorneys at Law PartG mbB**

| | | | |
|---|---|---|---|
| Leopoldstr. 4 | Phone +49 (0) 89 21 23 50 | Local Court: Munich | Deutsche Bank Munich SWIFT / BIC |
| 80802 Munich | Fax +49 (0) 89 22 02 87 | Partnership register: | code: DEUT DE MM   IBAN: DE47 |
| | | | 0010 0175 1734007007 |
| Germany | Info@grunecker.de | PR 1397 | |

[1] also: Mediator    [2] also: Agente de la Propedad Industrial (Éspana)    [3] also: Consulente in Brevetti (Italia)
[4] European Patent Attorney and UK Chartered Patent Attorney    [5] Professor at the College of Applied
Management    [6] also Attorney at Law, New York    [7] in cooperation with

MUNICH
Patent Attorneys
European Patent Attorneys
Thomas Schuster
Dr. Klara Goldbach
Martin Aufenanger, LL. M., MM'
Gottfried Klitzsch
Dr. Heike Vogelsang-Wenke
Reinhard Knauer
Dietmar Kuhl
Dr. Franz-Josef Zimmer
Bettina K. Reichelt
Dr. Anton K. Rau
Dr. Udo Weigelt, LL. M
Rainer Bertram
Jens C. Koch. M. S. (U of PA)
Bernd Rothaemel
Thomas W. Laubenthal. LL. M.
Dr. Andreas Kayser
Dr. Jens Hammer
Dr. Thomas Eickelkamp
Dr. Peter Miltényi ²
Dr. Moritz Höffe. LL. M.
Gero Maatz-Jansen
Michael Heise
Christian Meisinger
Dr. Martin Ahr
Dr. Wolfgang Neubeck
Steven M. Zeman. Ph. D.
André Nickel
Felix Kahr
Dr. Alexander Sturnvoll. LL. M.
Dr. Stefano Marchini ³
Dr. Thomas Kronberger
Yilin Jin
Dr. Georg Seisenberger
Dr. Olivia Nemethova. LL. M.
Dr. Rainer Plaggenborg
Victor Lopes Aguiar
Dr. Sabine Koch
Wolfram Thomas
Dr. Markus Grammel
Dr. Jegannath Korutottu ⁴

Attorneys at Law
Dr. Ulrich Blumenröder, LL. M
Dr. Maximilian Kinkelley, LL. M.⁶
Dr. Karsten Brandt
Anja Franke, LL. M.
Ute Stephani
Dr. Bernd Allekotte, LL. M.⁶
Dr. Elvira Bertram. LL. M.
Babett Erfe
Christine Neuhierl
Sabine Brandstätter
Cornelia Schmitt
Petra Lübbe
Dr. Holger Gauss
Dr. Nicolas Schmitz
Marina Schlumberger
Kirsten Hammerstingl
Sebastian Clotten, LL. M.
Jennifer Rosenhäger LL. M.
Mark Peters, LL. M.
Dr. Nicola Busch
Julia Bittner LL. M.
Sebastian Ochs
Philipp Strommer
Jan Rether
Karin Lochner
Swetlana Frese

BERLIN
Patent Attorneys
European Patent Attorneys
Dr. Patrick P. Erk. M.S. (MIT)
Tino Rumpold

COLOGNE
Patent Attorneys
European Patent Attorneys
Dr. Martin Dropmann

PARIS
European Patent Attorney
Dr. Wolfgang Neubeck

OF COUNSEL
Patent Attorneys
European Patent Attorneys
Gottfried Klitzsch
Attorneys at Law
Dr. Helmut Eichmann
Gerhard Barth

*Reference Translation – may contain inconsistencies*

In association with:   Attorneys of Grünecker PartG mbB, in particular
Dr. Udo Weigelt, Patent Attorney, and Dr. Andre Crusius,
European Patent Attorney, Leopoldstrasse 4, 80802 Munich

versus

**BMW AG**, Petuelring 130, 80788 Munich, represented by the Management Board: Harald Krüger (Chairman), Milagros Caiña Carreiro-Andree, Klaus Fröhlich, Pieter Nota, Nicolas Peter, Peter Schwarzenbauer, Andreas Wendt, Oliver Zipse

**- Defendant 1-**

and

**BMW Bank GmbH,** Lilienthalallee 26, 80939 Munich, represented by Managing Director Hans-Jürgen Cohrs (Chairman), Hans-Peter Mathe, Markus Walch and Thomas Weber

**- Defendant 2-**

due to:   Patent Infringement

**Amount in dispute**: EUR 1,000,000.00 (provisional estimate)

Please note that the attorneys listed in the caption represent the Plaintiff and that the patent attorneys of Grünecker Patent Attorneys and Attorneys PartG mbB cooperate as patent attorneys for the Plaintiff.

In the name and on behalf of the Plaintiff we bring

**Legal Action**

and assert the following

**Requests:**

That the Defendant be adjudged

I. under pain of penalty of an administrative fine of up to € 250,000 for each instance of infringement, or in the alternative, imprisonment of up to six months, or imprisonment of up to six months [*sic, translator*], in case of recurrence imprisonment of up to two years, to be served by the chief executive officer, to cease

a) to offer, to place on the market, to use and/or to import for the stated purpose and/or to own in the Federal Republic of Germany, systems for detecting energy with automated selection of wire pairs, if the system comprises

　　　- a device that is capable of energy detection with auto pair selection;

- a plurality of wire pairs communicatively coupled to the device

and in which

- the device generates a modified energy by considering an energy associated with at least two wire pairs within a plurality of wire pairs,

- the device uses the modified energy to determine if at least one additional device is communicatively coupled to the device via at least one wire pair within a plurality of wire pairs

and

- the device performs an automatic shutdown operation when no device is communicatively coupled to the device via the wire pair,

(Claim 1 of EP 1 316 181 B1 / DE 601 10 612 T2)

in particular if it is installed in automobiles of the Defendant;

II. to inform the Plaintiff in an orderly - also electronic - directory concerning the extent to which the Defendants have engaged in the actions named under Section I above since 15 March 2017, stating the following:

(a) the names and addresses of manufacturers, suppliers and other pre-owners,

(b) the names and addresses of the commercial customers and the points of sale for which the products were intended,

(c) the quantity of products delivered, received and/or ordered as well as the prices that were paid for the products indicated,

wherein, to verify the information, copies of the corresponding receipts (i.e., invoices, in the alternative, delivery notices) shall be submitted; details that must be kept confidential may be blacked out, with the exception of the required data;

III. to present to the Plaintiff unified, chronological information stating the extent to which the Defendant has engaged in actions named under section I since 15 March 2017, stating the following

(a) the individual deliveries, itemized by delivery volumes, dates, prices and product numbers as well as names and addresses of commercial customers;

(b) the individual offers, itemized by offer volumes, dates, prices and product numbers as well as the names and addresses of the successful commercial bidders;

c) the advertising purchased, itemized by advertising media, circulation figures, period of distribution and area of circulation;

(d) the cost of production and profit generated, itemized by the individual cost factors;

wherein the Defendants reserve the right to disclose the names and addresses of non-commercial customers and offerees not to the Plaintiff, but rather to an auditor based in Germany pledged to confidentiality to be designated by the Plaintiff as long as the Defendant bears the cost and empowers and obligates said auditor to inform the Plaintiff whether a particular buyer or offeree is included in the accounting.

IV. to surrender the products referred to in Section I in the direct or indirect possession of the Defendant or owned by the Defendant to a bailiff appointed by the Plaintiff for destruction at the expense of the Defendants,

V. to recall the products referred to in Section I above which have been in the possession of third parties since 15 March 2017 from the distribution channels, indicating to those third parties granted the goods owned by the Defendant or with their consent that the Chamber has recognized in the present judgment that the patent in suit has been infringed and earnestly requesting that the goods be returned to the Defendant and, in the event the goods are returned, reimbursing the third party for the purchase price which had previously been paid, as well as assuming the costs associated with the return;

We further request that:

VI. it be established that the Defendants are obliged to reimburse the Plaintiff for all damage caused by the actions described in Section I above which have arisen since 15 March 2017, and which may yet arise;

VII. the Defendant be ordered to pay the legal costs;

VIII. partial collateral be set for each request granted, as follows:

- for the claim for injunction (Section I) the security deposit is set at EUR 800,000.00;

- for the claims for recall/removal and destruction (Sections IV and V), a further partial security deposit of EUR 50,000.00 must be paid;

- for claims for information/accounting (Sections II and III), the security deposit is set at EUR 50,000.00;

- for the costs for damages or replacement (Sections VI and VII), the security deposit is set at 120% of the respective amount to be enforced.

## Grounds

### I.

### The Parties

1. The Plaintiff is a world leader in the field of semiconductor technology and holds patents in this field. They are part of Broadcom. Over the last few years, the group of companies to which the Plaintiff belongs has steadily expanded by means of acquisitions. In sales volume, they are the world's third largest semiconductor company (excluding contract manufacturers and memory chip companies) with more than 15,000 employees worldwide. The Plaintiff invests more than € 3 billion a year in research and development and has a rich patent portfolio. More recently, the Plaintiff has observed that automobiles, in particular, increasingly contain components that infringe a large number of their patents.

2. Defendant 1) is a German automobile company known to the court.

3. Defendant 2) is a group company of Defendant 1) and rents (leases) the automobiles of Defendant 1).

### II.

### The patent in suit

#### 1. Formalities

The Plaintiff is the holder of European patent EP 1 316 181 B1 granted for the application dated 13 August 2001, which, *inter alia*, was also granted with effect in the Federal Republic of Germany and is filed with the German Patent Office (DPMA) under the number DE 601 10 612 T2 (hereinafter: **patent in suit**).

The patent in suit claims the **priority** of US Provisional No. 224846 of **11 August 2000** and **is in force**.

The application was published on 4 June 2003; the reference to the grant of the patent was published on 4 May 2005.

We submit a copy of the patent in suit as

#### - Annex K 1 -

and the German translation - published as DE 601 10 612 T2 - as

#### - Annex K 2 -

*Reference Translation – may contain inconsistencies*

and an abstract of the registry of the DPMA with status as

- Annex K3 -.

In the following discussion, references to passages refer to DE 601 10 612 T2, unless otherwise indicated.

At this point, we refer to an interim universal succession that has occurred for the Plaintiff that is also documented in the register: the formerly registered (since 15 March 2017) Avago Technologies General IP (Singapore) Pte. Ltd. merged with the Plaintiff by acquisition as Avago Technologies International Sales Pte. Ltd., having effect on 5 September 2018. The Plaintiff is thus the overall legal successor of the former patentee, Avago Technologies General IP (Singapore) Pte. Ltd. The consequence of this is action is that the patent in suit has been transferred to the Plaintiff by way of universal succession. This was reported to the DPMA on 29 October 2018 (procedural status date); the amendment was published on 6 December 2018.

## 2. Technical background

The technical teaching of the patent in suit generally relates to a system/device and a method for **energy detection and automatic shutdown** (see [0001] of the patent in suit). In particular, it shows a possibility of energy-saving measures that can be implemented, such as when knowledge of the wiring (also called "connectivity of the wire pairs") is lacking. Energy-saving measures may be the total or partial shutdown of the device, for example.

The patent in suit starts from **prior art** according to which systems are known that could perform energy saving measures (see [0002]). The problem addressed by the patent in suit lies in the fact that the previously known systems, however, in each case

> *"are dependent on a priori knowledge of the connectivity of wires and wire pairs within their respective system"*

(see patent in suit a) above). Stated simply, the system/device needed to know how it is connected to other devices. Only then could it determine ("detect") whether the other devices are active (i.e., whether energy is sent from them to the system in the case of data exchange, for example). Energy-saving systems operate on the premise that if no energy is detected by the other systems, energy-saving measures can be undertaken, for example a shutdown of the system. However, if it is not possible to reliably determine whether the other devices are active, the system will not work properly.

Problems have been encountered in the prior art, for example, when *"the wires have been improperly connected"* (see [0002]). If the system does not know how the other devices are connected, it cannot properly detect the energy. It simply does not work as intended.

For this purpose, the systems known in the prior art relied on knowing exactly

> *"which wire pair is the receiver pair, to correctly control the current"*

> (see [0007] of the patent in suit).

Such scenarios could also occur in networks, for example. In particular, when so-called "cross connections" have been inserted into existing systems, incorrect wiring could occur (for example transmitter to transmitter and receiver to receiver).

## 3. Relevant person skilled in the art

The relevant **person skilled in the art** is an

> **electrical engineer (university or technical college) with several years of experience in the design of systems for energy detection.**

## 4. Problem and solution

In view of this, the **problem** of the patent in suit is to provide a system and a method, which makes possible a **solution** that

> *"can be used in conjunction with automatic media-dependent interface crossover (MDIX = media-dependent interface crossover)"*

> (see paragraph [0007] of the patent in suit).

For *"automatic media-dependent interface crossover and "MDIX"*, see below.

The patent in suit solves this problem, in particular, with a technical teaching according to claim 1 (system) which is suitable:

> *"for performing the correct function of each energy detection and shutdown circuit without having any knowledge of which pair is the transmitting pair and which pair is the receiving pair."*

Indeed, the present invention is capable of

> *"determining the presence of a connection partner regardless of whether the wiring was correctly installed or not"*

> (see paragraph [0009] of the patent in suit).

Claim 1 of the patent in suit can be described as follows in the form os a **feature analysis**:

> 1. System for energy detection with automatic wire pair selection.

> 2. The system comprises:

2.1 a device which is capable of performing energy detection with automatic wire pair selection;

2.2 a plurality of wire pairs communicatively coupled to the device.

3. The device

3.1 generates a modified energy by considering an energy associated with at least two wire pairs within the plurality of wire pairs;

3.2 uses the modified energy to determine whether at least one additional device is communicatively coupled to the device via at least one wire pair within the plurality of wire pairs;

3.3 performs an automatic shutdown process when no device is communicatively coupled to the device via the wire pair.

A copy of this feature analysis is submitted as

- Annex K 4 -.

## 5. Explanation of the subject matter of claim 1

### 5.1 Feature 1

1. System for energy detection with automatic wire pair selection.

**Feature 1** shows a system for energy detection with automatic wire pair selection. The detailed design of the system is specified by Feature Groups 2 and 3.

### 5.2 Feature Group 2

2. The system comprises:

2.1 a device which is suitable for performing energy detection with automatic wire pair selection;

2.2 a plurality of wire pairs communicatively coupled to the device.

### a) Feature 2.1

**Feature 2.1** comprises a device of the system **that is capable of** performing energy detection with automatic wire pair selection. The details concerning detection are shown in **Feature Group 3**.

**(1) Sub-feature "automatic wire pair selection"**

To understand what "energy detection with automatic wire pair selection" means, it helps to understand the prior art and the existing technical problems:

To transmit signals it is (logically) necessary that the signals are both sent and received. In the prior art, to do this, it was necessary for the devices to be properly connected ("wired") to transmit signals from one to the other. This was mainly due to the fact that the interfaces were permanently preset. That is, the transmission interface was always intended only for transmitting signals; the receiving interface was always intended only for receiving signals.

The cable connected to the fixed transmission interface of the transmitting device had to be connected to the fixed receiving interface (e.g. the socket) of the receiving device - the output of one device had to be connected to the input of the other device. However, this could lead to situations - as explained below - in which the transmission interface of one device - the actual transmitting device - is connected to the transmission interface of the other device (intended for receiving). The device intended for receiving then does not receive the signal (since the transmission interface is not designed for receiving). One reason for this is the arrangement of the wire pairs in the cable.

There were and are at least two pairs of wires in one cable, one for sending, one for receiving signals. With "normal" cables, the wires run "simply straight" from one interface to another. In networks when several devices are switched on, a so-called "switch" that ensures correct transmission has been (and will be) used. A switch can be a network switchboard that allows data to be exchanged between multiple devices on a network. "Normal" cables can be used in connection with a switch. For the reasons mentioned above, this was not possible with direct connection (without a switch) between two devices. Therefore, crossover cables have been used to connect the "right" interfaces. By crossing the cable pairs, the wire pairs were "reversed" so that the cable pair connected to the transmitting interface could then be connected to the receiving interface. This can be illustrated as follows:



Callouts: (Starting on the far left)

Sender: Transmitter

Senderschnittstelle = orange - Transmission interface = orange

Kabelpaar – wire pair

Empfanger – Receiver

Kabelpaar – Wire pair

Empfangerschnittstelle = blau – Receiving interface = blue

Based on this, energy detection systems of the prior art had to rely on *"having a well-defined knowledge of which wire pair was the receiver wire pair"* (see [0007]).

However, the system according to the patent suit is (also) suitable for detecting energy along with shutdown if it is not known which is the transmitter wire pair and which is the receiver wire pair (see [0009]). According to the technical teaching of the patent in suit, the system independently selects which is the right wire pair for sending/receiving - this is called "automatic wire pair selection". Thus, the system can work even if it is not known *a priori* which is the receiver and which is the transmitter wire pair.

In connection with the "automatic wire pair selection, the patent in suit makes use of the term "automatic media-dependent interface crossover (MDIX)", for example in [0007]. MDIX indicates a connection type in the context of an Ethernet connection.

In the "normal MDIX interface" (without the prefix "auto"), internally crossed connections are present in the interface (these replace, as it were, the above-mentioned crossed cables). The patent in suit, on the other hand, relies on *"automatic media-dependent interface crossover"*, in short "auto MDIX". With "auto MDIX", the software prevents the problem of incorrect cabling. How this works is not relevant to the case.

"Auto MDIX" is a fixed term that the person skilled in the art knows and connects this with an "automatic wire pair selection". Often "MDIX" interfaces today are also capable of "auto MDIX". This means that even if a hardware intersection (MDIX) is present in the interface, "auto MDIX" is additionally used. In this way it can be ensured that the correct wire pairs are assigned in each case of incorrect wiring (for example when using a "double" crossing in a crossed cable and the crossing by MDIX in the interface).

Paragraph [0022] results in "auto MDIX" (omissions and emphasis added):

> *"The present invention is at least one that is operable within systems employing Ethernet-based media-dependent interface crossover (MDIX). [...] An auto **MDIX** solution*

> *automatically compensates for any improperly installed cable pair(s). [...] The present invention makes an elegant modification to ensure proper functionality of each power detection circuit, even when auto MDIX is implemented."*

Of course, this does not exclude the fact that the technical teaching is also applied to correct cabling, and the patent in suit also includes this application.

### (2) Sub-feature device

In any case, the patent in suit considers a "device" to be a "*chip, a printed circuit board with individual components or chip groups*". However, any "*device with logical and operational configurability*" falls thereunder (see [0023]).

### b) Feature 2.2

According to **Feature 2.2**, the system comprises a plurality of wire pairs that are communicatively coupled to the device.

The "communicative" coupling indicates the fact that the pairs of wires must be such that they are connected to the device for transmitting and/or receiving signals and also such that they allow a corresponding connection with another device (see also below **Feature 3.3**).

It should be possible to determine whether they are active when connected to other devices, for example, by detecting outgoing energy from them.

### 5.3 Feature Group 3

3. The device

> 3.1 generates a modified energy by considering an energy associated with at least two wire pairs within the plurality of wire pairs;
>
> 3.2 uses the modified energy to determine whether at least one additional device is communicatively coupled to the device via at least one wire pair within the plurality of wire pairs;
>
> 3.3 performs an automatic shutdown process when no device is communicatively coupled to the device via the wire pair.

### a) Feature 3.1

According to the admittedly somewhat cumbersomely worded **Feature 3.1**, the device is intended to produce a modified energy **by considering** an energy associated with at least two pairs of wires within the plurality of wire pairs.

In the description of the patent in suit, the "modified energy" is synonymously referred to as "suitable energy" (see, for example, paragraph [0037]).

The sub-feature "generate" does not mean that the device itself produces energy.

**Ultimately, "modified"/"suitable" energy is simply an indicator of whether energy from the device is being received over a line. In addition to the wording of Feature 3.1, this also shows the interplay of Feature 3.1 with Feature 3.2. According to this, it should be determined whether there is communicative coupling by means of the "modified"/"suitable" energy.**

For the question of how "modified"/"suitable" energy is "generated", the patent in suit provides, among other things, information in connection with two preferred embodiments.

**According to this, it can simply be about determining whether there is any energy on a line - possibly at a given point in time. In addition, however, "modified"/"suitable" energy can also be generated using a pulse detected by the device and further processing it. In all cases, "generating" is nothing other than "detection" of energy in a wire pair. This definition already contains Feature 3.1 itself and is further clarified by the term "in that" (emphasis added):**

> *3. The device*
>
> > *3.1 generates a modified energy in that an energy is considered that is associated with at least two wire pairs within the plurality of wire pairs."*

Subclaims 4 and 6 illustrate the preferred embodiments mentioned.

**Subclaim 4:**

> *"Energy detection system with automatic selection of wire pairs according to Claim 1, wherein the device subtracts from the energy a connection pulse energy when the device transmits a connection pulse to generate the modified energy and the connection pulse energy is associated with a connection pulse transmitted from the device."*

This then clarified the fact that when a pulse is emitted, its energy must again be subtracted from the received energy to determine if another (active) device is coupled. Otherwise, energy could always be detected (namely, that of the self-generated impulse). In this case, no statement would be possible as to whether a further (active) device is actually present.

**Subclaim 6:**

> *"The energy detection system with automatic wire pair selection according to claim 1, wherein the device uses the energy associated with each of at least one wire pair within*

*the plurality of wire pairs as the modified energy when the device does not transmit a connection pulse."*

Subclaim 6 illustrates another possibility of "generating" the "modified"/"suitable" energy. This comprises both the case in which no impulse at all is transmitted by the device, as well as the case in which a pulse is transmitted at time intervals, for example. In the latter case, according to subclaim 6, in consideration of the energy on the wire pair, that point in time which is related to the pulse is left out of consideration. In this case, the device uses the existing energy of the wire pairs as "modified"/"suitable" energy.

As a result, according to claim 1, it is sufficient if it is checked whether any energy from a connection partner is present on the wire pairs. To this end, [0021] states the following (highlighting added):

*"An energy detection circuit capable of performing an automatic shutdown **monitors a connected wire**. This energy detection circuit **determines whether there is any incoming signal, or any energy on the wire**, that will signal the fact that **a connection partner is connected to the other end of the wire.**"*

This also confirms a recourse to the wording of the English language version of the granted European patent (**Annex K 1**). **Feature 3.1** reads as follows in the language of the procedure (emphasis added):

*"wherein the device **generates a qualified energy by considering an energy associated with at least two wire pairs within the plurality of wire pairs**"*

The English text speaks of *"qualified energy"* – i.e., "qualified energy". It also states *"generates [...] by considering an energy associated with [...] wire pairs"* - which can be understood as: *"generates [the qualified energy] by considering energy associated with wire pairs"*.

This shows that **Feature 3.1** is not aimed at having energy actually derived from the device, but rather that energy existing on the wire pairs is taken into account in the detection of energy. It also shows that it concerns allocating a certain qualification/quality to an existing energy (*"generate [...] qualified energy"*).

This "modified" "suitable"/"qualified" energy so "generated" uses the device to determine (see **Feature 3.2**) whether another (active) device is connected.

b) Feature 3.2

The determination step according to **Feature 3.2** takes place depending on whether such "generated" "modified"/"suitable" energy is present at all. If this is the case, the system concludes that at least one additional device is communicatively coupled to the device via at least one pair of wires within the plurality of wire pairs.

In this connection, [0021] states (bold print added):

*"An energy detection circuit capable of performing an automatic shutdown **monitors a connected wire**. This energy detection circuit **determines whether there is any incoming signal, or any energy on the wire which will signal that a connection partner is connected to the other end of the wire. If there is no wire connected to the other end, or no connection partner is connected to the other end of the wire connected to a device, then there is no energy on the wire** and the energy detection circuit (the detector) indicates this state. A state machine, which is also described in various examples, is suitable for recognizing various forms of transmission."*

Depending on the result of the determination step, the device performs a shut-off operation according to **Feature 3.3** - or not.

#### c) Feature 3.3

According to **Feature 3.3**, an automatic shut-off process is then carried out if no device is communicatively coupled to the device via the wire pair (see again **Feature 3.2**).

In any case, the following situations are identified according to [0031]:

- no device is connected,

- a device is connected but inactive.

> *[0031] When the device 210 is communicatively connected to a powered-on device, such as the powered-on device 230, the device 210 recognizes this and remains on for full operation. Then, if the powered-on device 230 is ever turned off, the device 210 detects this event and enters an automatic shutdown sequence. Situations could also arise in which one pair is connected to device 210 but no other device is communicatively connected to the other end of the pair. In this case, the device 210 is capable of determining that there is no further device, and subsequently executes an automatic shutdown operation."*

In this case, the device can **switch off totally or partially** (see [0044] and subclaim 2).


### III.

#### Nature of the contested embodiment and patent infringement

#### 1. Contested embodiment

The Defendants infringe claim 1 of the patent in suit. Merely by way of example and without limitation, we refer to the system for navigation, communication and entertainment used in the BMW models i3 and i8 (and, in any case, in the BMW Series 5 as well). The system for

navigation, communication and entertainment is offered and is on the market in the Federal Republic of Germany without the consent of the Plaintiff.

The system for navigation, communication and entertainment is chosen only as an example. The invention may also be used in other systems of the Defendants.

The system for navigation, communication and entertainment essentially consists of a so-called "head unit" as well as peripheral devices coupled with it.

Below, we show images of a top view along with – not of interest in this instance - technical data as well as a front view with attached production number of a headunit installed in the BMW models i3 and i8:



(Draufansicht): (Top view)



(Frontansicht): (Front view)

## 2. Headunit with chip

Inside the headunit are several boards, including a board with a chip from the manufacturer MICREL (circled in red).



Enlarged and copied from the above image, the chip designated as KSZ8864RMNU (hereinafter: 8864 chip) looks like this:



We submit the datasheet for this chip - an Ethernet chip - (as of 26 March 2015, revision 1.6) as

### - Annex K 5 -

According to "Ordering Information" (**page 3, Appendix K 5**), the chip with the designation KSZ8864RMNU is merely a version of the 8864 chip designed in particular for automotive applications, for example with respect to the temperature range:

**Ordering information**

| Part Number | Temperature Range | Package | Lead Finish/Grade |
|---|---|---|---|
| KSZ8864RMN | 0 °C to 70 °C | 64-Pin QFN | Pb-Free/Commercial |
| KSZ8864RMNI | -40 °C to +85 °C | 64-Pin QFN | Pb Free/ Industrial |
| KSZ8864RMNU (Automotive AEC-Q100 Qualified) | -40 °C to +85 °C | 64-Pin QFN | Pb-Free/Automotive |

Therefore, the technical specifications of **Appendix K 5** apply equally to chip KSZ8864RMNU.

An Ethernet port is attached and wired to the 8864 chip on the other side of this board. This Ethernet port is labeled "OABR" on the back of the headunit. OABR (Open Alliance BroadR Reach), which is also known by the name 100BASE-T1, indicates an Ethernet standard being developed for communication networks in automobiles. In the images shown below, the Ethernet port is outlined in blue.

Back side of the head unit with Ethernet connection:





Board removed with Ethernet connection:



In models BMW i3 and i8, an Ethernet plug of a wiring harness is connected to this Ethernet port of the board in the head unit when installed in the vehicle. It should be noted here that a board with the same components is also used in headunits of the BMW 5 Series.

The 8864 chip is connected to the Ethernet port on the board via an Ethernet isolation transformer on the board (Pulse HX1188NL, outlined in yellow in the board shown above).

**Proof:**          **Expert opinion**

**3. Headunit implements claim 1**

The headunit used in the Defendant's navigation, communication and entertainment system with the 8864 chip board shown above implements claim 1 **(contested embodiment)**.

The data sheet for the 8864 chip **(Appendix K 5)** proves that the 8864 chip has implemented the functions according to the patent (according to claim 1). This is explained in detail below.

It should be noted here as a precaution that this action is not limited to a design of the system for navigation, communication and entertainment with this special chip, but rather covers all devices that make use of the technical teaching of the patent in suit.

**a) Feature 1 and Feature Group 2 are implemented**

> 1. System for energy detection with automatic wire pair selection.

> 2. The system comprises:

>> 2.1 a device that is capable of performing energy detection with automatic wire pair selection;

>> 2.2 a plurality of wire pairs that are communicatively coupled to the device.

The headunit is a system for energy detection with automatic wire pair selection according to **Feature 1**, which is apparent from the following representation.

The 8864-CHIP is a device according to **Feature 2.1** and capable of performing energy detection with automatic wire pair selection. For details, see below:

**(1) Suitability for energy detection - Feature 2.1**

We describe the **suitability for energy detection** in more detail below in connection with Feature Group 3, but at this point we would like to refer to page 2, **Annex K 5**. The functionalities of the 8864 chip are listed there. Among these is also mention of an "energy-detect mode", i.e., an energy detection mode which is mentioned in connection with the preference for the "low power dissipation" of the 8864 chip:

> **Low-power dissipation:**

> • **Full-chip software power-down and per port software power down.**

> • **Energy-detect mode support < 0.1W full-chip power consumption when all ports have no activity.**

**(2) "automatic wire pair selection" Feature 2.1**

The 8864 chip also has automatic wire pair selection functionality.

As an example of an automatic wire pair selection, the patent in suit mentions the "auto MDI/MDI-X" functionality explained above, see for example, [0022]. This is also implemented in the 8864 chip, as the following excerpt from the data sheet shows (**page 2, Appendix K 5**):

> • **Half-duplex back pressure flow control.**

> • **HP Auto MDI/MDI-X and IEEE Auto crossover support.**

*Reference Translation – may contain inconsistencies*

• **MII interface of MAC supports both MAC mode and PHY mode.**

The 8864 chip is thus capable of performing a suitably compliant automatic wire pair selection according to the patent in suit.

**Feature 2.1 is implemented.**

**(3) "Plurality of wire pairs communicatively coupled to the device" - Feature 2.2**

The headunit also has a plurality of wire pairs that are communicatively coupled to the device according to **Feature 2.2**. The 8864 chip has a large number of connection points (so-called ports) via which the chip is connected to the board, for example. This connection between the board and the 8864 chip is achieved via a plurality of wire pairs that are communicatively coupled to the device (otherwise there would be no data exchange).

In this connection, the connections for the patented coupling with the 8864 chip, which also have a connection with the "automatic wire pair selection" according to **Feature 2.1** are of particular interest. Such functionality is available on the "auto MDI/MDIX enabled" ports of the 8864 chip.

In this connection, we provide below an image of the "auto MDI/MDIX capable" ports of the 8864 chip, a block diagram of page 1 of **Annex K 5**. We have highlighted the "auto MDI/MDIX enabled" ports in red. The illustration shows two ports with the abbreviation "PHY" that are assigned to layer 1 of the OSI model. The person skilled in the art will appreciate that these are connection points. Another indication for the person skilled in the art is the reference to "Auto MDI/MDIX"; this indicates to him that this pertains specifically to the topic of (physical) cabling. "PHY1" identifies port 1 and "PHY 2" identifies port 2.



The 8864 chip is connected to the board (a printed circuit board) by means of pins and can exchange data via these pins. The ports of the 8864 chip are connected to the board via pins. In particular, Port 2 of the 8864 chip is communicatively coupled to the Ethernet port of the board. Port 2 of the 8864 chip is coupled with the pins 9 and 10 for receiving data and with pins 11 and 12 for transmitting data, as is apparent from the section "Pin Description" according to the following excerpt from the data sheet (**page 10, Annex K 5**):

**Pin Description**

| Pin Number | Pin Name | Type"; | Port | Pin Function"² |
|---|---|---|---|---|
| 1 | RXP1 | I | 1 | Physical receive signal + (differential). |
| 2 | RXM1 | I | 1 | Physical receive signal - (differential) |
| 3 | TXP1 | O | 1 | Physical transmit signal + (differential). |
| 4 | TXM1 | O | 1 | Physical transmit signal-(differential). |
| 5 | VDDA12 | P | | 1.2V analog power. |
| 6 | GND | GND | | Ground with all grounding of die bottom. |
| 7 | ISET | | | Set physical transmit output current. Pull-down resistor. |
| 8 | VDDAT | P | | 3.3V analog Vool |
| 9 | RXP2 | I | 2 | Physical receive signal + (differential). |
| 10 | RXM2 | I | 2 | Physical receive signal - (differential). |

| 11 | TXP2 | O | 2 | Physical transmit signal + (differential). |
| 12 | TXM2 | O | 2 | Physical transmit signal - (differential). |

The numbering of the pins of the 8864 chip is apparent from the data sheet in the diagram below (**page 9, Appendix K 5**), wherein the pins 9, 10 and 11, 12 are marked in yellow and wherein, to identify the pins of the 8864 chip, the circular marking can be seen as a reference point in the illustration at the bottom left of the board, which can also be found on the 8864 chip:

**Pin Configuration**



**64-Pin QFN**

Pins 9, 10 and 11, 12 of port 2 are coupled via the Ethernet isolating transformer (Pulse HX1188NL) with two wire pairs of the Ethernet port. These two wire pairs are outlined in blue in the following image.



In the following rear view of the Ethernet connection, the connecting wires are numbered (from top left [1] to bottom left [2] and continue running in this way from top to bottom up to top right [19] to the right bottom [20], with odd numbers in the upper row and even numbers in the lower row).



The receiving pins 9, 10 of the 8864 chip are coupled via the Ethernet isolating transformer to the connecting wire pair 18, 20 (the two adjacent connecting wires at the bottom right), and the transmitting pins 11, 12 of the 8864 chip are coupled via the Ethernet isolating transformer to the connecting wire pairs 17, 19 (the two adjacent upper right connection wires).

In the BMW i3 and i8 models, the 8864 chip is thus coupled with the connecting wire pairs of the Ethernet connection, which in turn are connected to the cable harness.

The device has communicatively coupled wire pairs according to **Feature 2.2**.

b) **Feature group 3 implemented**

    3. The device

        3.1 generates a modified energy by considering an energy associated with at least two wire pairs within the plurality of wire pairs;

        3.2 uses the modified energy to determine whether at least one additional device is communicatively coupled to the device via at least one wire pair within the plurality of wire pairs;

        3.3 performs an automatic shutdown process if no device is communicatively coupled to the device via the wire pair.

The 8864 chip works in accordance with **Feature Group 3**.

As mentioned above, the 8864 chip has the possibility of an Energy-Detect Mode. We refer again to page 2, **Annex K 5**, where it reads:

**Low power dissipation:**

- Full-chip software power-down and per port software power down.

- **Energy-detect mode support < 0.1W full-chip power consumption when all ports have no activity.**

In the Energy Detect mode, *all ports*, including ports 1 and 2, are monitored for 'activity'. A port is active when energy flows through it. Thus, the 8864 chip can detect whether a further active device is connected to it (**Features 3.1** and **3.2**). It is therefore possible to monitor whether energy is received via the Ethernet port (at port 2) to which the cable harness is connected.

The functions associated with the Energy Detect Mode of the 8864 chip are described on **page 24** of **Appendix K 5**, under the heading "Energy Detect Mode":

**Energy Detect Mode**

The energy detect mode provides a mechanism to save more power than in the normal operation mode when the KSZ8864RMN is not connected to an active link partner. In this mode, if the cable is not plugged, then the KSZ8864RMN can automatically enter to a low power state, i.e., the energy detect mode. In this mode, KSZ8864RMN will keep transmitting 120ns width pulses at 1 pulse/s rate. Once activity resumes due to plugging a cable or attempting by the far end to establish link, the KSZ8864RMN can automatically power up to normal power state in energy detect mode.

Energy detect mode consists of two states, normal power state and low power state. While in low power state, the KSZ8864RMN reduces power consumption by disabling all circuitry except the energy detect circuitry of the receiver. The energy detect mode is entered by setting bit [4:3] = 01 in register 14. When the KSZ8864RMN is in this mode, it will monitor the cable energy. If there is no energy on the cable for a time longer than pre-configured value at bit [7:0] Go-Sleep time in register 15, then the KSZ8864RMN will go into a low power state. When KSZ8864RMN is in low power state, it will keep monitoring the cable energy. Once the energy is detected from the cable, KSZ8864RMN will enter normal power state. When KSZ8864RMN is at normal power state, it is able to transmit or receive packet from the cable.

Specifically, this reads:

Energy detect mode consists of two states, normal power state and low power state. While in low power state, the KSZ8864RMN reduces power consumption by disabling all circuitry except the energy detect circuitry of the receiver. The energy detect mode is entered by setting bit [4:3] = 01 in register 14. When the KSZ8864RMN is in this mode, it will monitor the cable energy. If there is no energy on the cable for a time longer than pre-configured value at bit [7:0] Go-Sleep time in register 15, then the KSZ8864RMN will go into a low power state. When KSZ8864RMN is in low power state, it will keep monitoring the cable energy. Once the energy is detected from the cable, KSZ8864RMN will enter normal power state. When KSZ8864RMN is at normal power state, it is able to transmit or receive packet from the cable.

The 8864 chip can therefore monitor the energy in the "energy detect mode", which is linked to the wiring at the ports ("*it will monitor the cable energy*"). In doing so, "*it generates a modified energy by considering an energy associated with at least two wire pairs within the plurality of wire pairs*"- according to **Feature 3.1**.

It can then use this "considered", i.e, "modified energy" "*to determine if at least one additional device is communicatively coupled to the device via at least one pair of wires within the plurality of wire pairs*" - **Feature 3.2**. Thus, **Annex K 5** (page 24) introduces the Energy Detect Mode as follows:

Energy Detect Mode

> **Energy Detect Mode**
>
> The energy detect mode provides a mechanism to save more power than in the normal operation mode when the KSZ8864RMN is not connected to an active link partner. In this mode, if the cable is not plugged, then the KSZ8864RMN can automatically enter to a low power state, i.e., the energy detect mode. In this mode, KSZ8864RMN will keep transmitting 120ns width pulses at 1 pulse/s rate. Once activity resumes due to plugging a cable or attempting by the far end to establish link, the KSZ8864RMN can automatically power up to normal power state in energy detect mode.

It is stated there that, depending on the activity at the port, - i.e., the presence of an "active link partner" via the Energy Detect Mode, a shutdown can be performed (see below). As established in **Feature 3.1**, the presence of energy at the ports, can be monitored. With this "modified energy" thus generated, it can then be determined in the 8864 chip whether a communicative coupling of a wire pair to the device is present - it can detect whether an active connection partner is present.

Depending on the result of the determination - according to **Feature 3.3** - an automatic shutdown can then be performed, whereby the 8864 chip can be put into the "low power state".

In the "low power state", all circuits of the 8864 chip can be switched off, except for those intended for the detection of power. This so-called "low power state" of the 8864 chip does not depart from implementation, because, as just shown, this means nothing other than the "monitoring/detection mode.

After all, it is clear that, with its Energy Detect Mode, the 8864 chip is suitable for carrying out an energy detection process according to the patent in suit in accordance with **Feature 2.1** in conjunction with **Feature Group 3**. This applies not only to port 2 and the connected Ethernet port connected thereto (which is sufficient for infringement, however). Rather, corresponding suitability is also observed with respect to port 1 and to the Ethernet chip KSZ8051MNLU communicatively coupled above the 8864 chip which is arranged on the same board. We reserve the right to further explanation, should the Defendants deny this.

**Feature Group 3** is **implemented**.

**Claim 1** is **implemented**.

## IV.

### Legal Arguments

1. The Plaintiff is a legitimate holder of the patent in suit. The legitimate holder prior to the Plaintiff, Avago Technologies General IP (Singapore) Pte. Ltd., was merged by way of universal succession to the Plaintiff named in the rubric, Avago Technologies International Sales Pte. Limited, with effect from 5 September 2018. The patent in suit and all claims therefrom have been transferred to the Plaintiff via universal succession.

2. The valid claim for injunctive relief is based on § 139 para. 1 in conjunction with § 9 para. 2 no. 1 PatG. The Defendants distribute the systems for navigation, communication and entertainment with the 8864-CHIPs described by way of example, which fall under claim 1 of the patent in suit, thus directly infringing same. Danger of recurrence is given. The Defendants offer and distribute the represented products in Germany. Defendant 2) markets them by way of leasing.

3. The Defendants are obligated to be informed about relevant industrial property rights of third parties and to observe them. Thus, in any case, the Defendant has acted with negligence.

4. In addition, the Defendants are obliged to pay damages, § 139 para. 2 PatG [Patent Act]. Since there is sufficient likelihood that the Plaintiff suffered damage because of the Defendants' actions of infringement, the Plaintiff has a legitimate interest in determining liability for damages with respect to the patent in suit. The Plaintiff is not in a position to quantify the amounts, which is why they are also entitled to requests for information and damages (pursuant to § 140b para. 1 PatG [Patent Act] and/or § 242 BGB [German Civil Code]).

5. In addition, the Plaintiff has the right to demand the recall and the removal of the infringing products from the distribution channels, § 140a para. 3 PatG [Patent Act].

6. The valid claim for destruction follows from § 140a para. 1 PatG [Patent Act].

7. Finally, according to § 140b para. 1 of the Patent Act, the Defendants have the obligation to provide the Plaintiff with information about the origin and distribution channels of the products that infringe the patent.

8. The jurisdiction of the Mannheim District Court is derived from the viewpoint of nationwide infringement (§ 32 ZPO [Code of Civil Procedure]) and from the fact that this is a patent dispute (§ 143 PatG [Patent Act]).

[Signature]

Dr. Bernd Allekotte

- Attorney at Law -


Attachments

K1 EP 1316 181 B1
K2 DE 601 10 612 T2
K 3 Extract from Register for DE 601 10 612
K 4 Feature analysis claim 1
K 5 Data sheet for 8864 chip