# Appendix 5

EIP Europe LLP
Graf-Adolf-Straße 14
D-40212 Düsseldorf

T +49 (0)211 9595 8500
F +49 (0)211 9595 8544

dusseldorf@eip.com
eip.com

Beglaubigte Abschrift

 **LEGAL**

**Rechtsanwälte**
Dr. Christof Höhne, LL.M.[1]
Florian Schmidt-Bogatzky, LL.M.[2]
Michael Munsch[1]
Isabelle Schaller
Elisa Beckamp, LL.M.
Dimitri Kosenko

Florian Schmidt-Bogatzky
fschmidtbogatzky@eip.com
+49 211 9595 85 09

**VORAB PER FAX: +49 40 428 43 - 4318**
**(ohne Anlagen)**
Landgericht Hamburg
Zivilkammer 27
Sievekingplatz 1
20355 Hamburg



02. August 2019

## K L A G E

der
    **Avago Technologies International Sales Pte. Limited.,** 1 Yishun Avenue 7, Singapore 768923, vertreten durch die Geschäftsführung,

- **Klägerin** -

Prozessbevollmächtigte:
    EIP Europe LLP, Graf-Adolf-Straße 14, 40212 Düsseldorf

Mitwirkend:
    Dilg, Haeusler, Schindelmann Patentanwaltsgesellschaft mbH, Leonrodstr. 58, D-80636 München

gegen
    **BMW AG,** Petuelring 130, 80788 München, vertreten durch den Vorstand: Harald Krüger (Vorsitzender), Milagros Caiña Carreiro-Andree, Klaus Fröhlich, Pieter Nota, Nicolas Peter, Peter Schwarzenbauer, Andreas Wendt, Oliver Zipse

- **Beklagte zu 1** -

**u n d**

> **BMW Bank GmbH,** Lilienthalallee 26, 80939 München,
>
> vertreten durch die Geschäftsführer Hans-Jürgen Cohrs
>
> (Vorsitzender), Hans-Peter Mathe, Markus Walch und
>
> Thomas Weber

- Beklagte zu 2 -

**w e g e n:**          **Patentverletzung**

Streitwert (vorläufig geschätzt):      **EUR 1.000.000,00**

Namens und in Vollmacht der Klägerin erheben wir Klage und werden **beantragen,** wie folgt
zu erkennen:

  I.    **die Beklagten werden verurteilt,**

   1. **es bei Meidung eines für jeden Fall der Zuwiderhandlung vom Gericht
      festzusetzenden Ordnungsgeldes bis zu 250.000,- Euro, ersatzweise
      Ordnungshaft bis zu sechs Monaten oder Ordnungshaft bis zu sechs
      Monaten, im Wiederholungsfall bis zu insgesamt-zwei Jahren, die Ord-
      nungshaft zu vollziehen an ihren Vorstandsmitgliedern bzw. Ge-
      schäftsführern,**

      **zu unterlassen,**

      **Systeme zum Verarbeiten von über ein Kommunikationsmedium emp-
      fangenen Signalen in Deutschland herzustellen, anzubieten, in den
      Verkehr zu bringen und/oder zu diesen Zwecken einzuführen oder zu
      besitzen,**

wobei das System umfasst:

- einen ein erstes Funkgerät oder ersten Empfänger umfassenden Chip, der zum Verarbeiten eines Signals für ein erstes drahtloses Protokoll verwendet wird, und

- wobei der Chip einen gemeinsam genutzten LNA umfasst, der das Empfangen des Signals für das erste drahtlose Protokoll und eines Signals für ein zweites drahtloses Protokoll ermöglicht,

wobei

ein Transkonduktanzverstärker in dem Chip dazu genutzt wird, einen Ausgang des gemeinsam genutzten LNA mit dem ersten Funkgerät oder ersten Empfänger zu koppeln,

und wobei

der gemeinsam genutzte LNA in einem zweiten Funkgerät oder zweiten Empfänger in dem Chip integriert ist, der zum Verarbeiten des Signals für das zweite drahtlose Protokoll verwendet wird

(EP 1 931 052 B1, Anspruch 11);

insbesondere wenn

das zweite Funkgerät oder der zweite Empfänger ein WLAN-Funkgerät oder WLAN-Empfänger ist;

(EP 1 931 052 B1, Anspruch 12);

und/oder wenn

der Transkonduktanzverstärker in dem zweiten Funkgerät oder zwei-
ten Empfänger integriert ist;

(EP 1 931 052 B1, Anspruch 13);

und/oder

das erste Funkgerät oder der erste Empfänger ein Bluetooth-Funkge-
rät oder Bluetooth-Empfänger ist;

(EP 1 931 052 B1, Anspruch 14);

2. der Klägerin unter Vorlage eines einheitlichen, chronologisch geord-
neten Verzeichnisses Auskunft zu erteilen, in welchem Umfang die Be-
klagten die zu I. 1. bezeichneten Handlungen seit dem 02.06.2012
begangen haben, und zwar unter Angabe

(a) der Namen und Anschriften der Hersteller, Lieferanten und anderer
Vor-besitzer,

(b) der Namen und Anschriften der gewerblichen Abnehmer sowie der
Verkaufsstellen, für die die Erzeugnisse bestimmt waren,

(c) der Menge der hergestellten, ausgelieferten, erhaltenen oder be-
stellten Erzeugnisse sowie der Preise, die für die betreffenden Er-
zeugnisse gezahlt wurden,

wobei

zum Nachweis der Angaben die entsprechenden Kaufbelege (näm-
lich Rechnungen, hilfsweise Lieferscheine) in Kopie vorzulegen
sind, wobei geheimhaltungsbedürftige Details außerhalb der aus-
kunftspflichtigen Daten geschwärzt werden dürfen;

EIP Europe LLP
Klageschrift vom 02. August 2019

Seite 5

3. der Klägerin unter Vorlage eines einheitlichen, chronologisch geord- neten Verzeichnisses Rechnung zu legen, in welchem Umfang die Be- klagten die zu I. 1. bezeichneten Handlungen seit dem 02.06.2012 begangen haben, und zwar unter Angabe

(a) der Herstellungsmengen und -zeiten

(b) der einzelnen Lieferungen, aufgeschlüsselt nach Liefermengen, -zeiten, -preisen und Typenbezeichnungen sowie der Namen und Anschriften der gewerblichen Abnehmer,

(c) der einzelnen Angebote, aufgeschlüsselt nach Angebotsmengen, -zeiten, -preisen und Typenbezeichnungen, sowie der Namen und Anschriften der gewerblichen Angebotsempfänger,

(d) der betriebenen Werbung, aufgeschlüsselt nach Werbeträgern, de- ren Auflagehöhe, Verbreitungszeitraum und Verbreitungsgebiet,

(e) der nach den einzelnen Kostenfaktoren aufgeschlüsselten Geste- hungskosten und des erzielten Gewinns,

wobei

- es den Beklagten vorbehalten bleibt, die Namen und Anschriften der Angebotsempfänger und der nicht gewerblichen Abnehmer statt der Klägerin einem von der Klägerin zu bezeichnenden, ihr gegenüber zur Verschwiegenheit verpflichteten, in der Bundesre- publik Deutschland an-sässigen vereidigten Wirtschaftsprüfer mit- zuteilen, sofern die Beklagte deren Kosten trägt und ihn ermächtigt und verpflichtet, der Klägerin auf konkrete Anfrage hin mitzuteilen, ob ein bestimmter Abnehmer oder ein bestimmter Angebotsemp- fänger in der Aufstellung enthalten ist;

- die in ihrem unmittelbaren oder mittelbaren Besitz oder in ihrem Eigentum befindlichen, unter Ziffer I. 1. b) bezeichneten Erzeugnisse an einen von der Klägerin zu benennenden Gerichtsvollzieher zum Zwecke der Vernichtung auf ihre - der Beklagten - Kosten herauszugeben, wobei ihnen das Recht vorbehalten bleibt, die genannten Erzeugnisse selbst zu vernichten und der Klägerin die Vernichtung durch schriftliche Erklärung nachzuweisen;

4. die unter Ziffer I. 1. b) bezeichneten, seit dem 02.06.2012 in Verkehr gebrachten Erzeugnisse gegenüber den gewerblichen Abnehmern unter Hinweis darauf, dass mit dem hiesigen Urteil der patentverletzende Zustand der genannten Erzeugnisse festgestellt wurde, und mit der verbindlichen Zusage zurückzurufen, etwaige Entgelte zu erstatten sowie notwendige Verpackungs- und Transportkosten sowie mit der Rückgabe verbundene Zoll- und Lagerkosten zu übernehmen und die Erzeugnisse wieder an sich zu nehmen;

5. die unter Ziffer I. 1. b) bezeichneten, seit dem 02.06.2012 in Verkehr gebrachten Erzeugnisse endgültig aus den Vertriebswegen zu entfernen, indem sie sie an sich nimmt und/oder dafür Sorge trägt, dass der jeweilige Besitzer die Erzeugnisse vernichtet.

II.   Es wird festgestellt, dass die Beklagten verpflichtet sind, der Klägerin allen Schaden zu ersetzen, der

- der Broadcom Corporation, Irvine, CA, USA durch die zu Ziffer I. 1. bezeichneten und in der Zeit vom 02.06.2012 bis zum 28.11.2016 begangenen Handlungen entstanden ist oder noch entstehen wird;

- der Rechtsvorgängerin (nämlich der Avago Technologies General IP (Singapore) Pte. Ltd., Singapore) der Klägerin durch die unter Ziffer I.1 bezeichneten und zwischen dem 29.11.2016 und dem 05. September 2018 begangenen Handlungen entstanden ist und noch entstehen wird.

- der Klägerin durch die unter Ziffer I.1 bezeichneten und seit dem 06. September 2018 begangenen Handlungen entstanden ist und noch entstehen wird.

III.    Die Beklagten tragen die Kosten des Rechtsstreits.

IV.    Das Urteil ist gegen Sicherheitsleistung, die auch in Form einer Bank- oder Sparkassenbürgschaft erbracht werden kann, vorläufig vollstreck- bar. Die einzelnen Teile des Tenors können gegen Sicherheitsleistung in Höhe eines von dem Gericht jeweils festzusetzenden Teilbetrages der Ge- samtsicherheitsleistung jeweils einzeln vollstreckt werden.

Für den Fall der Anordnung eines schriftlichen Vorverfahrens beantragen wir bereits jetzt den Erlass eines Versäumnisurteils gem. § 331 Abs. 3 ZPO, falls die Beklagten ihre Verteidigungsbereitschaft nicht rechtzeitig anzeigen.

EIP Europe LLP                                                               Seite 8
Klageschrift vom 02. August 2019

### Inhaltsverzeichnis

A.    Parteien.................................................................................... 9

B.    Das Klagepatent EP 1 931 052 B1 ...................................... 10

I.    Formelle Daten ...................................................................... 10

II.   Technischer Hintergrund und referierter Stand der Technik ............................. 11

III.  Technisches Problem ............................................................. 12

IV.   Lösung .................................................................................... 12

C.    Zur Patentverletzung............................................................. 19

I.    Die Verletzungsform macht von den Ansprüchen 11, 12, 13 und 14 des
      Klagepatents Gebrauch ........................................................ 33

D.    Rechtsfolgen .......................................................................... 35

Avago ./. BMW u.a. – EP 052

## B e g r ü n d u n g

### A.   Parteien

1.   Die Klägerin ist ein weltweit führendes Unternehmen auf dem Gebiet der Halbleitertechnologie und hält Patente auf diesem Gebiet. Sie ist Teil von Broadcom. Der Konzernverbund, zu dem die Klägerin gehört, wurde über die letzten Jahre durch Akquisitionen stetig vergrößert. Nach Umsatz handelt es sich um das drittgrößte Halbleiterunternehmen der Welt (ohne Auftragsfertiger und Speicherchip-Unternehmen) mit weltweit mehr als 15.000 Mitarbeitern. Die Klägerin investiert pro Jahr mehr als 3 Mrd. Euro in Forschung und Entwicklung und verfügt über ein reichhaltiges Patentportfolio. In letzter Zeit beobachtet die Klägerin, dass insbes. Autos in zunehmendem Maße Komponenten aufweisen, die eine Vielzahl ihrer Patente verletzen.

2.   Die Beklagte zu 1) ist ein bekannter deutscher Automobilkonzern.

3.   Die Beklagte zu 2) ist eine Konzerngesellschaft der Beklagten zu 1) und vermietet (verleast) Autos der Beklagten zu 1).

4.   Die Beklagten verwenden beispielsweise in ihren in Deutschland hergestellten und in Deutschland und international vertriebenen Fahrzeugen der BMW 5er Reihe die Fahrzeug-Einbau-Infotainment-Einheit (Head Unit) mit der Bezeichnung 6512-9877375 (DE). Die Einheit macht von der technischen Lehre des Klagepatents Gebrauch. Die sich daraus ergebenden Ansprüche werden mit der vorliegenden Klage geltend gemacht. Es wird darauf hingewiesen, dass die Beklagten die Verletzungsform auch in anderen Fahrzeugen verwenden, beispielsweise in der Head Unit des BMW i3 und i8.

**B.      Das Klagepatent EP 1 931 052 B1**

**I.      Formelle Daten**

5.    Die   Klägerin   ist   alleinverfügungsberechtigte   Inhaberin   des   Europäischen   Patents
      EP 1 931 052 B1 (Klagepatent), dessen Patentschrift wir in Kopie - für die Kammer 3-fach –
      als

**Anlage K 1**

(Eine Übersetzung wird nachgereicht.)

      überreichen. Das Patent beruht auf einer Anmeldung vom 09.07.2007 und nimmt die Priorität
      der Anmeldungen US 60/868,818 sowie US 11/622,551 in Anspruch. Die Veröffentlichung der
      Anmeldung erfolgte am 11.06.2008, und diejenige des Hinweises auf die Patenterteilung am
      02.05.2012.

6.    Das Klagepatent steht in Deutschland in Kraft. Einen aktuellen Auszug aus dem Register des
      Deutschen Patent- und Markenamtes überreichen wir als

**Anlage K 2**.

      Eine Nichtigkeitsklage der Harman Becker Automotive Systems GmbH gegen den vorliegend
      geltend gemachten deutschen Teil des EP '052 ist derzeit beim Bundespatentgericht anhän-
      gig. Diesseits wird erwartet, dass der Hinweis an die Parteien nach § 83 PatG in etwa im
      Herbst 2019 erfolgen dürfte.

7.    Ursprüngliche Patentinhaberin war die Broadcom Corporation, Irvine, Kalifornien, USA. Diese
      hat mit der als

**Anlage K 2a**

      beigefügten Erklärung vom 20.01.2017 mit Wirkung vom 28.11.2016 alle Rechte an dem Kla-

gepatent an die Avago Technologies General IP (Singapore) Pte. Ltd. abgetreten, einschließlich des Rechts, von Dritten im Klagewege Schadensersatz für dessen Verletzung in der Vergangenheit, Gegenwart und Zukunft zu fordern ("the right to sue and recover damages for past, present and future infringement of any of the Patents ..."). Dass das Klagepatent zu den übertragenen Patenten ("the Patents") gehört, ergibt sich aus Blatt 390 der (1215 Seiten umfassenden, hier auszugsweise vorgelegten) Anlage "Exhibit A" der genannten Erklärung, wo neben dem europäischen Klagepatent unter dessen Veröffentlichungsnummer auch der deutsche, französische und britische Teil des Patents dediziert aufgeführt sind. Die Avago Technologies General IP (Singapore) Pte. Ltd., wurde dann im Wege der Aufnahme auf die Klägerin, die Avago Technologies International Sales Pte. Limited, mit Wirkung zum 05.09.2018 verschmolzen (nach dem Recht des Staates Singapur: „amalgamation of companies"). Die Klägerin, die Avago Technologies International Sales Pte. Limited ist somit Gesamtrechtsnachfolgerin der vormaligen Patentinhaberin Avago Technologies General IP (Singapore) Pte. Ltd. Das Klagepatent ist daher im Wege der Gesamtrechtsnachfolge auf die hiesige Klägerin übergegangen. Dieser Vorgang ist bereits in Verfahren beim Landgericht Mannheim aktenkundig, beispielsweise in den Sachen 7 O 58/18 und 7 O 59/18. Die Klägerin geht auch mit Blick auf Parallelverfahren zwischen den Parteien davon aus, dass die Beklagten die Vorgänge kennen, und verzichtet daher an dieser Stelle auf eine vertiefte Darlegung.

## II.    Technischer Hintergrund und referierter Stand der Technik

8.    Das Klagepatent betrifft im Allgemeinen die elektronische Leistungsverstärkung. Einige der beispielhaft genannten klagepatentgemäßen Ausführungsformen betreffen ein Verfahren und ein System zum gemeinsamen Nutzen einer elektronischen Schaltung in Form eines rauscharmen Verstärkers (Low-Noise Amplifier bzw. LNA) in einem kombinierten Bluetooth- und WLAN-Chip (vgl. Abs. [0001]).

9.    Zum Hintergrund der Erfindung führt die Klagepatentschrift aus, dass Kommunikationsgeräte immer häufiger eine Vielzahl von Funktionalitäten aufweisen, insbesondere die Möglichkeit der drahtlosen Kommunikation gemäß dem Bluetooth-Protokoll einerseits und gemäß dem WLAN-Protokoll andererseits (vgl. Abs. [0002]).

EIP Europe LLP
Klageschrift vom 02. August 2019

10.   Zentrale Bedeutung beim Empfang von drahtlosen WLAN- und Bluetooth-Signalen komme dem sogenannten „Front-End" des Kommunikationsgeräts zu. Die meisten Verarbeitungsschritte des Front-Ends erfolgten in analogen Schaltkreisen. Das Front-End sei insbesondere dafür verantwortlich, die zum Teil mit sehr geringer Leistung empfangenen Radiofrequenzsignale zu empfangen. Die Aufgaben eines Empfängers könnten die Demodulation, das Filtern und die Analog-zu-Digital-Wandlung umfassen. Das Ergebnis eines vom Front- End verarbeiteten Signals könne als Basisband-Signal bezeichnet werden. Das Basisbandsignal enthalte typischerweise digitale Daten, welche nachfolgend in digitalen Schaltkreisen des Kommunikationsgeräts verarbeitet werden könnten (vgl. Abs. [0003]).

III.   Technisches Problem

11.   Mit dem Wandel zu tragbaren und integrierten Geräten, die der drahtlosen Kommunikation mittels verschiedener Dienste und Protokolle fähig sind, gehe aber das Problem einher, so führt die Klagepatentschrift aus, dass die analogen Radiofrequenzschaltungen für jeden der Dienste und Protokolle in verschiedenen integrierten Schaltungen („integrated circuits" bzw. ICs) oder Chips untergebracht sein können. Dies begrenze den Umfang der möglichen Miniaturisierung. Beispielsweise müsse jede integrierte Schaltung ihren eigenen rauscharmen Verstärker (LNA), Leistungsverstärker („power amplifier" bzw. PA) und Quarzoszillator aufweisen (vgl. Abs. [0005]).

12.   Als weiteren Nachteil der erhöhten Anzahl von integrierten Schaltkreisen verweist die Klagepatentschrift noch darauf, dass damit auch ein erhöhter Leistungsverbrauch im tragbaren Gerät und folglich auch eine erhöhte Betriebstemperatur sowie reduzierte Akkulaufzeit einhergehen (vgl. Abs. [0006]).

IV.   Lösung

13.   Zur Lösung dieses technischen Problems gibt das Klagepatent in dem unabhängigen Anspruch 11 nebst abhängigen Ansprüchen 12 bis 14 ein System zum Verarbeiten von über ein Kommunikationsmedium empfangenen Signalen an. Die erfinderische Lehre ist dabei in der Architektur des in Anspruch 11 beschriebenen Chips verwirklicht. Die vorliegend interessie-

renden Ansprüche 11, 12, 13 und 14 können in Form einer Merkmalsanalyse wie folgt wiedergegeben werden:

**Anspruch 11:**

   a)  System zum Verarbeiten von über ein Kommunikationsmedium empfangenen Signalen, wobei das System umfasst:

   b)  einen Chip

      b1)   der ein erstes Funkgerät oder ersten Empfänger umfasst

           und

      b2)   der zum Verarbeiten eines Signals für ein erstes drahtloses Protokoll verwendet wird, und

   c)  wobei der Chip einen gemeinsam genutzten LNA umfasst,

      c1)   der das Empfangen des Signals für das erste drahtlose Protokoll

           und

      c2)   eines Signals für ein zweites drahtloses Protokoll ermöglicht,

   d)  wobei ein Transkonduktanzverstärker

      d1)   in dem Chip

      d2)   dazu genutzt wird, einen Ausgang des gemeinsam genutzten LNA mit dem ersten Funkgerät oder ersten Empfänger zu koppeln

   e)  der gemeinsam genutzte LNA ist in einem zweiten Funkgerät oder zweiten Empfänger in dem Chip integriert,

   f)  der zum Verarbeiten des Signals für das zweite drahtlose Protokoll verwendet wird.

**Anspruch 12:**

   g)  wobei das zweite Funkgerät oder der zweite Empfänger ein WLAN-Funkgerät oder WLAN-Empfänger ist.

**Anspruch 13:**

    h) wobei der Transkonduktanzverstärker in dem zweiten Funkgerät oder zweiten Empfänger integriert ist.

**Anspruch 14:**

    i) wobei das erste Funkgerät oder der erste Empfänger ein Bluetooth-Funkgerät oder Bluetooth-Empfänger ist.

14. Eine Leseabschrift der Merkmalsanalyse überreichen wir (für die Kammer 3-fach) als

**Anlage K 3.**

15. In Merkmal a) beschreibt Anspruch 11 ein System zum Verarbeiten von über ein Kommunikationsmedium empfangenen Signalen. Unter Kommunikationsmedium versteht das Klagepatent insbesondere die Luftschnittstelle, weil es ausweislich des Anspruchs 11 selbst, der Beschreibung und der abhängigen Ansprüche 12 und 14 um den Empfang und die Verarbeitung von drahtlos übertragenen Signalen gehen soll.

16. Nach Merkmalsgruppe b) bis b1) des Anspruchs 11 umfasst das System einen Chip, der wiederum ein erstes Funkgerät oder ersten Empfänger umfasst. Ein Chip ist ein Halbleiter-Substrat, auf dem Schaltkreise aufgebracht sind. Vorteilhaft daran ist, dass sich auf diesem Wege Schaltkreise auf besonders kleinem Raum realisieren lassen. In den Ausführungsformen sind einerseits die Antenne und der Sende-/Empfangs-Umschalter und andererseits der digitale Basisband-Prozessor nicht als Teil des Empfängers dargestellt. Dies lässt sich beispielsweise der nachfolgend wiedergegebenen Figur 1 des Klagepatents entnehmen:

EIP Europe LLP
Klageschrift vom 02. August 2019                                    Seite 15



**FIG. 1**

17.     Bestandteile des Empfängers bzw. des Funkgeräts seien demgegenüber beispielsweise die
        zweite Verstärkerstufe und der Frequenzmixer (vgl. Abs. [0032] und [0035]), wie sich auch aus
        der Figur 3 des Klagepatents ergibt.



**FIG. 3**

18.   Weiter erläutert die Patentbeschreibung noch, dass ein Empfänger zwar einen Analog-Digital-
      Wandler aufweisen könne; er müsse es aber nicht (vgl. Abs. [0022]).

19.   Nach Merkmal b2) des Anspruchs 11 wird der Chip dazu verwendet, ein Signal für ein erstes
      drahtloses Protokoll verarbeiten zu können. Unter Protokoll ist eine (häufig in Standards doku-
      mentierte) Vereinbarung zu verstehen, nach der die Datenübertragung zwischen zwei oder
      mehreren Kommunikationseinheiten abläuft. Als Beispiele für drahtlose Protokolle nennt das
      Klagepatent selbst in den abhängigen Ansprüchen 12 und 14 das Bluetooth- und das WLAN-
      Protokoll.

20.   Der Chip weist ferner einen gemeinsam genutzten LNA auf (Merkmal c) des Anspruchs 11).
      Dieser ermöglicht das Empfangen des Signals für das erste drahtlose Protokoll und eines Sig-
      nals für ein zweites drahtloses Protokoll (Merkmale d) und c2) des Anspruchs 11). Unter LNA
      versteht der Fachmann einen rauscharmen Verstärker (deutsch für „low noise amplifier", vgl.
      Abs. [0011]). Ein Verstärker ist eine elektronische Baugruppe, welche eine Eingangsgröße zu
      einer Ausgangsgröße verstärkt. Ein rauscharmer Verstärker zeichnet sich dadurch aus, dass
      er verstärkt, ohne dabei das Signal-zu-Rauschverhältnis signifikant zu verschlechtern. Er bil-
      det daher gerade bei Vorrichtungen zum Empfang und zur analogen Verarbeitung von draht-
      losen Signalen, deren Signal-zu-Rausch-Verhältnis regelmäßig ohnehin bereits sehr schlecht
      ist, eines der ersten Bauelemente im Empfangspfad.

21.   Der Chip weist weiter einen Transkonduktanzverstärker auf (Merkmale d) und d1) des An-
      spruchs 11). Bei einem Transkonduktanzverstärker handelt es sich um einen Verstärker, der
      dazu verwendet werden kann, ein Spannungssignal in ein Stromsignal umzuwandeln. Dies ist
      beispielsweise in Absatz [0042] der Patentbeschreibung erläutert. Der Transkonduktanzver-
      stärker wird klagepatentgemäß dazu genutzt, einen Ausgang des gemeinsam genutzten LNA
      mit dem ersten Funkgerät oder ersten Empfänger zu koppeln (Merkmal d2). Gemäß einer
      Ausführungsform der klagepatentgemäßen Erfindung wird der Transkonduktanzverstärker
      beispielsweise dazu verwendet, das Signal über die mit Signalverlust verbundene lange Über-
      tragungsleitung vom WLAN-Funkgerät zum Bluetooth-Funkgerät zu übertragen (vgl. Abs.
      [0036]). Schematisch dargestellt ist dies in der Figur 3 der Klagepatentschrift:

EIP Europe LLP
Klageschrift vom 02. August 2019

Seite 17



FIG. 3

22.   Schließlich ist nach Merkmal e) des Anspruchs 11 der gemeinsam genutzte LNA in einem
zweiten Funkgerät oder zweiten Empfänger in dem Chip integriert. Nach Merkmal f) des An-
spruchs 11 wird das zweite Funkgerät oder der zweite Empfänger auch zum Verarbeiten des
Signals für das zweite drahtlose Protokoll verwendet. Aus der Patentbeschreibung erschließt
sich, was mit dem Wortlaut „in dem zweiten Funkgerät oder zweiten Empfänger ... integriert"
gemeint ist. Demnach ist dieses Merkmal insbesondere dann verwirklicht, wenn der gemein-
sam genutzte LNA funktional für die Verstärkung des Signals des zweiten Funkgeräts verwen-
det wird und sich örtlich in dem Bereich des Chips befindet, der dem zweiten Funkgerät
entspricht (vgl. Abs. [0032]). Vorteilhaft daran ist, dass aufgrund der kurzen Distanz zu den
weiteren, das Signal des zweiten Funkgeräts verarbeitenden elektronischen Baukomponenten
zu diesen keine lange Übertragungsleitung erforderlich ist, worunter die Signalqualität für das
zweite Funkgerät leiden würde (vgl. Abs. [0035]).

23. Besonders vorteilhaft stellt sich die klagepatentgemäße Lehre dann dar, wenn das zweite Funkgerät oder der zweite Empfänger ein WLAN-Funkgerät oder ein WLAN-Empfänger (Anspruch 12/Merkmal g) und das erste Funkgerät oder der erste Empfänger ein Bluetooth-Funkgerät oder ein Bluetooth-Empfänger ist (Anspruch 14/Merkmal i). Des Weiteren ist es klagepatentgemäß vorteilhaft, wenn der Transkonduktanzverstärker in dem zweiten Funkgerät oder zweiten Empfänger integriert ist (Anspruch 13, Merkmal h), mithin in dem WLAN-Funkgerät oder WLAN-Empfänger.

24. Wir heben in diesem Zusammenhang hervor, dass sich Anspruch 11 des Klagepatents (und damit die abhängigen Ansprüche) in den angegebenen räumlich-körperlichen Merkmalen ausschließlich auf den Chip und die in ihm enthaltenen Bauteile bezieht, die nach Herstellung des Chips nicht mehr verändert werden. Es geht um die interne Chip-Struktur, d.h. um die Hardware-Konfiguration. In Bezug auf den LNA spricht der maßgebliche englische Anspruch dementsprechend auch nicht von einer "Nutzung" o.ä., sondern nur von einem „shared LNA". Dies bedeutet, dass der Chip so eingerichtet ist, dass der LNA (308) mit dem Transkonduktanzverstärker TCA (315A) gemeinsam verschaltet ist, so dass am Eingang des Chips anliegende WLAN- und Bluetooth-Signale an den LNA (308) bzw. in anspruchsgemäßer Weise an den TCA (315A) weitergeleitet werden können. Äußere Umstände, insbesondere die Frage, ob tatsächlich ein gemeinsames Signal am Eingang anliegt, spielen daher für die Verwirklichung der Merkmale von Anspruch 11 keine Rolle. Vielmehr erfolgt eine Anspruchsbenutzung, wenn ein Erzeugnis (hier ein Chip) durch Verwirklichung der entsprechenden räumlich-körperlichen Merkmale geeignet dazu ist.

Als Beweis für dieses fachmännische Verständnis bieten wir an:

**Beweis:**      Sachverständigengutachten.

EIP Europe LLP                                                                         Seite 19
Klageschrift vom 02. August 2019

### C.     Zur Patentverletzung

25.    Die Beklagten bieten an und vertreiben mit unter der Marke „BMW" vertriebenen Fahrzeugen
       beispielsweise der BMW 5er Reihe das Steuergerät (Head Unit) 6512-9877375 (DE). Die
       Steuergeräte sind Teil des BMW Infotainment-Systems. Smartphones können mit solchen
       kraftfahrzeuggebundenen Systemen über Bluetooth verbunden werden. In jüngerer Zeit ist
       auch die Bereitstellung eines WLAN (IEEE 802.11)-Hotspots hinzugekommen.

26.    Die Klägerin hat das – gerichtsbekannte – Analyse-Unternehmen TechInsights gebeten, bei-
       spielhaft das im Geltungsbereich des Klagepatents erworbene Steuergerät eines BMW der
       BMW 5er Reihe zu untersuchen. Wir überreichen eine Kopie des Untersuchungsberichts als

                                      **Anlage K 4.**

       Die Verantwortung der Beklagten für Angebot und Vertrieb ist beispielsweise anhand des Eti-
       ketts (BMW-Emblem oben) auf S. 5 und 8, aber auch anhand S. 6 und 12 („BMW") ersichtlich.

27.    Auf einer der in dem Steuergerät verbauten Leiterplatten befindet sich eine Funktionseinheit
       in Form einer kleineren Leiterplatte, die durch Kontaktpins mit der größeren Leiterplatte ver-
       bunden ist (siehe S. 60 der Anlage K 4):

EIP Europe LLP
Klageschrift vom 02. August 2019



■ Marvell 88W8787 Bluetooth/WLAN SoC
■ Maxim MAX4835 LDO Linear Voltage Regulator
■ Microchip 25AA080CI Serial EEPROM 8 Kb
■ Microsemi LX5511 Power Amplifier for WLAN Applications

BT/WLAN Module with Shielding Removed

28.   Der in dieser Abbildung in hellblau markierte Mikrochip ist der von der Marvell Semiconductor Inc., Santa Clara, CA, USA, hergestellte Typ Avastar 88W8787 SoC. Wir überreichen ein Datenblatt der Herstellerin Marvell zu dem Produkt als

**Anlage K 5**.

EIP Europe LLP                                                                    Seite 21
Klageschrift vom 02. August 2019

29.    In der Einleitung auf dem ersten Blatt heißt es wie folgt:

„The Marvell® Avastar™ 88W8787 is a highly integrated system-on-a-chip (SoC),
specifically designed to support high throughput data rates for next-generation
products. The Marvell Avastar family of wireless devices delivers best-in-class
single-function and multi-function radios for the entire spectrum of always-on
consumer electronics devices.

The Marvell Avastar 88W8787 SoC is designed for both simultaneous and
independent operation of the following:

IEEE 802.11a/g/b and 802.11 n payload data rates for Wireless Local Area
Network (WLAN)

Bluetooth 3.0 + High Speed (HS) (also compliant with Bluetooth 2.1 + EDR)

FM transmit and receive (digital encoder/decoder FM radio with RDS/RBDS)"

Auf Deutsch:

„Der Marvell® Avastar™ 88W8787 ist ein hochintegriertes system-on-a-chip
(SoC), das speziell für einen hohen Datendurchsatz für Produkte der nächsten
Generation ausgelegt ist. Die Familie der Marvell Avastar-Geräte liefert die besten
Einzelfunktion- und Multifunktion-Funkeinheiten für das gesamte Spektrum stets
eingeschalteter Konsumenten-Elektronik-Produkte.

Der Marvell Avastar 88W8787 SoC ist sowohl für gleichzeitigen als auch
unabhängigen Betrieb der folgenden (Systeme, A.d.Ü.) ausgelegt:

IEEE 802.11a/g/b und 802.11n Nutzdatenraten für Wireless Local Area Network
(WLAN)

Bluetooth 3.0 + High Speed (HS) (auch kompatibel mit Bluetooth 2.1 + EDR)

FM Senden und Empfangen (digitales Codier/Decodier FM-Radio mit
RDS/RBDS)"

30.    In den Spezifikationen auf Seite 3 von Anlage K 5 wird insbesondere die Anwendung für mit
WLAN und Bluetooth ausgerüstete Geräte und die Koexistenz mit anderen auf dem Chip be-
findlichen Funkeinheiten herausgestellt:

Avago ./. BMW u.a. – EP 052

EIP Europe LLP
Klageschrift vom 02. August 2019

## SPECIFICATIONS

### APPLICATIONS
- WLAN/Bluetooth/FM enabled cellular handsets
- Portable audio/video devices and accessories
- Personal navigation devices
- Personal digital assistants
- Gaming platforms

### GENERAL FEATURES
- Simultaneous and independent WLAN, Bluetooth, and FM Tx/Rx operation
- Coexistence with cellular and other on-chip radios
- Low power dissipation
- CMOS and low-swing sine wave input clock
- Digital audio interfaces (I2S and PCM)
- 12, 13, 19.2, 24, 26, 38.4, and 52 MHz crystal clock support with auto-frequency detection using external 32.768 KHz CMOS-level sleep clock
- Power management with external sleep clock support for FM Tx/Rx operation
- Sleep and standby modes for low power operation
- Fully compatible with Marvell Power Management device(s)

31.  Auf dem ersten Blatt unten von Anlage K 5 ist ein Blockschaltbild des Systems wiedergegeben, das wir als

**Anlage K 6**

beifügen und im Folgenden wiedergeben:

EIP Europe LLP
Klageschrift vom 02. August 2019

Seite 23



Fig 1. Avastar 88W8787 SoC Block Diagram.[1]

32.   Ein die vorliegend interessierenden Funktionen betreffender Teil des Blockschaltbilds („oben rechts") ist nachstehend eingeblendet:



Avago ./. BMW u.a. – EP 052

EIP Europe LLP
Klageschrift vom 02. August 2019                                                  Seite 24

33.   Dort ist ganz rechts ein Antennensymbol zu erkennen, von dem aus Funksignale nach links in
      den mit „SP3T" gekennzeichneten Block laufen. Es handelt sich um einen Dreifachschalter mit
      einer einzigen Schaltebene („Single Pull Triple Throw"), so dass hier jeweils nur einer der drei
      links erkennbaren Anschlüsse angesteuert werden kann.

34.   Der mittlere Anschluss auf der linken Seite des Schalters leitet WLAN-Sendesignale
      (WLAN Tx) an die Antenne weiter.

35.   Der untere Anschluss stellt die Verbindung für Bluetooth Sende- und Empfangssignale (Blue-
      tooth Tx/Rx) her.

36.   Im Fokus steht aber der obere Anschluss, welcher einen gemeinsamen Empfangspfad für
      Bluetooth- und WLAN-Signale darstellt. „RX" steht für „receive" oder auf Deutsch für „Emp-
      fang". Dieser gemeinsame Empfangspfad enthält innerhalb der Baugruppe „Direct Conver-
      sion RF" einen gemeinsam genutzten rauscharmen Verstärker, der entsprechend als „Shared
      LNA" bezeichnet ist.

37.   Funktional übernimmt dieser die Funktion der ersten Verstärkungsstufe, und zwar sowohl für
      den Empfang von WLAN-Signalen als auch für den Empfang von Bluetooth-Signalen.

38.   Das durch den gemeinsam genutzten rauscharmen Verstärker verstärkte Signal wird, genau
      wie in der in Figur 3 des Klagepatents dargestellten Ausführungsform, zunächst in zwei Emp-
      fangspfade aufgeteilt und an die jeweiligen zweiten Verstärkungsstufen (jeweils mit „LNA" hin-
      ter dem „Shared LNA" bezeichnet) weitergeleitet. Dabei führt einer der Empfangspfade
      unmittelbar zu einem dem WLAN-Empfänger oder WLAN-Funkgerät zugeordneten (nicht ge-
      meinsam genutzten) LNA. Der andere führt hingegen über eine lange Übertragungsleitung zu
      einem weiteren (nicht gemeinsam genutzten) LNA. Der letztere nicht gemeinsam genutzte
      LNA ist oder enthält – wie weiter unten anhand von Anlage K 7 dargelegt werden wird – einen
      Transkonduktanzverstärker, welcher das vom gemeinsam genutzten LNA erhaltene Signal zur
      weiteren Verarbeitung im Bluetooth-Empfänger oder Bluetooth-Funkgerät verstärkt.

39.  In dem Blockschaltbild nach Anlage K 6 sind der gemeinsam genutzte LNA und der darauf folgende WLAN-LNA auf gleicher Höhe wie das graue Rechteck (WLAN RF) angeordnet (und mit diesem durch einen kurzen Pfeil verbunden). Damit werden beide Baugruppen dem WLAN-Funkgerät unmittelbar räumlich zugeordnet.

40.  In Übereinstimmung mit dem Diagramm im Datenblatt erklärt das Datenblatt in der rechten Spalte von Seite 2 im dritten Bulletpoint das Abschnitts "WLAN BASEBAND", dass der gemeinsam für WLAN und Bluetooth genutzte LNA auch der "WLAN BASEBAND" Verarbeitung zugutekommt ("WLAN/Bluetooth LNA sharing"). Auch unter dem Abschnitt "WLAN RADIO" in der rechten Spalte von Seite 2 der Anlage K 6 wird am Ende auf die gemeinsam genutzten Eingangskomponenten für WLAN und Bluetooth hingewiesen. Die beiden genannten Passagen werden nachfolgend wiedergegeben:

**WLAN BASEBAND**
*  802.11n 1x1 SISO with on-chip Marvell SISO RF radio
*  Backward compatibility with legacy 802.11a/g/b technology
*  WLAN/Bluetooth LNA sharing
*  PHY data rates up to 150 Mbps
*  20, 40, 20 in 40 MHz, and duplicate legacy mode operation
*  Modulation and Coding Scheme (MCS)—0~7 and 32 (duplicate 6 Mbps)
*  Enhanced radar detection for long and shot pulse radar
*  Enhanced AGC scheme for DFS channel
*  Japan DFS requirements for W53 and W56
*  Radio resource measurement
*  Optional 802.11n SISO features:
   - 20/40 MHz coexistence
   - 1-stream STBC reception
   - Short guard interval
   - RIFS on receive path
   - Beamformee function and hardware acceleration
   - Greenfield Tx/Rx
*  Power save features

**WLAN RADIO**
*  Integrated direct-conversion radio
*  20 and 40 MHz channel bandwidths
*  Shared WLAN/Bluetooth receive input scheme for 2.4 GHz band

41.    Näheres zu den von der Produzentin des Avastar 88W8787 SoC, Marvell Semi-conductor,
       verwendeten Techniken bei der Herstellung von SoCs mit einem gemeinsam genutzten LNA
       („shared LNA") und damit insbesondere zum Aufbau und der Funktionsweise der angegriffe-
       nen Ausführungsform lässt sich der bereits oben als Anlage K 7 angesprochenen Veröffentli-
       chung „A WLAN and Bluetooth Combo Transceiver with Integrated WLAN Power Amplifier,
       Transmit-Receive Switch and WLAN/Bluetooth Shared Low Noise Amplifier" der Autoren
       Renaldi Winoto, Ming He, Yuan Lu, David Signoff, Edwin Chan, Chi-Hung Lin, Wayne Loeb,
       Jinho Park und Li Lin, entnehmen. Bei diesen Autoren handelt es sich ausweislich der Veröf-
       fentlichung selbst und ausweislich ihrer LinkedIn-Profile um Ingenieure der Produzentin des
       Avastar 88W8787 SoC. Wir legen eine Kopie der Veröffentlichung (im Folgenden als „Winoto"
       bezeichnet) als

                                            **Anlage K 7**

       sowie Ausdrucke der obengenannten LinkedIn-Profile als

                                            **Anlage K 8**

       vor.

42.    In dieser Veröffentlichung beschreiben Ingenieure der Produzentin des Avastar 88W8787, wie
       sie, integriert in einem Chip, einen kombinierter Bluetooth- und WLAN-Empfänger mit einem
       „shared LNA", d.h. einem gemeinsam genutzten LNA, kostengünstig hergestellt haben.

       *„Abstract —A front-end circuit of a System-on-a-Chip (SoC) containing an IEEE
       802.11b/g/n wireless LAN (WLAN) and a Bluetooth transceiver is presented. This
       SoC integrates a WLAN power amplifier (PA), a transmit-receive switch (T/R
       switch), a process and temperature insensitive power detector, and a **low-noise
       amplifier (LNA) that is shared between WLAN and Bluetooth**. The class AB
       power amplifier has a maximum saturated output power of +29dBm, while still
       meeting - 28dB EVM for QAM64 modulation at an output power of +21 dBm. The
       shared low-noise amplifier has a noise figure of 3.3dB. **The presented solution
       significantly reduces the overall Bill-of-Materials (BOM) for the combo WLAN
       and Bluetooth transceivers."***

                                  (Anlage K 7, S. 395, Abstract; Hervorhebung hinzugefügt)

EIP Europe LLP
Klageschrift vom 02. August 2019

Seite 27

Auf Deutsch:

> „Zusammenfassung - Ein Front-End-Schaltkreis eines System-on-a-Chip (SoC)
> enthaltend ein IEEE 802.11b/g/n wireless LAN (WLAN) und einen Bluetooth-
> Sender/Empfänger wird vorgestellt. Dieses SoC integriert einen WLAN-
> Leistungsverstärker (PA), einen Sende-Empfangs-Schalter (T/R Schalter), einen
> prozess- und temperaturunempfindlichen Leistungsdetektor und einen
> **rauscharmen Verstärker (LNA), der von WLAN und Bluetooth gemeinsam
> genutzt wird.** Der Leistungsverstärker der Klasse AB hat eine maximale gesättigte
> Ausgangsleistung von +29dBm, erreicht aber -28dB EVM für QAM64- Modulation
> bei einer Ausgangsleistung von +21 dBm. Der gemeinsam genutzte rauscharme
> Verstärker hat einen Rauschwert von 3.3dB. **Die vorgestellte Lösung verringert
> signifikant die allgemeinen Materialkosten (BoM) für die kombinierten WLAN
> und Bluetooth- Empfänger.**"

(Anlage K 7, S. 395, Abstract; Hervorhebung hinzugefügt)

43. Ferner findet sich der Begriff „shared LNA", wie er auch im Datenblatt des Avastar 88W8787

SoC verwendet wird, im Schlagwortverzeichnis ("Index Terms").

44. Weiter heißt es im Abschnitt „I. Introduction" der Veröffentlichung mit Verweis auf die Figur 2,

dass Gegenstand der Veröffentlichung ein integrierter SoC („System on a Chip") mit Bluetooth-

und WLAN-Funktionalität ist:

> „The front-end circuit presented in this paper integrates a WLAN PA, a T/R switch,
> and **a shared LNA that can be simultaneously used by WLAN and Bluetooth
> into a single CMOS SoC** (Fig. 2). The SoC also contains a separate Bluetooth
> PA, the design of which is outside the scope of this paper, along with all necessary
> baseband and digital circuits to fully support single-chip operation for both WLAN
> and Bluetooth standards."

(Anlage K 7, S. 395, re. Sp.; Hervorhebung hinzugefügt)

Auf Deutsch:

> "Der Front-End-Schaltkreis, der in diesem Papier vorgestellt wird, integriert einen
> WLAN-PA, einen T/R-Schalter und **einen gemeinsam genutzten LNA, der von
> WLAN und Bluetooth simultan genutzt werden kann, in einem einzigen
> CMOS SoC** (Fig. 2). Das SoC enthält auch einen separaten Bluetooth-PA, dessen
> Aufbau nicht Gegenstand dieses Papieres ist, neben allen notwendigen
> Basisband- und digitalen Schaltkreisen, um den Betrieb sowohl für den WLAN- als
> auch für den Bluetooth-Standard auf einem einzigen Chip zu unterstützen."

(Anlage K 7, S. 395, re. Sp.; Hervorhebung hinzugefügt)

45.    In dem Abschnitt „I. Introduction" erläutert die Veröffentlichung also ausdrücklich, dass „[t]he
       front-end circuit presented in this paper integrates a WLAN PA, a T/R switch, and a shared
       LNA that can be simultaneously used by WLAN and Bluetooth into a single CMOS SoC
       (Fig.2)", mit anderen Worten also, dass "der in dieser Veröffentlichung behandelte Front-End-
       Schaltkreis integriert einen WLAN-Leistungsverstärker (PA), einen Sende-Empfangs-Schalter
       (T/R Schalter, und einen gemeinsam genutzten LNA, der von WLAN und Bluetooth simultan
       genutzt werden kann, in einem einzigen CMOS SoC (Fig. 2).

46.    In der Figur 2 auf Seite 396 der Veröffentlichung ist ein Blockschaltbild dieses Chips darge-
       stellt. Im Folgenden ist dieses Blockschaltbild wiedergeben und farblich derjenige Bereich ge-
       kennzeichnet, der hier von Interesse ist, weil er den gemeinsam genutzten LNA sowie einen
       zum Koppeln des Ausgangs des gemeinsam genutzten LNA mit dem Bluetooth-Empfänger
       oder Bluetooth-Funkgerät verwendeten Transkonduktanzverstärker als Teil des Chips zeigt.



Fig. 2. Integrated WLAN front-end with shared WLAN/Bluetooth
LNA.

47. Der gemeinsam genutzte LNA ist hier nicht als bloßes Blocksymbol dargestellt, sondern kon-
kreter als ein auf zwei Transistoren beruhender Cascode-Verstärker, der ein Eingangssignal
in ein höheres Ausgangssignal verstärkt. Der diesem Cascode-Verstärker entsprechende Be-
reich des Chips ist in der folgenden Wiedergabe der Figur 2 der Veröffentlichung Winoto farb-
lich hervorgehoben:



Fig. 2. Integrated WLAN front-end with shared WLAN/Bluetooth
LNA.

48. Weiter zeigt das Blockschaltbild in Figur 2 der Veröffentlichung Winoto (wie in der in Figur 3
des Klagepatents dargestellten Ausführungsform) eine Aufteilung des Ausgangssignals des
gemeinsam genutzten LNAs in einen WLAN-Pfad und einen Bluetooth-Pfad, die jeweils wie-
derum mit einem Verstärker versehen sind. In der nachfolgenden Wiedergabe der Figur 2 ist
dieser Bereich des SoCs rot hervorgehoben.



Fig. 2. Integrated WLAN front-end with shared WLAN/Bluetooth
LNA.

49.   Im Abschnitt „C. WLAN/Bluetooth Shared Mode" der Veröffentlichung Winoto heißt es hierzu,
dass der Ausgang des gemeinsam verwendeten LNAs zwei Verstärker ansteuert, wovon der
eine unmittelbar den WLAN-Mischer ansteuert und der andere das vom gemeinsam genutzten
LNA erhaltene Radiofrequenzsignal nicht im Spannungsmodus, sondern im Strommodus
(„current-mode") zum Bluetooth-Empfänger überträgt:

> „A single-pin WLAN and Bluetooth shared receive mode is implemented in this
> chip. The output of the above described **LNA drives two amplifiers. One
> amplifier directly drives the WLAN mixer, while the other sends the current-
> mode RF signal across a distance** to a commongate buffer within the **Bluetooth
> transceiver block**."

(Anlage K 7, S. 397, Brückenabsatz zwischen linker und rechter Spalte;

Hervorhebung hinzugefügt)

EIP Europe LLP
Klageschrift vom 02. August 2019

Auf Deutsch:

> „Ein gemeinsamer WLAN- und Bluetooth-Empfangsmodus über einen einzelnen Anschluss ist in diesem Chip implementiert. Der Ausgang des oben beschriebenen LNA **steuert zwei Verstärker an. Ein Verstärker steuert direkt den WLAN-Mischer an, der andere sendet das RF-Signal im Strommodus über eine Distanz** an einen im **Bluetooth-Sender-/Empfänger-Block** befindlichen Puffer in Gateschaltung."

(Anlage K 7, S. 397, Brückenabsatz zwischen li. und re. Sp.;

Hervorhebung hinzugefügt)

50.   Aus diesen Ausführungen ergibt sich zweierlei:

51.   Zunächst folgt aus dem Umstand, dass keine Übertragung des empfangenen Signals zum WLAN-Empfänger erforderlich ist, dass sich der gemeinsam genutzte LNA schon in demjenigen Bereich des Chips befindet, der dem WLAN-Empfänger zugeordnet ist.

52.   Außerdem wird das Signal im Strommodus („current mode") zum Bluetooth-Empfänger übertragen. Daraus folgt, dass der vom gemeinsam genutzten LNA angesteuerte Verstärker ("unten links" im Bild: "To Bluetooth") ein Spannungssignal in ein Stromsignal umwandelt. Es handelt sich also um einen Transkonduktanzverstärker. Dies wird bestätigt durch das diesen Verstärker repräsentierende Trapezsymbol, das üblicherweise für einen Transkonduktanzverstärker steht.

53.   Damit das Bluetooth-Funkgerät das Signal des aktuellen Betriebsmodus verarbeiten kann, verfügt es über eine Last, die es ermöglicht, den aktuellen Betriebsmodus wieder in eine verstärkte Spannung umzuwandeln (LNA-Last).

54.   In diesem Zusammenhang merken wir an, dass die Entwickler des Marvell 8787-Chips auch eine gemeinsame Übertragung von WLAN- und Bluetooth-Signalen über zwei Antennen avisiert haben (Anlage K 7, S. 397, linke Spalte, vorletzter Absatz).

55.   Die Klägerin hat darüber hinaus das Unternehmen TechInsights um eine Schaltungs-Extraktion und eine damit zusammenhängende Analyse mit Blick auf den vorliegend in Rede stehenden Chip Marvell 88W8787 gebeten. TechInsights hat mehrere Exemplare entsprechend

EIP Europe LLP
Klageschrift vom 02. August 2019

Seite 32

untersucht. Diese Untersuchung erfolgte im Rahmen eines vorherigen Rechtsstreits der Klägerin mit Konzernunternehmen eines Wettbewerbers der Beklagten beim Landgericht Mannheim (2 O 267/17) betreffend das hiesige Klagepatent. Dort erfolgte eine Einigung der Parteien, bevor es zu einer Entscheidung kam.

56.    Eine Kopie dieser TechInsights-Untersuchung wird als

**Anlage K 9**

überreicht. Wir verweisen insbesondere auf die nachfolgend wiedergegebene Abbildung 2.3.2. auf S. 8 des Reports.



Avago ./. BMW u.a. – EP 052

EIP Europe LLP
Klageschrift vom 02. August 2019

Seite 33

57. Die Abbildung verdeutlicht den Ort und die Funktion wesentlicher Elemente mit Bezug zum Klagepatent durch farbige Markierungen. Unten im Bild ist die Lage des Eingangs (violett) gezeigt. Das rechts abgebildete blaue Rechteck markiert die WLAN-Funktionseinheit, das rote Quadrat auf der linken Seite die Bluetooth-Einheit. Die ungefähre Stelle des gemeinsam genutzten LNA (hier durch ein grünes Dreieck symbolisiert) ist durch einen grünen Pfeil angezeigt, der ungefähre Ort des nachgeschalteten Transkonduktanzverstärkers TCA (hier durch ein gelbes Trapez symbolisiert) ist durch einen gelben Pfeil angezeigt. Der TCA befindet sich im WLAN-Receiver. Eine Übertragungsleitung zwischen dem TCA und dem Bluetooth-Funkgerät ist durch eine von der rechten Kante des blauen WLAN-Rechtecks zur rechten Kante des roten Bluetooth-Quadrats führende dicke dunkelblaue Linie gekennzeichnet.

I. **Die Verletzungsform macht von den Ansprüchen 11, 12, 13 und 14 des Klagepatents Gebrauch**

58. Es handelt sich bei der Verletzungsform, wie sich sowohl aus der Funktions-beschreibung als auch aus den Blockschaltbildern des Halbleitersystems Avastar 88W8787 SoC in Anlage K 5 ergibt, um ein System zum Verarbeiten von über ein Kommunikationsmedium empfangenen Signalen, nämlich um ein System, das drahtlos über die Luftschnittstelle WLAN- und Bluetooth-Signale empfangen und verarbeiten kann. Merkmal a) des Anspruchs 11 ist verwirklicht.

59. Die Verletzungsform weist einen Chip in Form des Avastar 88W8778 SoC auf, der ein erstes Funkgerät oder einen ersten Empfänger in Form eines Bluetooth-Funkgeräts oder Bluetooth-Empfängers aufweist. Der Chip ist somit zum Empfang und zur Verarbeitung eines Signals für ein erstes drahtloses Protokoll geeignet und wird dazu verwendet. Merkmale b), b1) und b2) des Anspruchs 11 sind somit verwirklicht.

60. Weiter umfasst der Chip ausweislich der Blockschaltbilder im Datenblatt des Avastar 88W8787 SoC gemäß Anlage K 5 und in der Veröffentlichung Winoto gemäß Anlage K 7 einen gemeinsam genutzten LNA („shared LNA"), der das Empfangen des Signals für das erste drahtlose Protokoll, dem Bluetooth-Protokoll, und eines Signals für ein zweites drahtloses Protokoll, dem WLAN-Protokoll, ermöglicht. Merkmale c), c1) und c2) des Anspruchs 11 sind damit verwirklicht.

61.    Ferner enthält der Avastar 88W8787 SoC auch einen Transkonduktanzverstärker. Dieser ist
       nach dem gemeinsam genutzten LNA und nach der Aufteilung des Signals in einen Bluetooth-
       und einen WLAN-Empfangspfad angeordnet und koppelt den Ausgang des gemeinsam ge-
       nutzten LNA mit dem Bluetooth-Funkgerät oder dem Bluetooth-Empfänger, d.h. mit dem ers-
       ten Funkgerät oder ersten Empfänger, welcher Signale für das erste drahtlose Protokoll
       verarbeitet. Merkmale d), d1) und d2) des Anspruchs 11 sind folglich verwirklicht.

62.    Schließlich ist der gemeinsam genutzte LNA auch in einem zweiten Funkgerät oder zweiten
       Empfänger in dem Chip integriert. Denn der gemeinsam genutzte LNA befindet sich - wie oben
       bezugnehmend auf Anlage K 5 gezeigt - in einem Bereich des Avastar 88W8787 SoC, der
       dem WLAN-Funkgerät oder WLAN-Empfänger zugeordnet ist, welcher auch zum Verarbeiten
       des Signals für das WLAN-Protokoll, d.h. für das zweite Protokoll, geeignet ist und dazu ver-
       wendet wird. Merkmale e) und f) des Anspruchs 11 sowie auch Anspruch 12 sind damit ver-
       wirklicht.

63.    Damit macht das beschriebene System von allen Merkmalen der Ansprüche 11 und 12 des
       Klagepatents Gebrauch.

64.    Weiter befindet sich der Transkonduktanzverstärker TCA in dem WLAN-Receiver (siehe vor-
       stehende Abbildung aus der Anlage K 9). Anspruch 13 ist folglich verwirklicht.

65.    Da, wie oben geschildert, das erste Funkgerät oder der erste Empfänger ein Bluetooth-Funk-
       gerät oder Bluetooth-Empfänger ist, ist auch der abhängige Anspruch 14 verwirklicht.

       **Beweis:**        Sachverständigengutachten

### D. Rechtsfolgen

66. In dem Herstellen, Anbieten und Inverkehrbringen der Verletzungsformen in Deutschland bzw. von Deutschland aus in alle Welt liegt eine unmittelbare Verletzung der Ansprüche 11,12, 13 und 14 des Klagepatents gemäß Art. 64 EPÜ i. V. m. § 9 Nr. 1 PatG.

67. Als Fachunternehmen sind die Beklagten verpflichtet, sich über die maßgeblichen gewerblichen Schutzrechte Dritter zu informieren und diese zu beachten. Die Verletzungshandlungen erfolgten in Kenntnis der Rechtslage, jedenfalls aber grob fahrlässig.

68. Aufgrund der vorstehend dargelegten Patentverletzung steht der Klägerin gegen die Beklagten ein Unterlassungsanspruch nach Klageantrag I. 1. gemäß § 139 Abs. 1 PatG in Verbindung mit Art. 64 Abs. 1, Abs. 3 EPÜ, 79 EPÜ zu.

69. Die mit Klageanträgen zu I. 2. und I. 3. geltend gemachten Ansprüche auf Auskunft und Rechnungslegung ergeben sich aus Art. 64 Abs. 1, Abs. 3, 79 EPÜ in Verbindung mit §§ 242, 259, 260 BGB und § 140b PatG. Da die Klägerin das Ausmaß der Verletzungshandlungen nicht kennt, haben die Beklagten nach ständiger Rechtsprechung Auskunft zu erteilen und Rechnung zu legen, um die Bezifferung des Entschädigungs- und des Schadensersatzanspruchs zu ermöglichen. Weiterhin dient die Auskunft gemäß § 140b PatG der Beseitigung weiterer Verletzungsquellen.

70. Die mit Klageanträgen zu I. 4., I. 5. und I. 6. geltend gemachten Ansprüche auf Rückruf, Vernichtung und Entfernung aus den Vertriebswegen ergeben sich aus Art. 64 Abs. 1, Abs. 3, 79 EPÜ in Verbindung mit § 140a PatG.

71. Der mit Klageantrag zu II. geltend gemachte Anspruch auf Schadensersatzfeststellung ergibt sich aus Art. 64 Abs. 1, Abs. 3, 79 EPÜ in Verbindung mit § 139 Abs. 1, Abs. 2 PatG und § 256 ZPO. Der Klägerin entsteht durch die Verletzungshandlungen der Beklagten ein erheblicher Schaden, den die gemeinschaftlich handelnden Beklagten als Gesamtschuldner ersetzen müssen. Vor Rechnungslegung kann ein konkreter Schaden jedoch nicht berechnet werden, so dass im Augenblick nur auf Feststellung geklagt werden kann.

EIP Europe LLP
Klageschrift vom 02. August 2019

Seite 36

72.     Die örtliche Zuständigkeit des Landgerichts Hamburg ergibt sich daraus, dass Verletzungsge-
        genstände mit Wissen und Wollen der Beklagten bundesweit und damit auch im Gerichtsbezirk
        angeboten und vertrieben werden, § 32 ZPO.

Florian Schmidt-Bogatzky
Rechtsanwalt

Beglaubigt
Rechtsanwalt

EIP Europe LLP
Klageschrift vom 02. August 2019

Seite 37

## Anlagenverzeichnis

| | |
|---|---|
| **Anlage K 1** | Klagepatent EP 1 931 052 B1 |
| **Anlage K 2** | Registerauszug EP 1 931 052 B1 |
| **Anlage K 2a** | Assignment EP 052 BRCM - Avago Gen IP |
| **Anlage K 3** | Merkmalsanalyse Ansprüche 11 bis 14 |
| **Anlage K 4** | TechInsights Teardown Marvell 88W8787 July 2019 |
| **Anlage K 5** | Marvell Avastar 88W8787 SoC Data Sheet |
| **Anlage K 6** | Block Diagramm Marvell Chip 88W8787 SoC |
| **Anlage K 7** | Winoto Artikel |
| **Anlage K 8** | LinkedIn Winoto |
| **Anlage K 9** | TechInsights Schaltungs-Extraktion |

Avago ./. BMW u.a. – EP 052