Pages 1 - 116

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE VIRGINIA K. DEMARCHI, MAGISTRATE

| | |
|---|---|
| In Re Ex Parte Application of BAYERISCHE MOTOREN WERKE AG and BMW BANK GMBH, | No. 19-MC-80272 WHO (VKD) |
| Applicants. | San Francisco, California<br>Tuesday<br>September 22, 2020<br>10:00 a.m. |

**TRANSCRIPT OF ZOOM VIDEO CONFERENCE PROCEEDINGS**

**APPEARANCES**:

**For Petitioner BMW:**
FINNEGAN HENDERSON FARABOW GARRETT & Dunner LLP
1875 Explorer Street
Suite 800
Reston, Virginia 20190
**BY: LIONEL M. LAVENUE, ESQ.**
**JOSEPH MICHAEL MYLES, ESQ.**

FINNEGAN HENDERSON FARABOW GARRETT & DUNNER LLP
901 New York Avenue, N.W.
Washington, DC 20001
**BY: ROBERT BENJAMIN CASSADY, ESQ.**

**For Broadcom:**
HOPKINS & CARLEY
The Letitia Building
70 South First Street
San Jose, California 95109
**BY: JOHN V. PICONE, ESQ.**
**PETER NISSLY, ESQ.**

***Reported By:*** ***Debra L. Pas, CSR 11916, CRR, RMR, RPR***
*Official Reporter - US District Court*
*Computerized Transcription By Eclipse*

**TUESDAY - SEPTEMBER 22, 2020** **10:01 A.M.**

**P R O C E E D I N G S**

**---000---**

**THE CLERK:** In the matter of the Ex Parte Application of Bayerische Motoren Werke AG and BMW Bank, Case No. 19-MC-80272.

**THE COURT:** May I have the appearances, please, starting with counsel for BMW.

**MR. LAVENUE:** For BMW, good morning, Your Honor, this is Lionel Lavenue.

Also with me is Ben Cassady and Joey Myles.

**THE COURT:** Good morning.

And appearances for Broadcom.

**MR. PICONE:** Good morning, Your Honor. John Picone, Hopkins & Carley on behalf of Broadcom.

**THE COURT:** Okay. Good morning to you as well.

Who will be arguing principally for each side? For BMW it will be Mr. Lavenue?

**MR. LAVENUE:** Yes, Your Honor.

**THE COURT:** And Mr. Picone?

**MR. PICONE:** Yes, Your Honor.

**THE COURT:** Okay, great. So we are here on Broadcom's motion to quash BMW's deposition subpoenas. And I'm going to refer to the parties just collectively as BMW and Broadcom. And I understand that the deposition topics are the

same for all of the individual entities. So if that's okay, I'll just refer to them collectively.

I wanted to ask a couple of questions, and both sides can respond as appropriate. I'm interested in the status of the proceedings in Germany. I understand there are three and they may be at different levels, but if you can let me know if any of them are nearing completion -- and I'm not even sure I know what I mean by that, because I understand there are various stages, including appellate stages -- but I'd like to get an understanding of where the parties are in those proceedings for which discovery is being sought in the first instance.

So let me just address that question to Mr. Picone first. They are Broadcom's proceedings. What is the status?

**MR. PICONE:** One of the cases, Berman, has reached a decision of non-infringement, but I understand that that is not something that we would be able to analogize to a granting of summary judgment, and that are there other possible proceedings that could go on from that.

The other two patents, I believe, are still undergoing the nullity proceedings. But Mr. Lavenue probably would have a better idea as to the status of the other two proceedings.

**THE COURT:** Okay. Let me just ask them. When it has reached some kind of decision of non-infringement, is there still a nullity aspect to that proceeding as well, or is that no longer being considered?

**MR. PICONE:** I don't know that, Your Honor.

**THE COURT:** Okay. All right. Mr. Lavenue, can you shed some light on the status question?

**MR. LAVENUE:** Yes, Your Honor. And, also, we have a slide that may help with this, if I may share that?

**THE COURT:** Actually, it would be easier for me if you could just answer it. Maybe the slide would be awesome, but unless you've shared it with your colleagues on the other side, I would rather just have the question answered.

**MR. LAVENUE:** Sure, Your Honor.

So the slide -- I'm sorry. The information is that there are three cases. Of the three cases, two of the cases are still underway. One case was dismissed on September 18th.

The one case that was dismissed on September 18th is asserted patent EP '181. However, even for the dismissed case, that case is subject to appeal. And interestingly in Germany, unlike in the U.S., on appeal evidence may still accepted.

So our position is that even for the one case that's dismissed, the discovery in this proceeding is still relevant because of the differences with the German law.

**THE COURT:** Okay. Thank you.

And it would be relevant both on questions of infringement and invalidity or nullity?

**MR. LAVENUE:** The case that is on appeal is on infringement. The nullity is a separate action. So there is

three --

**THE COURT:** That's still going? That's not mooted or otherwise not proceeding because of the non-infringement decision?

**MR. LAVENUE:** By my understanding, that is still ongoing.

**THE COURT:** All right. Thank you.

And everything as to all issues are still in play in the other two patent cases?

**MR. LAVENUE:** The other two patent cases, for the second one there is an oral hearing in the '052 European patent on November 12, 2020. So that's the oral hearing that basically is the main hearing for the case.

**THE COURT:** Okay.

**MR. LAVENUE:** November 12th.

For the other, proceeding for EP, European Patent, '531, that case is stayed pending the nullity action, but still alive. And so any evidence from these discovery proceedings would be available. And that proceeding, if the nullity proceeding is unsuccessful in that case, is unstayed.

**THE COURT:** I see. All right. Thank you. That's helpful.

And in terms of the question that had come up in our prior disputes involving document discovery and the question of damages, are there any proceedings in which damages are at

issue?

And what I'm really trying to ask is has anything changed in terms of the status of whether damages are relevant or not?

And I understand the parties have different perspectives on the imminence, likelihood, reasonably contemplated status of those damages proceeding, but I've already said what I think about that. And I'm really just asking about whether there has been any change in the state of play on that issue.

**MR. LAVENUE:** Go ahead, John.

**MR. PICONE:** This is John Picone, Your Honor. I don't believe so.

**THE COURT:** Okay.

**MR. PICONE:** The damages are not at issue.

**MR. LAVENUE:** And you're probably not surprised to know that we disagree, Your Honor.

We believe that damages are at issue because of that litigation value issue, which we had not presented in the initial briefing, but we did on the reconsideration, and you found that we should have raised that in the initial briefing. But on the value of litigation, that still is at -- is of issue.

In the case that was recently dismissed, in fact, it was specifically addressed and argued. The initial litigation value damages issue was that the case was a $1 million case. However, the Court found that that was too low -- remember,

this is the case that was dismissed on September 18th -- and raised that to 5 million dollar -- five million euro case. But even that number, as I understand from German counsel, is subject to further review later on in the appeal. So that may be even raised once again.

So all of these issues on valuations and damages, you know, we would submit.

To the extent that we may not have argued that issue for purposes of document discovery, we would argue that it is still alive for purposes of the deposition. So to the extent that we may have waived that for arguing before Your Honor on documents, we would say it's still alive for deposition.

**THE COURT:** All right. I appreciate the point about the value of litigation, and I was distinguishing between damages per se and value of litigation.

I probably don't fully understand how this works in Germany. I totally concede that. But it does seem that the parties presented them as distinct proceedings. There would be a damages proceeding if and when there was a finding of infringement and the nullity matter turned out the right way for Broadcom, but otherwise not.

And, yet, there is still this value of litigation concept that comes into play; is that correct?

**MR. LAVENUE:** That is correct, Your Honor.

**THE COURT:** Both parties agree on that? There is

still -- even if there were no damages proceeding, there would still be a consideration by the German court on the value of litigation?

**MR. PICONE:** Yes, Your Honor. That's our understanding. And we've been told by our German counsel that that is largely an administrative issue related to fees and costs that could be recovered. We don't understand it to have any relationship to the actual damages, money damages that will be paid.

**THE COURT:** All right. So maybe it's not incorrect for me to be thinking about these as separate items, but I do -- I don't want to go down a rabbit hole on that question right now.

So I have a couple of sort of time framing remarks, I guess, that hopefully will help us proceed. I also have some observations for you all, which may or may not be helpful.

So I think in the dispute that you've presented to me today I have two questions I have to resolve.

How are the deposition topics relevant to any issue that is actually at issue in the German proceedings?

And the second question is: Is the discovery that's being sought via those deposition topics disproportionate to those proceedings? Burdensome to prepare a witness, for example, to address those topics, unduly so.

Am I correct, first of all, that BMW is seeking a single

deposition of a corporate representative of Broadcom to last not more than seven hours, even if Broadcom needs to designate more than one witness to testify?

**MR. LAVENUE:** We had not received any information from counsel for Broadcom on the number of witnesses because they refused any deposition. So we have not got to the point of the number.

We also for the same reasons have not discussed the timing because that, in our view, would relate to the number of witnesses that would be presented.

**THE COURT:** That's what I'm asking. Because it need not relate to the number of witnesses presented. So that still seems like it's an open question. Okay.

All right. So here are my observations, which, as I said, may not be useful to you all, but I will share them anyway.

So you all are fighting over literally every aspect of every single topic in these deposition notices or subpoenas, and you all are bringing huge amounts of legal resources to bear on not just this dispute, but on your many other disputes. And I am surprised that you could not agree on a single thing.

And my observation is, is that may not be in your clients' best interests. That is not something that the Court is going to decide, but I just throw it out there that -- for your consideration that that may not be in your clients' respective best interests.

I will decide this dispute, but for the many topics that are presented to me in this briefing it is my observation that BMW needs and wants something narrower than what the topic describes in several cases. And so there may be some -- some room in this hearing or between the parties to deal with these topics, acknowledging that narrower scope.

And as a general matter, it seems to me that if Broadcom had produced responsive documents or has been required to produce responsive documents, it makes sense that those -- that that subject matter suggests relevant areas of inquiry for discovery, and it surprises me that Broadcom would so strenuously resist a witness to testify to those subject matters.

So, for example, if Broadcom has produced license agreements reflecting licenses of the asserted patents on the theory that that is somehow relevant to the commercial success of the claimed inventions, it seems plausible that BMW might want to inquire about those licenses.

Now, I'm happy to entertain all the arguments you want to make on why that would not be the case, but that seems -- those kinds of -- those kinds of arguments resonated with me when I heard them.

Likewise, you may have already concluded that something is not relevant for purposes of document discovery. I am somewhat surprised to see an argument that says: Oh, but they would be

relevant for deposition discovery. That -- that seems not that compelling to me as a general matter.

So let me just pause there and say, before we get into the rest of this hearing, do the parties think that it would be useful for you all to try again, to see if you can narrow your dispute?

Let me ask Mr. Picone, since it's your client's motion.

**MR. PICONE:** Yes, Your Honor. I think that we could reach an agreement on some narrow topics, and we had offered a deposition by written question on several of the things where we saw, like you did, that there was some relevance.

Although we are plagued with what I call give-a-mouse-a-cookie problem that -- because it seems like Broadcom -- I mean, BMW wants such expansive discovery, such broad discovery that is -- to our perspective just is going to trigger numerous privilege objections and require further intervention, possibly during the deposition, to resolve these privilege disputes.

And we primarily saw the deposition as a discovery on discovery deposition. That was the first thing that they wanted to talk about, and ominously foreshadowed that when they withdrew their motion for reconsideration.

So while I admit that there are certainly topics that are relevant to live issues in Germany, that I believe if were narrow enough we could adequately prepare a witness to provide

the answers to those questions. But we're not amenable to just having an all-or-nothing approach.

And, also, BMW has suggested that -- you know, that they are not tethered by the findings of the Court or that -- the description of the categories and that they can ask any question they want at any time just to gauge the witness's reaction. And, of course, that, you know, makes it, again, very difficult for us to prepare a witness.

So, yes, there are topics. Yes, I think we could reach some resolution as to those -- relevance and how to deal with those and adequately prepare and present a witness, but the way it's currently postured it's difficult to get there.

**THE COURT:** All right. Let me pose the question to Mr. Lavenue.

And the question on the table is whether in light of the Court's observations, which are not rulings, but just observations about this dispute, whether it would be worthwhile for the parties to try to see if they can narrow their dispute?

**MR. LAVENUE:** So thank you, Your Honor.

Frankly, you are correct, that there have been a number of disputes that we have had with Broadcom. Our disputes track the fact that we believe that they have done two things, which make my answer that it would be unlikely that we would be able to resolve the dispute.

What I would love to do is what I've done in other cases

in the NDCA, is if it weren't for COVID, to go into your conference room and start at 9:00 a.m. and, you know, hammer it out, with you coming in every hour to check in on us and to resolve disputes in the interim. I think that would be wonderful. That's what I would really like, because we've found it so very difficult to deal with Broadcom.

Broadcom's attorneys, personally, I like them very much. I think that John and Peter are great guys, but the positions that are taken by Broadcom have made it immensely difficult for us to get anywhere.

Remember, that we began this process in December. It's now September. Proceedings in Germany usually end in a year, and so the timing is very important.

That's why we are pressing, because there is a significant number of documents that we do not believe that we have. We've requested them. We've listed those in our brief. We still today don't have them.

And we know from the second and third 1782 proceedings that there were documents that were not produced in this first proceeding that were -- that have been identified by counsel for Broadcom in those other proceedings.

So from -- just to quickly answer your question. We don't believe that asking for one 30(b)(6) deposition -- we believe that there would be one witness addressing all topics. We have discussed it with Broadcom. So that was our understanding, is

there would be one witness for all of the entities addressing the issue.

We had not discussed the seven hours. But from our perspective, we're asking for one deposition of 7-ish -- 7 to 14 hours, somewhere in that time frame, just seems reasonable considering the length that this case has gone on and the amount of struggle that we've gone through to get documents.

**THE COURT:** All right. Well, I'm going to take that answer as no, you don't think you can, unless I have the ability to lock you all in a conference room.

Parties of this sophistication with these kinds of lawyers should not need the Court to lock them in a conference room to resolve a discovery dispute or to narrow a discovery punishment. Really, it shouldn't be necessary.

All right. Well, I think the most efficient use of our time then is to just proceed with the topics. And let's go ahead and do that.

I thought we would go topic by topic, not literally in the order 1 through 20, but just -- they have been grouped, at least initially by Broadcom, slightly differently by BMW, but I guess we'll follow my grouping just for efficiency's sake.

So starting with the first topic, literally number one, which is a topic that asks for deposition testimony about Broadcom's efforts to collect and produce responsive documents.

My understanding from the papers is that this topic is

driven principally by BMW's concern about the fitness of Broadcom's privilege log and about Broadcom's failure to produce some documents that BMW believes or knows that Broadcom has. One example is the emails changed between Mr. Tan and Dr. Grote.

And the response, as I understand it from Broadcom, is that this is a function of the parties' agreement about which custodians or repositories would not be searched.

So I -- I don't think -- I do find that it is probably not a good use of your time to use deposition discovery to figure out document disputes, but I -- I'm not really clear even at this late stage in the case what it is. And this is actually something I would have expected the parties to talk candidly with each other about, and possibly you have.

But what are the custodians whose files were not searched, based on the agreement that you have, or repositories that were not searched, based on the agreement that you have, because of -- and that possibly BMW feels should be searched? Have you all had a candid conversation about that issue? Because I've just got to tell you, it seems an appropriate representative's deposition is not the right way to sort this out.

**MR. PICONE:** Your Honor, this is John Picone.

We've said all along that the repositories that we've excluded are Broadcom's in-house legal department, outside counsel.

**THE COURT:** That's it?

**MR. PICONE:** That's it.

And I think -- and we've said that -- you know, they have technical people that work in the legal department. They work directly under the supervision and at the direction of the lawyers.

So, you know, they help with all the normal and ordinary functions of a patent case, whether that's due diligence analysis, workup, claim charts, all the stuff that goes into a patent case.

And, you know, they use consultants, too. But, again, those consultants are working directly for the legal department. Those are the repositories that we've excluded. I don't think we've hidden the ball on that, and --

**THE COURT:** I'm sorry. Let me just get a clarification.

When you say the in-house legal department, so this would not include people who are the claimed inventors on the patent?

**MR. PICONE:** Right. They are not in the legal department. The claimed inventors -- none of the engineers, normally and ordinary Broadcom engineers that work outside the department, you know, if they had any involvement in the case, it -- that information would have been logged or produced, if it wasn't privileged.

But, you know, they have non-lawyers that are

technologists that work for the legal department. That's their only job. They don't -- you know, it's not their day job to work for the legal department and then they have, you know, a night shift for the engineering department. They work for --

**THE COURT:** They don't wear two hats, in other words?

**MR. PICONE:** They do not wear two hats.

**THE COURT:** All right. And outside counsel is the only other category of custodian?

**MR. PICONE:** Yes.

**THE COURT:** And the parties have referred to repositories. Is there some other database or shared resource that you're referring to when you refer to repositories?

**MR. PICONE:** We haven't. We haven't drawn that distinction. The repositories are basically the files, the legal department's files, outside counsel's files.

**THE COURT:** Okay.

**MR. PICONE:** Things like that.

We haven't extended the repository to other people outside the legal department.

**THE COURT:** Okay. Just sticking with you, Mr. Picone.

On this, this observation that BMW has made that there are communications exchanged between Mr. Tan and Dr. Grote that obviously BMW knows about, but would have expected to have been produced by Broadcom, because Mr. Tan is not within this

category of -- of privileged custodians. Beyond just saying, well, you already know about those documents, what is Broadcom's explanation for why they weren't produced?

**MR. PICONE:** I -- I have a problem with the premise, Your Honor. I don't think that there were communications between Dr. Grote and Mr. Tan that weren't produced.

**THE COURT:** I see.

**MR. PICONE:** It was more that BMW believed that there were a lot of preparatory meetings and documents given to Mr. Tan and assumed that they were just, you know, lengthy email communications back and forth regarding the settlement meeting, in preparation for his settlement meeting. Just not.

**THE COURT:** Okay.

**MR. PICONE:** He's not that kind of CEO. So they just don't -- they don't exist.

**THE COURT:** All right. But you're not suggesting somehow that Mr. Tan's files weren't searched for responsive documents.

**MR. PICONE:** No, I'm not suggesting that at all.

**THE COURT:** All right. Mr. Lavenue, I am really not inclined as a general matter to allow there to be a corporate representative required to testify about the document search and collection activities unless there is really some evidence that there has been a failure of review collection and production of responsive documents.

And the explanation that counsel has provided seems plausible. And I really ought to -- you know, the papers have some examples, but they are talked about in the level of generality necessarily, given the proceeding that -- you know, not super compelling on this point.

So let me give you an opportunity to respond.

**MR. LAVENUE:** Thank you, Your Honor.

So first of all, I'll note that you asked counsel for Broadcom for a list of the custodians not searched and a list of the repositories. He just generally told you two areas that he didn't name custodians, which is one of the problems that we have had in these discuss because of the very lack of detail.

Also, as we know from the second and third 1782, basically what Broadcom did is they used our so-called agreement to exclude any searching that would have found relevant documents, not just including the Grote emails, which are missing. I mean, we know that there are emails between Grote and Tan, and they never produced them from their side. So we know that they are missing those.

But also in the second and third set of 1782 counsel for Broadcom has admitted to us that they provided us with no prior art that was from the in house legal or outside counsel, and they admit that that is not privileged. And when we reached the deal with them, the deal was you do not have to go and do general searches in the in-house legal repository and the

outside counsel repository with the exception of the documents that we specifically asked for.

We could not have more specifically asked for the prior art. They admitted to us they did not search for the prior art in those privileged repositories. So that's example one. There are three examples.

Example two. They never provided us with the prosecution files, which are not privileged, between the inventor and the prosecuting patent attorney where there is communications with the Patent Office. So that is another set of files. Not only with the European Patent Office, but also the related foreign files. They admitted to us that they didn't provide those as well.

We asked why not. And they said: Well, the agreement. I mean, under their view the agreement is everything.

And we said: Well, no. We specifically asked for prior art, prosecution files. And they said: Well, you know, you screwed yourself because you said there was an agreement. We agreed with you so, therefore, we didn't provide it. So that's point number two.

And then point number three is we have absolutely nothing from the inventor files of these European patents.

So for at least these documents, not to mention first sale information for the topics at issue, not to mention the assignment authority for the -- I mean, we have a whole list in

our brief of all the documents --

**THE COURT:** You have the assignment documents now. So I don't -- I don't really want to hear about documents that you already have and -- just the ones that you don't have.

And it sounds to me, if I'm interpreting this correctly, that the problem is is that you say that BMW meant, okay, you don't have to generally search the legal department's files or outside counsel's files, but there are things that should be easily located. We don't know where they are, but they are these things. Prosecution files. You know, fill in the blank. You know, these other kind of discrete categories of documents.

Don't run a word search on this custodian's files. That's not what we're looking for. We're just looking for these discrete categories of documents.

And Picone says: No, that's not what our understanding was.

**MR. LAVENUE:** That is correct.

**THE COURT:** Okay. So isn't this the kind of thing that once you all realize that you had different understandings of the agreement, that if you concede -- and I'm not saying you do -- that certain categories of documents, which are easily locatable, are relevant to the pending dispute, that you could just work that out? You don't need a deposition of a witness who says: Oh, yeah, that was the agreement, and so we didn't look there.

I mean, this is -- this is what frustrates the Court.

**MR. LAVENUE:** And you put your finger on it, Your Honor.

The problem is that Broadcom is saying: I'm sorry, Mr. Lavenue. You identified in the second and third 1782 these other things that you didn't specifically identify in number one, but we're not going to give them to you, and number two and number three, which they've already told us, because of the so-called agreement in number one. They have refused to provide these very same documents.

Now, this just shows the difficulty that we're going through here.

**THE COURT:** Well, I don't want to belabor topic number one unduly, but let me give Mr. Picone an opportunity to just explain why he thinks this matter can't be resolved on the document side, because I know you don't think it's appropriate for deposition.

**MR. PICONE:** I don't -- I disagree with the concept that we would not give them the prior art. We said, if you -- if we could identify -- because we agreed with them. We don't think that just the raw prior art sitting in some lawyer's file is -- somehow makes that privileged.

But, you know, we offer that exception and then it -- now we want eight more exceptions that basically force us to search and/or, you know, undertake the laborious effort of collection

search and then identification of particular incidents.

If you just wanted the prior art, we agreed to give that to them.

**THE COURT:** Okay. So have --

**MR. PICONE:** We agreed to give that to them.

**THE COURT:** Have you done the prior art in the prosecution files right now?

**MR. PICONE:** No, we haven't. Because we have a dispute about the prosecution files.

It's not just the prosecution files for that particular patent-in-suit. It's every patent in the family or related patent to the technology. So we're up to, I think, close to 100 prosecution files.

**THE COURT:** So let me just say what I -- I hate to invite more discovery disputes.

Okay. I am not going to allow a deposition on this, like, how to do search files topic. That's a waste of everybody's time.

If there are discrete document request disputes that you all have, the appropriate way to handle that is to submit them to me. I'm still discovery referral, by the way, on the case even though the district judge is now Judge Orrick. So procedurally you can still submit discovery disputes to me in the first instance.

But this is not a good use of anybody's time to have a

corporate representative be prepared to talk about things which the lawyers should really be able to talk about themselves and figure it out.

And this should not turn into: I want every shred of paper that is not privileged in the files of people whose general work is to represent the company and to do legal work on behalf of the company. It shouldn't turn into that, Mr. Lavenue.

But if are there discrete categories of documents that are responsive to discovery requests that you've already served -- document requests that you already served, you and Mr. Picone and your team should be able to talk about those and work something out. It is way more efficient to do that than to come here and fight about it in front of me. I guarantee you.

And, yet, if you can't agree, you will -- I think you will be better served by submitting a discovery -- possibly a discovery letter rather than a full-blown, you know, all pages included motion with sur replies to the Court.

All right. So unless you really need to talk to me about something more on topic one, I would like to move on to the other deposition topics.

Mr. Lavenue?

**MR. LAVENUE:** Thank you, Your Honor.

I think that we will likely be before you again on this

issue, unfortunately.

I mean, just one example is so counsel for Broadcom has noted that it will provide the prior art and it will provide the prosecution files, but as you heard, they will not provide the related prosecution files. If you have a European patent and a U.S. patent, we want the U.S. patent as well because it relates to the European patent. They are utterly refusing to provide that. So that's going to be a dispute that we will have to bring up.

A separate -- just one other quick issue, Your Honor. A separate issue is counsel for Broadcom noted that inside of the law department they have non-lawyers who are doing such things as running prior art searches. The case law is quite clear that running prior art searches and corresponding with prior art search firms is not privileged because it's prior art. And so we want that, too.

They are refusing to provide any --

**THE COURT:** Right. I'm not going to resolve any document disputes right now.

When we get to the prior art topics, we can talk about whether that's -- the searches and the methodology for searching that you're asking for is even relevant to any issue in the case. But I'm not going to resolve any document disputes without a appropriate record.

So I just -- my inclination is to not allow deposition

testimony on topic one.

Okay. Regarding topics two and nine, which Broadcom grouped together because they appear to concern damages and possibly the value of litigation issue.

Topic two is:

"Evaluations regarding the asserted patents."

And topic nine is:

"Any efforts to sell, license or monetize the asserted patents, including any agreements, licenses, contracts, settlements or proposals related to the asserted patents or the technology described in the asserted patents."

So with respect to topic nine, my observation about the license agreements that have already been produced, because I believe I was persuaded that they had some bearing on the commercial success issue, if the asserted patents were the subject of license agreements, that that might be relevant to an issue in the case. It does seem to me that, just taking that narrow slice of what's being asked for in topic nine, that testimony about licenses would also be relevant.

So, Mr. Picone, why would that not be the case?

**MR. PICONE:** I don't disagree. It would be relevant.

**THE COURT:** All right. Good.

**MR. PICONE:** That's really not the substance of that dispute.

The substance of that dispute is that they want every license that Broadcom has ever signed that subsumed these patents.

And, again, as we explained to BMW repeatedly, Broadcom typically licenses the patents on a portfolio basis, all 24,000 of them, of which, you know, the patents-in-suit may be one of or two of. And, you, know there are hundreds and hundreds -- I can't prepare a witness on hundreds and hundreds of licenses.

**THE COURT:** I'm not asking about that.

You produced four license agreements that include licenses for the asserted patents. How do those differ from the hundreds of patents that you refer to?

**MR. PICONE:** They directly subsume the patents-in-suit. Those are the ones. Those are the unique licenses where these patents-in-suit are actually licensed.

So, yes, the testimony on those licenses, sure, that's relevant.

**THE COURT:** Good. All right. I think that's a good -- a good resolution of part of your dispute.

All right. So let's talk about the broader issues raised by topics two and nine:

"Efforts to sell, license, monetize the asserted patents or proposals to do so."

I have already found that that is not relevant from a document discovery perspective and I am disinclined to allow

deposition testimony about matters that I thought were not relevant when the dispute came up on documents.

So let's focus on topic nine, which has the expansive language there. As I believe I indicated when we were talking about documents, I think it's speculative for BMW to say: Well, maybe there will be some potential licensee who has raised issues of, you know, questioning infringement and validity of these patents in communications about a license. That's really very far afield, and I don't think that discovery is warranted.

But let me give you a opportunity, Mr. Lavenue, to respond on topic nine.

**MR. LAVENUE:** So, Your Honor, the communications that you just mentioned that were between Broadcom and other licensees, I think from my head, I would put that in topic two.

For topic nine, I think that the issue is more like what counsel for Broadcom noted, which is when we ask questions, if we're allowed to, of Broadcom about the license -- the three license agreements that were produced, are we able to also ask about other license agreements? And I think that he's basically -- I think he's saying that he's refusing to provide a witness until you resolve that.

And he says, well -- and he noted that Broadcom -- and I wrote this down -- quote, typically license based upon portfolio-wide. But that indicates that they don't always

license portfolio-wide. So that's just a question that we would ask for a Broadcom witness.

And then, also, we know that Broadcom licenses not only portfolio-wide, but subject matter. For example, automotive; right? We are BMW, an automotive manufacturer. And so we would want to know, okay, well if you don't license portfolio-wide, do you have automotive licenses? And we've specifically asked Broadcom for that, and they've refused to answer that on number two and number three.

So, I mean, these are all questions. In order to understand the rates and the license and the terms for the three licenses that we have, we need to have context for the other licenses, and I think that we're entitled to ask about those other licenses.

**THE COURT:** So here is what I am inclined to do on topic nine.

Topic two is evaluation. So I think that's separate.

But on topic nine, for the licenses that have been produced, I think Broadcom should produce a witness who can answer questions about those specific licenses.

And as to licensing practices, which, you know, may be within the number of topic nine, I think you're asking specifically about how, if at all, has Broadcom licensed those asserted patents. And if the answer is the only other means by which we've licensed the asserted patents is in a portfolio

manner that includes hundreds or thousands of other patents, then you will have that answer.

But I will not -- at this point I don't find a good reason to require Broadcom to produce all of those portfolio licenses.

And you're suggesting, I think, there might be some middle scope, which is some subset of licenses geared towards a particular technology or industry or aspect. And it may be appropriate to inquire about that, but I -- I'm not persuaded at this point that there are licenses that would be relevant to any issue of commercial success, which is the only issue that so far -- the only legal issue that has been presented to the Court that causes me to think that licenses are relevant, since you're not -- you're not talking about damages at this point in your German proceedings. That if you're talking about commercial success of a particular license -- a particular patent, then if you have a license where you can't discern the value of that particular patent, it's not going to be useful.

Do you see what I'm saying? So if it's one among hundreds, I don't see how it's useful.

**MR. LAVENUE:** Just so you know, Your Honor, we did not ask for all licenses. We didn't even ask for a list of the licenses in the first 1782 in your proceeding.

We have asked for a list of the licenses, and just a list, not the licenses themselves, in number two and number three. That was refused.

**THE COURT:** When you're talking about number two and number three, topic two is evaluations regarding the asserted patents; and topic nine is any efforts to sell, license or monetize.

**MR. LAVENUE:** When I was referring to number two and number three, I meant 1782 proceeding two and three, other 1782 proceedings.

**THE COURT:** Okay. All right.

**MR. LAVENUE:** And so in those we had asked for a list of the licenses. That was refused.

We also asked for a list of the automotive manufacturers that had licenses. That was refused.

So in the first 1782 proceeding, in your proceeding, all we asked for were for the licenses. And then we asked -- in documents.

And then for the deposition what we planned to do is to say: Okay. Are these licenses for VW and Daimler, are they consistent with the terms that you've offered for others in other licenses. If they said yes, then we would be fine; right?

But because they are so fishy, squirrely, whatever the proper word is, in 1782 number two and three on providing us with any of this other information, now it makes us wonder, well, since they won't even give us a list, since they won't even give us context, then maybe there is something in the

first one that we need to ask about.

And we have told counsel for Broadcom that we plan to ask about that. And he said: Well, no, I'm not going to allow that. I'm going to go to the Court. And that's one of the reasons that we're before you.

**THE COURT:** All right. So let me ask Mr. Picone. Given what the Court has said about why I think license agreements for the asserted patents may be relevant to the German proceedings, what is the scope of testimony that Broadcom believes is relevant?

**MR. PICONE:** The proper scope of the testimony is the content and subject matter of the licenses that were produced.

Candidly, Your Honor, I think you've got it right. When you have a portfolio license, when the asserted patents are one of hundreds or thousands or tens of thousands of patents that are licensed to a third party, it's utterly irrelevant because you can't discern any value. It's the value of the whole rather than the individual parts.

So to the extent that they are licensed, where the patents-in-suit are licensed, you know, specifically called out or were asserted against a third party, those licenses, we've agreed to produce those and we have.

So, but this list of licenses, hundreds -- I don't even know how many hundreds of licenses over a 20-year period of time. So that seems utterly irrelevant and overly burdensome

to create that list and then just hand it to them, of which, you know, they just see the parties. I don't think that's particularly relevant.

**THE COURT:** If counsel for BMW were to inquire how did Broadcom come up with the -- you know, the value, however -- I don't even know how it's valued, if it's a royalty rate or a lump sum or what. Maybe it's cross license. I don't know. But how did Broadcom come up with a value that this license attributed to this patent, would your witness answer those questions?

**MR. PICONE:** Yeah. They could answer those questions. Sure.

**THE COURT:** All right. So let's turn back to topic two, which is evaluations regarding the asserted patents.

My understanding is that on this one Broadcom says that there has been no such valuation of the asserted patent. Is that the case? Asserted patents, plural.

**MR. PICONE:** Yes, Your Honor. They don't evaluate the patents. They don't sit down and ascribe value to the individual patents.

**THE COURT:** Let me just inquire a little bit further. I mean, there are many contexts in which someone might attribute value to a particular patent. It might come up in a tax context. It might come up in a transactional context, where someone is -- diligency in the value of a portfolio and

patents within a portfolio.

So it seems to me like the easiest way to resolve this question is if none of those things have happened, there has been no also valuation of the asserted patents, one or more of them, then couldn't you all just, like, put that in a declaration and hand it over and be done?

**MR. PICONE:** Sure.

**THE COURT:** Okay.

**MR. LAVENUE:** We tried to resolve this issue, Your Honor, when we were discussing the number of licenses. And what I asked is, I said: Well, other than the Daimler and the VW license, for all your other licenses can you commit to me that you do not have carve-outs for automotive or for specific automotive parts?

And counsel for Broadcom said: No, I cannot commit to that.

And I said: Well, look. If you have other licenses that refer to automotive specifically or the automotive parts specifically, we're entitled to know if you have sections within your other licenses, because those sections would have specifics about the technology at issue that relate to automotive. That's what we were driving at.

So if they had answered that question and said: No, all of our portfolio licenses are portfolio-wide and do not have carve-outs for automotive, we wouldn't even be here; but they

refused to provide that commitment.

**THE COURT:** All right. I'm actually talking about topic two, which is not about licenses. It's about valuations -- unless I'm reading it wrong. Let me go back and look at the actual document.

(Brief pause.)

**THE COURT:** Yes. Topic two is evaluations regarding the value of the asserted patents.

And Mr. Picone says there aren't any. And at my request or at my prompting indicated that he would be prepared to have Broadcom do a declaration attesting to that.

**MR. LAVENUE:** Well, my understanding --

**THE COURT:** Why wouldn't that resolve the dispute?

A license is not a valuation in the same way that -- at least I'm not understanding it that way. You have a whole separate topic on licenses.

So if someone says: This patent is worth this many euros, for whatever reason, transaction, you know, taxation, whatever it is, that counsel's evaluation. If Mr. Picone is prepared to have his client attest that there has been no such valuation, isn't that enough for you?

**MR. LAVENUE:** It would be enough if they included in that commitment, that declaration, that there was no specific carve-out for these patents in any other portfolio-wide license, then the answer would be yes.

**THE COURT:** That doesn't make any sense to me. Why does it matter whether there's a carve-out or not a carve-out?

**MR. LAVENUE:** Because that would be an indication of value in the other license. If you had a carve-out for these patents in another license and said these particular patents for automotive are treated differently from all of our other Broadcom patents, that would indicate value.

**THE COURT:** How does it indicate a valuation of a -- the patents? There is no number attached to it. It's just -- I'm not valuing these patents. I'm not including them in a license. How is that a valuation?

**MR. LAVENUE:** If you're paying a million dollars for a license and it's portfolio-wide, but in the license it says and for the automotive section, that section is 200,000 of that 1 million, that would be a valuation within the license itself.

**THE COURT:** Let me just ask a factual question, which I don't know if this is maybe, you know, a question that invites a massive dispute.

But the asserted patents, as they have been defined in the discovery requests, are those the sum total of what you, Mr. Lavenue, are referring to as the automotive patents, or is that a category that is not defined or potentially encompasses way more patents than the asserted patents?

**MR. LAVENUE:** There's two groups. One is the three patents at issue. The other group are the patents that are

identified as the automotive patents in the VW and Daimler licenses.

**THE COURT:** How many patents are those?

**MR. LAVENUE:** Hundreds.

**THE COURT:** Okay. So the asserted patents are a discrete group in your view?

**MR. LAVENUE:** Yes, Your Honor.

**THE COURT:** Is that consistent with how Broadcom treats them, Mr. Picone?

**MR. PICONE:** I believe so, Your Honor. Those were specifically asserted against those entities and then -- the license then encompassed -- went beyond the asserted patents.

**THE COURT:** I see.

**MR. PICONE:** In that instance. But we're talking about a generalized licensing activity that does typically -- outside the litigation context, do the -- the licensing, and even within the litigation context, typically license them on a portfolio basis, the entire Broadcom portfolio.

**THE COURT:** I understand typically. I understand typically.

I think what Mr. Lavenue is talking about is, are there circumstances in which these three asserted patents, while they may be part of a broader license, are within the license treated uniquely, discretely as a group, and separately valued for licensing purposes from the other patents that may be also

part of the portfolio?

If that is, in fact, happening, then they are not being treated in a massive lump of hundreds of other patents that are being licensed as a portfolio.

So I put the question to you: If there are such license agreements, it seems to me plausible that they would be relevant to the question of commercial success of the asserted patents if there is some way to say, we can separately distinguish value attributable to these, these asserted patents, from the remainder of many other patents that have also been licensed.

**MR. PICONE:** Yes. If I understand the question you're asking, you're saying that there are license agreements where they license the portfolio, big clump patents, but they carve out these three and say: You don't get those. You only get the big clump.

**THE COURT:** Or they say: It's this much for the big clump, and it's more or less or different for these asserted patents. Like, distinguishing them in some way so you can distinguish them from the big clump, to use your term of art.

**MR. PICONE:** One, I agree with you. I think that would be a relevant circumstance -- that would be a relevant situation that would -- that would -- talk with commercial success, being treated differently.

And, two, I'm not aware of that. I had not read the

hundreds of licenses that Broadcom has. I've represented them for a long time. I'm not aware of any circumstance where that has happened.

I can certainly confirm that with the people who are much more knowledgeable and actually have knowledge of the entire portfolio, but I'm not aware of that ever happening, outside of the license agreements that we're talking about that relate to the patents-in-suit.

**THE COURT:** I think that bears some investigation, and it may be a simple matter of inquiring of a person with knowledge. Maybe there is a way that they can be searched.

But that does seem, if we acknowledge that, it's -- it is relevant, if there were a license that were structured that way. And then it would make sense to me to permit deposition testimony as to the licenses that have already been produced and as to this other kind of license, where the asserted patents are distinguished as a group from the remainder in a way that allows value to be attributed to them distinctly.

So how long do you think you need, Mr. Picone, to figure out whether there are any such other licenses?

**MR. PICONE:** I'm thinking, if I'm lucky, it would take about half an hour. If I'm not lucky, it would take a lot longer.

**THE COURT:** Okay. Let's put it -- I think it's appropriate to conduct that investigation, and that then a

deposition on this narrowed topic nine can proceed.

I still don't think there is anything to be done about topic two by way of deposition testimony, unless you want to have a deponent come in and say: There are no valuations of the asserted patents, apart from whatever valuation may be gleaned from the license. We have not separately, for any purpose, set out to value the asserted patents.

So I think it would be appropriate do that by declaration or by having somebody say it in a deposition. I -- I just -- the answer -- if the answer is there isn't anything, then you all should be able to resolve that.

**MR. PICONE:** We would be happy to provide a declaration to that effect, Your Honor. That seems the easiest. It just cuts down on another topic that I have to prepare a witness on.

**MR. LAVENUE:** We would prefer the deposition question on that.

The only other follow-up, Your Honor, would be topic two is the evaluation of the value of the patent. Remember that in Germany there is a value given by Broadcom to the Court.

And so it really seems -- it sort of drives our German colleagues crazy that we can't ask about valuation and Broadcom says there is no valuation when they valued the patent at $1 million in the case that was just dismissed.

So our German colleagues say: Well, how can the Court not

allow us to ask about valuation when they themselves set valuation for the patents in Germany?

**THE COURT:** So here is the issue that possibly requires some -- that you help the Court out a little bit more. So I have one party telling me that value of litigation is different than value of patent. I don't know how a German court values a patent except by damages. But somebody is telling me it's attorney's fees. Somebody else is telling me it's the value of the patent in some abstract way. I don't know how I can resolve that question.

I don't think that the declarations I have before me, but I'm -- you know, maybe I have not focused on this sufficiently, but I don't think that the declarations really address that question. I have information about what the valuations were, but not exactly. I think Mr. Seitz's declaration.

**MR. LAVENUE:** We could supply additional information from our German colleagues.

I worked a year in Germany at a German law firm. Even after all of that, Your Honor, it's very difficult.

Basically they value the case based upon the damages. Then they take a little book and they flip in their book to the page of the damage, and then across to from there is the value in attorney fees. And so there is a relationship between the damages and the attorney fees.

So I think what counsel for Broadcom is talking about is

one column. I'm talking about the other.

**THE COURT:** But if you haven't actually litigated the case to a close and you haven't actually had litigation on damages, it makes no sense to me. I'm sure I'm missing something. So --

**MR. LAVENUE:** They have to guess, and we're looking for how they guessed.

**THE COURT:** Okay. Guessing is something that lawyers are doing in the proceedings. It is -- and I presume you disclose the value of litigation. So why would you need a deponent to tell you what is the disclosed value of litigation?

**MR. LAVENUE:** Because it's tied to their other licenses, Your Honor. That's why the value --

**THE COURT:** If this comes back to licenses, then I think we've already addressed that.

So I'm not inclined to have deposition testimony about valuations if what you intend, Mr. Lavenue, is to get into how did you come up with the number you were going to give the German court. That seems to me like more far afield.

But I will -- I will think about that. Let me decide whether I really need more information from you all about what this is in Germany. I will think about that.

Don't file anything unless I ask you to. Okay? All right.

Moving on, topics three and four I have sort of grouped

together. This has to do with the question of assignments and mergers.

So on this question it seems to me that -- my first question was whether there's still a -- there is still a question of standing in any of the proceedings. I think the answer is yes. Although in one proceeding there has been some question of standing that's already been addressed, but it's still relevant.

Do the parties agree that the question of standing is still being litigated in -- or is still live in all three proceedings, or is it only as to certain patents that the question is still live?

**MR. LAVENUE:** Our understanding is it's alive and in all three, Your Honor.

**THE COURT:** Do you agree, Mr. Picone?

**MR. PICONE:** I wish I had enough information to agree or disagree. I don't know.

**THE COURT:** Okay. Well, again, it seems to me that this is a situation where documents have been produced that bear on the question of whether the assignments conveyed the interests in the patents with -- and were done with the relevant authority. There are documents that have been produced on this point, and a witness ought to be able to answer questions about those documents.

It doesn't seem like it's relevant for there to be broad

questioning about anything having to do with the merger between Broadcom and any of these other affiliated entities during the last five years. But focused on the question of the matters, frankly, that -- that BMW included in its opposition brief, that does seem to be relevant.

So, Mr. Picone, why wouldn't Broadcom provide a witness to talk about those documents that you've already produced?

**MR. PICONE:** We thought that they had enough information from the documents themselves and that any other questions would largely be surplusage.

And so I -- you know, I -- just viewed in a vacuum, I don't disagree. They should probably, you know, be able to ask about the documents, about who signed them, when they signed them. You know, all the normal and ordinary questions, just to authenticate and to provide more information about -- apparently, the authority of a person signing them is an issue in Germany, and they -- this idea that they don't recognize this is an officer, manager, managing agent, director, authority inherent in American corporate law.

So I don't disagree. Viewed in a vacuum, they should be able to ask about the documents that were produced; not about all the mergers, not about the merger documents, and all that other stuff.

**THE COURT:** It does seem like matters focused on the issues that BMW flags in its opposition brief, as I said, those

do seem to be appropriate and relevant to the matters in dispute. So I'm inclined to allow deposition testimony on that subject matter, but I don't think it needs to be as broad as the topics as described.

So, Mr. Lavenue, you're ahead on this one. Is there anything that you want to say by way of grabbing defeat from the jaws of victory or something like that?

**MR. LAVENUE:** I was just trying to remember that phrase.

Yes, Your Honor. I'm not going to say anything.

**THE COURT:** Okay, good.

Moving on to topics five and six, I have grouped together. This is:

"The methods used to disclose prior art to the attorneys prosecuting the asserted patents and any prior art search performed by or for Broadcom."

Now, here is where the thought occurred to me that while prior art may be relevant, and not privileged and all of that stuff, methods used to disclose prior art between those people finding it and the attorneys prosecuting patents and how the prior art search was done is unlikely to be relevant, and very likely to be privileged, unless you all have some issue about inequitable conduct. You know, the American concept of inequitable conduct going on in this case, which I didn't see in any of the papers.

So let me pose this question to Mr. Lavenue. You're not just asking for prior art here. You're asking for methods used to communicate to attorneys who are prosecuting, and you're talking about searches performed. Why is that relevant to any issue in the German proceedings?

**MR. LAVENUE:** So the search results are, my understanding of the law, not privileged.

You are correct that if there are search terms that are provided, those would normally be redacted.

So if there was a search, the search terms would be redacted. Everything that resulted from the search would be produced. That's what I've normally done.

**THE COURT:** Great. But I'm not asking about privilege. I'm asking about relevance in the first instance, before we even get to something is privileged or not.

Why is the search performed or the method of communication of prior art relevant to any issue in the case?

**MR. LAVENUE:** Oh, for two reasons. So on infringement, there is the question of whether or not the patent scope is properly construed in view of the prior art. So we're entitled to know what prior art there is on the plaintiff's side.

For purposes of the nullity action and validity, we're entitled to know what prior art Broadcom had in its files.

And then also there is a distinction between the prior art

of the prosecuting attorneys, which would be in the files, which is one reason we're asking for that, and the prior art by the inventors.

So you're right that the case law does indicate that if there is a prior art search done by the prosecuting attorney, the search terms would be potentially privileged, but not by the inventor. So if the inventor is searching for prior art, the case law is pretty clear that that is not privileged.

**THE COURT:** Okay. So let's just assume prior art is relevant.

Again, my question is: Why is the method used to disclose prior art to the attorneys prosecuting the asserted patents or the searches performed for prior art by or for Broadcom, why are those things relevant?

**MR. LAVENUE:** We were trying to distinguish between what the inventor searched for and what the prosecuting attorney searched for. We --

**THE COURT:** Why does it matter who searched for what and how?

If you say the prior art is relevant and I want a witness who will talk to me about the prior art, okay, that's fine. But why the methodology? Why the searching? Why is that relevant?

**MR. LAVENUE:** To be perfectly honest, Your Honor, we understand that both VW and Daimler provided prior art to

Broadcom as a defense in their exchanges.

And to the extent that that prior art was conveyed to in-house counsel in the U.S. for Broadcom and they researched that prior art and identified that prior art, studied that prior art, and then responded to VW and Daimler, I understand that we've lost on topic two, and I -- I concede that.

But this is another point at us looking for the prior art that we believe resulted from those back-and-forth exchanges between Broadcom and Daimler and Broadcom and VW when they were negotiating. That's why, Your Honor.

**THE COURT:** Why not just ask them for the prior art? Why do you have to get testimony about the methods and the prior art searches? Just ask them. If what you want to know is the prior art that Broadcom has, just them for that.

I just -- I don't understand this kind of round and about way of getting to it.

**MR. LAVENUE:** Understood. Well, that's -- you know the reason why we're asking for those methods. So now you know.

But we haven't even received the prior art. And we have not received the files, the prosecution files or the attorney files.

**THE COURT:** Let's just say you got all the prior art you want. Every piece of prior art that Broadcom has. And maybe it matters when they had it. Like, prior art developed

during litigation, I'm not sure why they should disclose that to you.

But if it was prior art that preceded the issuance of the patents, okay, let's just say as an example that category. Okay.

So is there some claim or defense going on in any of the German proceedings that is like inequitable conduct in the United States where the allegation would be: You had prior art. You had an obligation to disclose it, and you failed to do it.

Or you had an obligation to search. Maybe there is an obligation to search that isn't here, and you didn't do that, and so that's why we want to know.

**MR. LAVENUE:** It's not called inequitable conduct. It's just called lack of novelty. And the answer is yes to that question, with a different name.

**THE COURT:** Lack of novelty is the equivalent of inequitable conduct?

**MR. LAVENUE:** In the German proceeding it would be presented as a lack of novelty, not as inequitable conduct.

You don't have the same concept of inequitable conduct in Germany. You would just say: The inventor did not -- had this prior art and did not disclose it. Therefore, it lacks novelty and the patent is invalid.

**THE COURT:** But does it matter that the inventor had

it and didn't disclose it, or does it matter that it exists in the world?

**MR. LAVENUE:** You can use that information in order to time frame the outrage of your position, but it technically would not result in its own defense, like it does in the U.S. It would just add flavor to the context.

**THE COURT:** I am -- okay. Flavor? Flavor sounds a little tangential to me.

I'm looking at the materials that were submitted for -- in connection with Mr. Seitz's declaration, and I'm not seeing anything about that, about the question of you had it and you didn't submit it. And that, in itself, is independently relevant than it exists in the world and anticipates or renders obvious, or whatever the equivalent in Germany, makes it not novel. So demonstrates lack of novelty of the asserted patent.

So perhaps there is something in here that suggests support for your argument, but I am not seeing it.

**MR. LAVENUE:** Well, that is the basis, Your Honor, is that in Germany you would have to submit. If you had it and did not submit it, that would be a lack of novelty.

I mean, I guess in a roundabout way if you have a failure to provide proof in the U.S., that would also apply -- I mean, in Germany, in Europe, that would also apply to the U.S. That's why we asked for the U.S. files as well. Because if you commit inequitable conduct in Europe, that applies to the U.S.

as well.

**THE COURT:** Yes. But that would be in aid of a U.S. proceeding, not in aid of a foreign proceeding. So 1782 is not really a good vehicle for that discovery in my view.

Let me ask Mr. Picone the question that I asked you, which is the question of prior art seems relevant to a nullity proceeding, invalidity proceeding in Germany, but the methodology used to find the prior art and the methodology used to disclose it to the attorneys prosecuting the asserted patents, I'm expressing some skepticism about that.

Mr. Lavenue says, well, it actually would be considered by the German court. The fact that an attorney or an inventor had -- had done a search and had this information in his or her files would actually be relevant, if only as an outrage sector.

What's your response?

**MR. PICONE:** I heard that too. And I join you in your skepticism because that sounded to me like it's really not relevant, but it might be good for some histrionics. It doesn't relate -- histrionics don't make it relevant.

What I heard was it relates to novelty, which is what prior art does. It relates to whether or not the patent is valid, anticipated or otherwise invalid.

So I don't think there is any dispute that prior art, yes, but the methodologies -- I didn't even know what that is, to be honest with you. Are they talking about did we talk to them

about it? Did we email it to them?

**THE COURT:** How did you get prior art into your hands? They want to know how you came to know of it.

**MR. PICONE:** Sure. So that might be lawyers, you know, searching for prior art like they do, like they have been doing for years and years.

**THE COURT:** Or from a third party saying, hey --

**MR. PICONE:** Right. Yes, sure. It can be from a third party. You can use any of those searches.

So we don't dispute whatever the result is they get. But the -- that's -- that kind of ends the testimony, right, because, you know, there is the prior art.

Because otherwise they are going to be saying: Well, why is this prior art? Look at this claim. Compare this claim to this piece of prior art. Because now we're getting way far afield of what a 30(b)(6) witness can do for you.

**THE COURT:** So it does seem to me that if there was an inequitable conduct issue, an inequitable conduct-like issue in the German proceedings, that how you came upon prior art matters. And what you did with it once you got it and the timing of it and all of that stuff, that matters.

If both parties agree that there is no such claim or defense going in the German proceedings, then it seems like the prior art matters.

**MR. PICONE:** I don't disagree. And I see nowhere in

anyone's papers saying that the timing of it matters at all.

In fact, this -- this idea of the time has been first raised here. And, you know, what I imagine is some mad scramble to find something in Germany that can be somehow tangentially linked and presented to the Court to say, well, it's kind of like inequitable conduct, because it's not -- it wasn't here on the papers. And so we're just hearing about it today.

**THE COURT:** So let me just ask the question of Mr. Lavenue. I am not seeing any topic that is about the prior art per se.

Hang on. Let me just get to this.

(Brief pause.)

**THE COURT:** Right. So I'm not seeing any topic that is about the prior art per se, only about how did you get it; or once you found it, how did you disclose it to the attorneys that are prosecuting.

Am I missing something in your topics?

**MR. LAVENUE:** No. We considered that to be part of the topic, was the prior art itself.

**THE COURT:** Okay. It's not written that way. Let me just say that.

And we had had this prior dispute about whether prior art documents should be produced wherever they reside. I think where we left that is I had encouraged the parties to talk

about that and to come to me if there were any dispute about it.

What I may need to do is give you a deadline for talking about it. Because I am sensitive to the fact that if there are proceedings happening in Germany and this dispute over depositions drags on too long or if it's contingent on the document dispute that's not resolved, then that could be problematic.

But my observation is the topics do not actually ask the question that I think you want to -- or do not really encompass the questions that you may want to ask about prior art. But if they did, I have a question which kind of dovetails with a question I have about topic 19, which is the factual basis of the infringement allegations of Broadcom against BMW, which is even though we could say prior art is relevant and the factual basis for somebody's infringement contentions are relevant, is a corporate representative fact witness really the appropriate vehicle for obtaining that information?

Typically in the United States it would not be. You would do that by expert deposition, or you would have, of course, you know, the relevant disclosures, or the factual basis bases for your contentions. And, you know, maybe it is. Maybe there was a person, a fact witness, a non-lawyer who is deeply involved in making these claims and could articulate the factual basis for infringement or could articulate an understanding of the

prior art and why it is or is not relevant to the question of nullity.

But I just wanted to pose the question, that it struck me as odd. So I'm kind of looping together, you know, giving you the benefit of the doubt that topics five and six encompass prior art per se.

I see an issue there that kind of dovetail with my concern about topic 19. So let me ask Mr. Lavenue to address that concerned.

**MR. LAVENUE:** So for 19, Your Honor, we have that listed last in our order of relevance. That's the last topic. And the reason that we have that last is it's just to confirm if Broadcom's witness, that the factual basis for infringement allegations are fully in pleadings in the German proceeding. So if they say that, then we've identified that there is going to be no surprise.

If they say yes, everything is in there, then we're good. If they said no, we have other facts that relate to the infringement allegations that we haven't put in there, then I would say, well, what are those?

It's a pretty simple question, and it was just to nail down the lack of surprise that we would not have something to jump up and get us that we didn't ask about.

**THE COURT:** Wouldn't the German proceedings themselves afford you an appropriate vehicle for ensuring

that -- I'm going to call them contentions, but whatever, the contentions that have been made on infringement have been disclosed in those proceedings and there are no surprises?

I mean, I can't imagine the German court allowing you -- allowing Broadcom to say: Oh, wait a minute. We're going to have -- we have a whole different reason for saying there's infringement, after the Court has already seen the parties' respective positions. But I -- I confess, I may not be understanding how that works.

**MR. LAVENUE:** Well, two responses. One is, remember, this has been going on for ten months. And so ten months ago we didn't -- we were not at the point where we knew the full flavor of the allegations that were being made because the cases had not proceeded. Also, one case is still stayed. So we have not had anything that has been submitted in that case.

So it's just -- it's an early opportunity for us, for the one case that has been stayed, to say there is nothing else coming up.

For the one case that's been dismissed, you're probably right.

For the middle case that has the hearing in November, the question would be: Are you going to be presenting anything new on the hearing in November 2020 that you haven't already put. If they say no, it's all going to be in the briefing, then that would be fine.

It's merely just a wrap-up that we have of all the combined allegations.

**THE COURT:** I guess my question is: How could it possibly not be as you hope and expect? That is, how could it possibly be other than that Broadcom has put whatever it's going to contend in its briefing or will put it in its briefing and it won't be something it raises at the hearing that you anticipate that will be a surprise to all participants, including the Court?

**MR. LAVENUE:** Well, for example, if they add any products or if they add any allegations, that would --

**THE COURT:** The German court doesn't control that? Doesn't say, you know, here is a deadline by which you have to sort of put your stake in the ground about what it is you're contending infringes and why?

**MR. LAVENUE:** They could move for leave to amend, but, you know, we never know what our opponent is going to do in moving for leave to amend to add new products.

**THE COURT:** Okay. Let's just kind of take the concept. So maybe topic 19 is of limited scope and narrow and have a narrow objective for that.

What about the Court's concern that, you know, having a corporate representative testify about the prior art is -- is somewhat unusual?

**MR. LAVENUE:** It's to confirm that we have all the

prior art. You --

**THE COURT:** Okay. It's just confirm that you -- that it's all been produced? That's the goal?

**MR. LAVENUE:** Oh, if you're asking are we going to ask the corporate witness to make comparisons between the prior art and the patents, that was not our intent at all.

**THE COURT:** Okay. Okay, good. So if the question is just have you -- has all the prior art been produced, or have all of the allegations of infringement been made, or if not, when do you plan to change them? If those kinds of questions, really, that's something that counsel should -- should be able to do between the two of you.

A corporate representative should give a deposition about that? That strikes me --

**MR. LAVENUE:** But they haven't provided the prior art, Your Honor. It's been ten months and we --

**THE COURT:** Okay. Okay. We had that prior dispute about the prior art in your issue about the custodians. And I think there is a -- probably a path to resolution of that.

But let me give Mr. Picone an opportunity to address the Court's questions that I posed to Mr. Lavenue on both the prior art and topic 19, which is the factual allegations in support of the contention, the infringement contentions.

**MR. PICONE:** So generally, Your Honor, contention depositions are generally disfavored, especially in the

30(b)(6) context, because of all the issues related to expert testimony and the limitations of a percipient witness testifying on behalf of the company.

That being said, if -- has it all been produced? That's a question I can answer. If they want it under oath, that's a question I can provide a declaration for. That's easy. That is literally not worth the time of sitting in a deposition asking those type of questions.

Secondly, with respect to have you made all the allegations with respect to the factual basis of your infringement contentions? I can't see how you prepare a non expert or non-attorney, litigation attorney, to make those -- that testimony. And that should be something that -- I think you hit the nail on the head, should be dealt in the normal and ordinary course of German litigation.

If German litigation allows you to seek leave to amend to add products and targets of the infringement action, then that's something that's done in the course of the German litigation. I believe it rise or fail on the basis of the merits of that particular issue. Having a corporate representative testify as to that?

And, also, that would implicate privilege issues, because how -- you know, the idea of maybe adding products or adding allegations in a -- that's all the province of -- the litigation strategy of the lawyers. And then -- so I don't

know how a corporate witness testifies to that.

**THE COURT:** Right. If it does seem -- if I'm understanding Mr. Lavenue correctly, if the goal of topic 19, and perhaps by extension topics five and six, is to assess respectively whether there are additional allegations of infringement that have not yet been made and whether there is some prior art that remains to be produced, assuming that it would resolve the question of producing prior art, if that's the point of those topics, then it does seem that a deposition -- deposition testimony is not the appropriate vehicle for confirming that information.

But I want to make sure I'm characterizing the dispute correctly, because I now understand that BMW's goal here is narrower than what I originally inferred from the topics and from the papers frankly.

**MR. PICONE:** That was our understanding, Your Honor, the way you characterized it. So, and the simplicity of that I think is --

**THE COURT:** Mr. Lavenue, am I right? Have I misinterpreted your remarks in this argument?

**MR. LAVENUE:** I do think so a little bit, Your Honor. We certainly would ask a witness from Broadcom: How did you identify BMW? How was that done --

**THE COURT:** How does that matter to any issue in the case? Why did you pick BMW to sue? Like, why does that

matter?

**MR. LAVENUE:** Which product did you look at? How did you compare the product to the patent?

**THE COURT:** That gets -- yeah, that gets to the investigation point, which is topics eight and -- let's see. We have eight. Yeah, topic eight, I think, is investigations.

"Investigations regarding the functionality of the accused technology or any component."

My note on that is, why is it relevant to any issue in the case?

They accuse these products of infringing these patents. Why does it matter what their rationale was? Maybe they really, really dislike your company. I don't know. Maybe they thought you were really harming them in the marketplace.

There could be many reasons, but why is it relevant to an issue in the German proceedings?

**MR. LAVENUE:** Well, the relevance to the German proceedings is standard essential whether or not the patent has to be provided under FRAND terms. Whether or not there is an infringement based upon the way that the courts construe infringement in Germany, which is if you are in a dominant market position. All of these are at issue.

So if -- if they are going to sue BMW and they were a long-time customer -- I mean, BMW is a long-time customer of Broadcom. Why did they all of a sudden decide to sue BMW? Was

it because they felt that they were not getting enough money from their -- the purchase of the products? They didn't like the products that were being used by others?

And then were those products actually infringing? And what prior art was relating to whether or not those products -- whether or not the patents were valid in view of those products? Because many of those products had patents that predated the patent.

**THE COURT:** Okay. Let me put aside the standards essential patent issue.

Your topic eight wants to know -- wants to have deposition testimony about investigations regarding the functionality of the accused technology or any component therefore.

So why would it matter what the investigation was? Let's assume it was completely non-privileged. Just, let's just assume. What is it relevant to, the investigation? Why is the investigation itself relevant?

**MR. LAVENUE:** If it's non-privileged, then it would indicate, we believe, that there was no infringement and that Broadcom knew that there was no infringement, but yet they brought it as a weapon.

I mean, after all we have been sued ten times on --

**THE COURT:** What is the issue that it's relevant to?

**MR. LAVENUE:** That non-infringement.

**THE COURT:** The fact that someone investigated the

functionality of the accused technology is not relevant to whether it's actually correct that the product infringes or it doesn't infringe.

Why would it be relevant that Broadcom investigated this question or the nature of its investigation? Doesn't it just matter to the German court whether they are right or not?

**MR. LAVENUE:** But, Your Honor, you can see that if we have a document from Broadcom where they reviewed whether or not there was infringement, they concluded there was no infringement, yet they sued us anyway. If we show that to the German court, assuming it's not privileged, then they are going to agree with us that it's not privileged.

**THE COURT:** Right. So Broadcom has an engineer who is not trained -- I'm just making this up. Has an engineer who is not trained in the law and says: Hey, I'm comparing this to the patent, and I don't see it. I don't see infringement.

Really? That's going to turn the -- that's going to cause the German court to say: Well, I'm just going to follow whatever that, like, non-lawyer engineer said and you must, therefore, lose.

It just --

**MR. LAVENUE:** Certainly, Your Honor --

**THE COURT:** This strikes me as so implausible that that is, like, really going to be -- yeah, maybe it, like, sounds good. I grant you that.

But, really? We're going to have deposition discovery of the investigation so that you can look for that, like, great, you know, jury argument when there is not even going to be a jury? Some German judge is really going to be persuaded by that?

**MR. LAVENUE:** Yes, a German judge would. I have been in multiple proceedings in Germany on infringement. The Germans are -- I mean, just like a judge in the U.S. would be persuaded.

If you have an engineer, you don't have to be a lawyer if you're comparing claim to a technology. In some cases the engineers understand it better than the lawyers. I mean, yeah, you have to implement claim construction.

**THE COURT:** Right.

**MR. LAVENUE:** It's still highly relevant. It couldn't be any more relevant.

**THE COURT:** I'm just going to say one thing right now, which I know that the court reporter has a complete stop at 11:30. So I understand that. You can drop off whenever you need to, and we'll just continue recording this by Zoom. I just want to say that so she doesn't feel uncomfortable.

So there will be ability to get a transcript. It just won't be fully transcribed in realtime.

Okay. So, Ms. Cromwell, if you're not currently having the Zoom recording activated, please, make sure it is.

**THE CLERK:** It's being recorded.

**THE COURT:** Okay. Great. Thank you.

Sorry, moving right along. This is taking longer than I thought, but I would like to just give Mr. Picone an opportunity to respond on the question of why -- you know, assuming it's not privileged, why investigating -- investigations that Broadcom may have done regarding the functionality of the accused product would or would not be relevant, as Mr. Lavenue argues, to the question of infringement.

**MR. PICONE:** It's not. My recollection is infringement is you compare properly construed claims with the accused device.

**THE COURT:** All right. So let's say you have an engineer who did -- who compared claims to the accused device, and maybe he or she happened to use the correct instruction in doing so and concluded internally that there was no infringement.

**MR. PICONE:** Yeah. Could it be circumstantially irrelevant? Maybe. But, you know, I suppose -- like I said, it could be circumstantially irrelevant. You may get it in in a jury trial. I don't know how a German court, that's a bench trial, is really going to give that a lot of credence to some random engineer who took it upon him or herself to then sit down with a patent and not do their job and compare it to BMW's

products? That unicorn, one, I'm not aware that it exists.

My knowledge is is that all investigations and analysis of infringement and potential lawsuits was done within the legal department with outside counsel.

So that -- so you would get a witness that would say: Yes, all that was done. And you would get a witness that say: No, I'm not aware of any engineer conducting independent non-privileged investigation into potential infringement with BMW.

So we're going to prepare a witness to say that. Again, I could give you a declaration for that.

**THE COURT:** All right. I'm sure Mr. Lavenue would love to have a witness who would say there were no investigations done other than by counsel. I will consider the argument on that question.

I had perfectly excluded the question of standard essentials patents. And the reason for that is I think they fall into a different category, and I actually grouped them differently. I'm going to come back to topic seven in a moment.

But I had grouped topics 10, 11 and 12 together, and I wanted to -- so topic 10 is investigations regarding the standards essential nature of the asserted patents. 11 is meetings, contributions, declarations, et cetera, relating to the asserted patents and various standards. And topic 12 is

the use of Broadcom chips that practiced the asserted patents or various standards. Leaving aside for a moment the part of topic 12 that talks about Broadcom practice and products.

On the standard essentials point, it seems to me from paragraph eight of Mr. Seitz's declaration that there is only one patent -- I think it's EP '531 -- that is alleged by BMW to be a standard essential patent in support of their abuse of dominant market position, that argument, and that Broadcom opposes that characterization.

So let me just pose the question to Mr. Lavenue. Is that, in fact, the position that BMW has taken; that is, this dominant market -- abuse of dominant market position because of an undeclared and -- and not FRAND licensed standard essential patent, namely the EP '531 patent, is limited to that patent.

**MR. LAVENUE:** Yes, Your Honor.

**THE COURT:** Okay. So as a first principle, it seems that discovery that goes beyond that patent in that case and talks about investigations broadly about the standards essential nature of the asserted patents as a whole and Broadcom's participation in standard settings organizations with respect to the asserted patents, et cetera, not relevant as to the two other patents, just as a first principle. Do you agree?

**MR. LAVENUE:** We would have agreed except for the fact that there is an inconsistency between Broadcom's opening

brief on the Motion to Quash when they said that it never investigated its patents for standard essentially. In its reply brief, docket 68 at 12-10, that they -- they have had some investigation.

So I think that is one issue that we're trying to figure out.

**THE COURT:** Okay. Let me make sure I -- looking at docket 68 at 12-10, I'm not sure what you're referring to.

**MR. PICONE:** Yes, Your Honor. We see it says:

"Deposition questions demonstrates that a deposition by written question could easily answer those questions with a simple "yes" and "the asserted patents are not SEPs."

**MR. LAVENUE:** Okay. Well, if that's the case, then we're entitled to ask about that because I think that whether or not it's only on the one or the three, if you have not indicated that it's SEP in the other two, then that would no longer be an issue that we would have to investigate, we would have to ask about.

**MR. PICONE:** That seems like a non-sequitur to me because --

**THE COURT:** All right. Okay. Just a minute. Just a minute.

So here is how I'm thinking about this issue. Broadcom says: We have not declared any patent to be standards

essential. We don't think any of these asserted patents are standards essential. That's not our position.

BMW is saying: Oh, but one of them necessarily is standards essential. And whether it was declared or not, necessarily is. And then it should have been licensed, according to FRAND terms, and you should have made a commitment, and you should have done all these things, and to not have done so is an abuse of a dominant market position.

And I understand that as a defense that's being asserted in the case that involves EP '531.

My prior understanding was nobody had said anything about any standard essential patent in the case or any -- I mean, there was speculation only about there being a standard essential patent at issue amongst these asserted patents.

If there is actually a pled affirmative defense or an argument that's been made by BMW that puts this in issue, I think that changes the analysis for that patent, not generally for everything.

So I really would like to understand what the State of play is as to the EP '531 and the argument that's described in Mr. Seitz's declaration on that point. And I believe it was paragraph eight.

**MR. PICONE:** That's correct.

**MR. LAVENUE:** The answer is yes, Your Honor. I mean, yes, it's an issue in EP '531.

It was also raised in EP '181, but since that case is dismissed and on appeal, I'm not sure what we'll do with that.

It specifically was in EP '531. We were just looking at this this morning. I think it's in EP '181. It's not in EP '052. That's for sure.

**THE COURT:** Okay. All right. Well, let's just focus on EP '531.

And, Mr. Picone, why wouldn't it be relevant then if it's really -- if it is an issue in play in that proceeding, why wouldn't discovery be relevant as to that patent and its -- you know, any commitments or participation and representations that Broadcom has made to the relevant standards setting organization as to that patent.

**MR. PICONE:** Right. We're not aware of any. That was primarily our point, is that we're not aware of it.

And the only -- the only reason this SEP issue is raised is because the argument is that as we're -- as Broadcom is construing the patent, it necessarily makes it a de facto standard essential patent.

So it's a construct that BMW has put together that argues the breadth of the construction offered by Broadcom necessarily now moves it within the SEP, without any of the normal and ordinary steps that a patent would have to incur to become an SEP; participating in a standard setting body, making disclosure, FRAND disclosures in those standard settings. This

is more of a construct that BMW is arguing.

So we're not aware that the '531 was included in the -- in any standard setting body activity and considered a standard. So it's almost as if BMW is trying to create the standard essential patent from one that was not based on the construction.

**THE COURT:** I agree. Well, I think what they are saying is if the patent is construed as broadly as you say, then it is necessarily essential to the standard.

**MR. PICONE:** Right.

**THE COURT:** So here is my question for Mr. Lavenue, which is: What benefit do you get from deposition discovery about representations that -- not benefit. What information do you get from deposition discovery about Broadcom's representations about this asserted patent, if any, to the standard setting organization? How is that information relevant to your abuse of dominant market position defense?

**MR. LAVENUE:** Well, that would support the defense in Germany if there statements that had been made relating to standard essentiality, whether made to a standard organization or made to others.

For example, did Broadcom -- or has Broadcom told others that the patent is standard essential, or that it's essential to practicing the standard? Not just to a standard setting organization, as counsel for Broadcom mentioned, but also in

any context. For example, in discussions with Volkswagen or Daimler or any of its other potential targets in Germany, has that dominant market position been utilized? Because if it had, then something would be relevant.

**THE COURT:** Certainly. But if the answer is -- as Broadcom's counsel says, if the answer is we haven't ever made any such representations. In fact, we've represented the opposite to the relevant standards setting organizations and to others. We said, we don't think this is essential. Is that relevant to any --is it still relevant to your claim, that they said no, we don't think so?

**MR. LAVENUE:** If -- if we ask a relevant question and he answers -- their witness answers the question yes, that would be relevant to the German proceeding because then we would know -- in addition to the fact that we believe that they are making these allegations of standard essential -- essentiality to the industry, then we would know, okay, they haven't made those allegations to the standards entities, is what their corporate witness has said, so we have this inconsistency. We can just --

**THE COURT:** Do you have evidence currently that Broadcom has made representations that the EP '531 patent is standards essential?

**MR. LAVENUE:** That is our understanding. Yes, Your Honor.

**THE COURT:** That's not what paragraph eight says. What it says is:

"If EP '531 is construed as Broadcom proposes, it attributes a dominant market position to Broadcom because it claims technologies that form a de facto standard for graphics processors."

That is not the same thing as Broadcom is out there telling people that its patent is standards essential.

So do you have information that Broadcom has affirmatively represented that its patent is essential to some standard?

**MR. LAVENUE:** Those in the industry have indicated to us that that is the case, yes, Your Honor.

**THE COURT:** That Broadcom has made those representations?

**MR. LAVENUE:** Yes. I don't have a declaration, but --

**THE COURT:** As opposed to if it's this broad, then, yes, everybody practices it who practices a standard.

**MR. LAVENUE:** Something along those lines, that's correct.

**THE COURT:** I'm just trying to understand the nature of the -- you know, how the issue has been framed in Germany.

Okay. Well, let's see. Okay. I wanted to ask a question about the other part of topic 12, which is the use of Broadcom chips that practice the asserted patents.

Okay. So I understand from the opposition brief that discovery of practicing products is relevant to questions of claim scope at the very least. That makes some sense.

So, Mr. Picone, why wouldn't deposition testimony about which Broadcom products practice the asserted patents and how, why wouldn't that be relevant to questions of claim scope?

**MR. PICONE:** I don't disagree that it could be relevant to claim scope.

The real question at that point becomes is the 30(b)(6) witness, corporate representative witness, the one, the best person who could speak on that with any qualification and how we would pair a witness to talk about that.

Again, because you are talking about the scope of interpretation of claims. You are talking about the application of those properly construed claims to a particular device, and the comparison and contrast to those things. That doesn't seem like something that would be known to the company outside its counsel or its expert witness. That is not an appropriate topic for a 30(b)(6) deposition.

**THE COURT:** Yeah. I do agree that that makes sense, that concern makes sense in the same way that having a fact witness as a corporate representative talk about infringement and invalidity positions and explaining those positions is probably not appropriate.

But if the question was: Which of Broadcom's products

practice or have practiced each of the asserted patents? You had a corporate witness who could testify to that. I mean, normally that would just be in U.S. litigation and Northern District of California, you would be making that as a written disclosure.

**MR. PICONE:** Sure. No, I don't disagree.

**THE COURT:** So if it were limited to that, that seems like not an impossible task for a corporate representative. Do you agree with that?

**MR. PICONE:** I do agree with that.

**THE COURT:** Okay.

**MR. PICONE:** Right. If you just want to know which products practice and they give you a list or a name -- you know, something that -- that -- they testify to that, that's fine, but --

**THE COURT:** Okay.

**MR. PICONE:** -- I'm going to be on the phone with you, I guarantee you, because it's not going to be limited to that question.

**THE COURT:** Okay. Well, let me just ask Mr. Lavenue. In terms of that aspect of topic 12, is that what you're after, is just knowing which products practice?

And then knowing which products practice you can say: Okay. Well, that product practices. Then it must be that the claim scope would have to be X instead of Y, otherwise it

wouldn't practice, and we can use that information in the German proceeding.

So is it just knowing which products practice that you're after?

**MR. LAVENUE:** No, Your Honor. We would also -- I think we mentioned this in one of our sample questions -- want to know about the first sale of the Broadcom chip.

From our information, they have not produced any first sale document. How can Broadcom not have any documentation or information about the sale of its own chip?

**THE COURT:** Are we talking about document requests now or are we talking about your deposition topics?

**MR. LAVENUE:** That would be questions, questions that we would ask the witness. Did you sell your product? When did you sell it? When did you have the first sale? Are there any documents on that?

And so if they say, yeah, we have all that, then I'll come back to you and say, Judge, you know, they didn't produce it. They said they have it. We want it. Unless counsel from Broadcom gives it to us.

**THE COURT:** Okay. So the topic 12 says -- I'm going to leave out the standards part:

"The use of Broadcom or Avago products or chipsets, including -- an enumerated list -- that allegedly practiced the asserted patents."

**MR. LAVENUE:** Correct.

**THE COURT:** Doesn't ask for date of first sale, although maybe you think that that is encompassed by the "use of."

**MR. LAVENUE:** We've asked for that ever since we had our first meet-and-confer, Your Honor.

**THE COURT:** Okay. So let's just construe it as "use of" meaning first use of and any subsequent use of. Okay, fine.

So if you want to know which Broadcom or Avago products or chipsets practice and when they first practiced --

**MR. LAVENUE:** And to whom they were sold. That's the universe.

**THE COURT:** Okay. I want -- I want to say that I am totally okay with the parties having negotiated a different scope of topics than the ones that were originally served. I am not trying to throw a monkey wrench into that.

So it may be that you all have had discussions and the understanding is as you say; that it encompasses first sale, to whom it was sold and what they are. But I've just got to tell you that that topic, as literally read and presented to me, does not say that.

So, again, I do not want to create disputes that have already been resolved and understandings that have been longstanding. Okay. So that's not the problem here.

**MR. PICONE:** Your Honor?

**THE COURT:** Just a minute.

**MR. PICONE:** That's not the case.

**THE COURT:** Just a minute. Just a minute.

**MR. PICONE:** All right.

**THE COURT:** I understand that you may disagree about that. But trying to kind of cut the cycle of disputes here, it does seem to me that it would be relevant to know which products practiced the asserted patents. If there really is a first sale problem that you think is out there. If something was sold and it itself is going to anticipate, that is relevant. It does seem to me to be relevant.

I will let Mr. Picone tell me why it's not. But why does it matter to whom it was sold?

**MR. LAVENUE:** The who and the when go together. That's all, Your Honor.

**THE COURT:** Okay.

All right. Mr. Picone?

**MR. PICONE:** If they have the -- if the German law has the allegory of the one-year bar, you know, first sale, patentability, if they have that, some analogous concept, I agree it would be entirely relevant. You know, the fact if you're selling it and it's beyond the year, then the patent is valid. If that is indeed the fact, and I'm not aware that it is, then, yes, it would be relevant.

**THE COURT:** Okay. But you don't know whether that is a concept in German law?

**MR. PICONE:** I don't.

**THE COURT:** Okay. Mr. Lavenue, that's not in Mr. Seitz's declaration, so...

**MR. LAVENUE:** It's the same point of novelty argument, Your Honor. It is a defense.

**THE COURT:** Okay. But is there like a for sale bar kind of concept? Is there a time limit? Is there --

**MR. LAVENUE:** Yes. If you sell one moment before you file the application, it's invalid. That's correct.

**THE COURT:** Okay.

**MR. LAVENUE:** There is no grace period in Germany.

**THE COURT:** So what's the -- what is the date that is of concern for each of the patents? I assume they are different dates.

**MR. LAVENUE:** That I'll have to ask Mr. Myles to look up and give to us as we go further. I don't have that handy with me, Your Honor.

**THE COURT:** Okay. Because it seems to me that if -- so there are two features then of why you think this topic 12, this first part of topic 12 is relevant, leaving aside the standards issue. It's whether some activity by Broadcom itself has invalidated the patent by being a sale that's done before the relevant -- whatever the relevant date is called in

Germany. And it's also evidence of the scope, the claim scope.

**MR. LAVENUE:** Correct.

**THE COURT:** Okay. Those two things.

I would like to know what the relevant dates are, and what it's called, and some confirmation about the -- what is the concept in German law that actually is in play here, and the nullity proceeding.

Don't file anything until I tell you because I will put in it an order. And I will look through and see if there is anything else that I want you to supplement your briefing on on that point or on the -- you know, the German law point. So let me just make a note about that.

(Brief pause.)

**THE COURT:** Okay. And, Mr. Lavenue, if you're telling me that this has been a long-term understanding between the parties, that that's what this topic encompasses, Mr. Picone says it has not been. It bothers me that counsel don't agree on this point.

Are you comfortable that you're representing correctly what the understanding was between the parties?

**MR. LAVENUE:** I am comfortable. And the point -- the reason I come to that conclusion is because there has been no documents that have been provided on this topic at all that I'm aware of.

**THE COURT:** That's irrelevant to the understanding of

what the topic encompasses.

**MR. LAVENUE:** Yes.

**THE COURT:** The fact that no documents have been provided is irrelevant to what does the topic encompass.

**MR. LAVENUE:** Yes, Your Honor. I am comfortable.

**THE COURT:** Okay. So --

**MR. PICONE:** Your Honor, if you note that our entire section in the Motion to Quash deals with the standard essential issue. That has been the singular focus of the parties' discussions about trying to resolve the standard essentiality.

Nowhere do we agree that this includes first sale, on sale bar, none of that. We would have addressed it if that was the -- if that was the topic of the parties' agreement --

**MR. LAVENUE:** It was specifically --

**MR. PICONE:** -- or a demand.

**THE COURT:** No, no.

Okay. All right. Mr. Lavenue, you're saying it was specifically what?

**MR. LAVENUE:** It was specifically discussion at our meet-and-confer, that there was a question that that was the case.

**THE COURT:** All right. Well, there is a question, and Mr. Picone has raised it. I really don't want to get into that kind of dispute. I really don't.

I'm hoping that this is something that can be more amicably resolved, but I fear not. So I may just have to make a call on it, regardless of what your prior -- your prior agreements have been, and just make a call based on what is relevant and fair given the topics as written. And I'm going to keep that in mind, because the topic as written wouldn't seem to lend itself to that.

**MR. PICONE:** Your Honor, our position is we're not going to be -- we're not rigid on that. We're just saying there has never been an agreement.

But as we're talking about it today, that, you know, if there is that on sale bar concept and --

**THE COURT:** Okay.

**MR. PICONE:** You know, we're not going to be rigid in our interpretation. It's just that we don't want to -- we don't want to necessarily give credence to the idea that you can read anything into any request at all.

**THE COURT:** I got it. I appreciate the flexibility on that point, and I think maybe your implicit suggestion, which is, let's figure out what the legal concept is first and what -- and that may sort of suggest to itself a resolution -- suggest a resolution to this problem. So I'm comfortable with maybe having -- having that decision follow some further submission.

Okay. I did want to circle back to this question of topic

seven, which I had initially grouped with another topic. But I would like to ask about the topic that asks for:

"Testimony on infringement or invalidity opinions and communications relating thereto."

Okay. So let me just ask the question. In the German proceeding is there an occasion on which Broadcom will rely on an opinion of counsel, as you might in U.S. litigation? Is there some opportunity for that to happen or -- in the infringement and nullity proceedings that are existing? Is that, you know, possibly something that will happen down the road; or has it already happened, where there is a reliance on an opinion of counsel?

**MR. PICONE:** Your Honor, we're not aware of that as being an issue in the German proceedings.

**THE COURT:** Okay.

**MR. PICONE:** Or even a concept that's recognized to combat willful infringement. We're not aware of that. That doesn't mean it doesn't exist. It just means we don't know.

**THE COURT:** But you're not the -- you're saying BMW is the infringer, so it wouldn't --

**MR. PICONE:** Right. I was more talking about --

**THE COURT:** Right, with that concept. Okay.

**MR. PICONE:** Right. We conducted an invalidity analysis.

**THE COURT:** I see.

**MR. PICONE:** I think that's part of it as well.

**THE COURT:** So, yes. Correct.

So let's just focus on invalidity. There is no -- there is no proceeding in the German nullity action where it would be available to a party to say: Hey, you know, we didn't know about this prior art or whatever, or we had an opinion that this prior art didn't invalidate the patent. Therefore, you know, whatever penalty might flow from otherwise being wrong on the question of validity doesn't because we have this opinion, counsel. There is no concept like that?

**MR. PICONE:** I'm not aware of the -- we're not a moron defense in Germany, Your Honor.

**THE COURT:** All right. Well, let me ask Mr. Lavenue then. You know, I am skeptical of requests that ask for deposition testimony about infringement or invalidity opinions because those -- that sounds to me like opinion of counsel. Although I know that you are thinking of opinion in a more informal way or encompassing opinions more informally, but also I think your request encompasses opinions that may be opinions of counsel that have been disclosed and, therefore, lose their privilege status.

Have I framed the issue correctly from your perspective?

**MR. LAVENUE:** Yes, Your Honor. So the opinions of counsel have not been identified in the privilege log because, as you know, there's only two entries.

So even if they had an opinion of counsel or any opinions of counsel, a two-entry privilege log doesn't have that. We think we're entitled to that.

Setting that issue aside. As far as a non-privileged opinion of counsel, either on infringement or validity, that was specifically asked to be included by our German colleagues because they told us that in German proceedings they've had in the past there have been documents that have been used by their opponents which was an opinion on infringement or validity, and they were -- they were surprised with that.

And so they wanted us to make sure that Broadcom did not have a similar non-privileged document that they planned to come and use in court either in the nullity or in the infringement proceeding and that they wouldn't have to deal with that issue again. It was basically a backstop that they not be -- not be surprised.

**THE COURT:** So would it be sufficient for BMW's purposes if you were to have the opportunity to ask a Broadcom witness: Does Broadcom intend to rely on an opinion of counsel for either infringement or invalidity?

**MR. LAVENUE:** That's really all we were planning to do. And if they said no, then that would be the extent of it.

And then one other quick addition from before, Your Honor, on the question on first sale. Request for Production No. 7, at the very end indicates that we're asking for documents from

Broadcom on their products and chipsets "including, but not limited to invoices and delivery notes."

And my colleagues, Mr. Myles and Mr. Cassady, just sent me an email reminding me that when we went through production, document request No. 7 on invoices and delivery notes, that that's where we discussed first sale with counsel for Broadcom. Just to backstop my -- my recollection was hopefully not faulty on that issue.

**THE COURT:** On the document requests? That makes sense, but are you saying that it was also a topic of discussion when you all came to the deposition testimony?

**MR. LAVENUE:** Oh, no, Your Honor. I agree with counsel for Broadcom. He was referring only to the deposition testimony. When they said they weren't going to provide a witness, we did not go into this level of detail.

**THE COURT:** Well, thank you for clarifying that. Because, of course, we are focusing on deposition testimony, and it now appears there is no disagreement on that point.

**MR. LAVENUE:** Okay.

**THE COURT:** I don't know if there is any disagreement on the document production. I'm not inviting it, but you all have told me you're done with document production, for the most part. There are these lingering things that have slopped over into the deposition testimony category, which we may need to deal with by also dealing with documents.

But let's kind of circle back to the infringement and invalidity question I was trying to nail down, which is: Is there anything beyond understanding whether Broadcom intends to rely on an opinion of counsel for infringement or invalidity in the German proceedings that BMW wants to inquire about? If the answer is no, is that the end of the questioning?

**MR. LAVENUE:** If the answer is no and that they don't have one.

If they say that the -- the answer is, well, we're not planning on using it, but we have one we never produced, then we would want a copy of it because that should have been produced.

And then also we would ask the witness: Are you aware of any internal privileged ones? And if they say: Yes, but we're not -- you know, we're not going to talk about that. Then I'm going to say: Well, why is it on your privilege log?

**THE COURT:** And the answer will be: Because it was in our lawyer's file, and we didn't search our lawyer's file.

**MR. LAVENUE:** But we did not -- our agreement was not that they could not do anything on the log. Our agreement was only that they did not have to produce documents that were not specifically requested or log them. And we specifically requested that to either be requested or logged. That's not -- that is a complete violation of the agreement.

**THE COURT:** So let me just ask Mr. Picone. Are you

aware of any occasion where Broadcom has shared opinions of counsel with third parties, either as part of a licensing transaction or some other transaction where third party might have inquired: Do you have an opinion? What does it say? Do you know, has that happened?

**MR. PICONE:** I'm not aware -- again, Your Honor, I'm not aware, but we have to remember that over the last 15 years, Avago has become -- Avago has become Broadcom, and CA, and Symantec. So I'm not aware of them having done that. But then again, there is a lot of separate parties that have now come as one. So I can't speak exhaustively, authoritatively on that issue. I'm just not aware of it.

**THE COURT:** Okay. So, but this then begs the question of preparing a witness.

So if the Court were to allow a deposition that permitted BMW to ask questions about what has or has not been done to find out if there have been any disclosures of opinions on infringement or invalidity, you would have to go to the effort of looking into all that stuff.

**MR. PICONE:** Right. And, of course, given my experience with Broadcom and many of its subordinate entities that are now part of Broadcom, that is not generally the practice. And it certainly wouldn't have been the practice outside of the legal department. They just don't typically engage in that type of activity.

**THE COURT:** All right. Well, it does seem like there -- there may be some sort of possibly narrow scope for this topic that may be relevant.

I mean, opinions on infringement or invalidity are relevant. If they were not privileged, they are probably the kinds of things that should be disclosed and someone should be asked about.

**MR. PICONE:** We agree, Your Honor. We don't disagree with that.

**THE COURT:** Let's not belabor this one. We're getting close to be done.

**MR. LAVENUE:** Your Honor, I have those dates for you, if you would like those dates.

**THE COURT:** The dates with respect to the question of whatever the relevant date in Germany is for use of the patents?

**MR. LAVENUE:** Yes, Your Honor.

**THE COURT:** Okay. And what is that called in Germany? Does it have a name? The filing date? Do you call it something else?

**MR. LAVENUE:** It's the filing a date; right.

**THE COURT:** It's the filing date. Okay.

**MR. LAVENUE:** EP '531 is February 5th, 2000. EP '181 is August 13th, 2001. EP '052 is December 6, 2006.

**THE COURT:** I will note that. Thank you.

And, of course, Mr. Picone, if you have some disagreement about those dates, if I do allow additional filing, you can let me know if there is some disagreement between the parties those dates.

Okay. Where were we? Okay. Positions taken by any party -- this is topic 13. Positions taken by any party in any proceeding involving use of the patents in at least the eight different cases that are listed in the topic.

And then we have -- well, they are related a little bit to materials produced by third parties to Broadcom in response to Broadcom's own 1782 applications. That's topic 17.

And topic 18, Broadcom's current ability to access information possessed or controlled by another affiliate.

Let's take this question of -- as I understand it, topics 13 and 17 are information that Broadcom has based on other proceedings, positions it has taken in other proceedings, positions the parties have taken in other proceedings involving the asserted patents and discovery that Broadcom itself has obtained by way of its own discovery efforts.

Focusing first on topic 14 -- sorry, topic 13, excuse me. Again, this -- this topic struck me as kind of like the wrong vehicle for obtaining information. If BMW has produced -- sorry. If Broadcom has produced records to BMW reflecting the positions that everyone has taken in these various cases, including Broadcom, it seems like if there are positions that

Broadcom has taken about the asserted patents that are inconsistent with positions it's now taking, that might be a basis for someone to testify about the reasons why that is, if there are factual reasons. For legal reasons, maybe not.

But why would you ask a Broadcom witness to testify about positions others have taken in other cases involving the asserted patents? How would that really be a relevant topic for a deposition of Broadcom?

**MR. LAVENUE:** That was not our intent, Your Honor.

**THE COURT:** Okay. So what is your intent for topic 13?

**MR. LAVENUE:** Positions by Broadcom. Not positions by Daimler or VW or the others.

**THE COURT:** Okay. All right. And, again, the concern I have is that if it gets a little bit into the same area of, you know, what are your infringement contentions, what are your invalidity contentions, not necessarily well suited to a fact witness. So how do you address that concern?

**MR. LAVENUE:** One thing is that we want to confirm that we have all of the documents, and I think that there seem to be some gaps. We want to ask the Broadcom witness to confirm that all of that information has been provided. And then to confirm that we have all of the specifics on which patents that Broadcom has accused of these three against the particular targets that they have and that we've collected all

that information.

We believe that there's gaps in that production; that there are documents that have not been filled in, and to just see what the Broadcom witness knows about that and whether or not the documents have been collected.

As far as the positions that are presented on the litigation positions, again, this goes to, I think, the last topic we talked about. It was 19 or something. Are you aware, Mr. or Ms. Broadcom Witness, if there are other litigation positions that are planned to be presented in our case? And then we would perhaps go through some of the positions that are in the other cases and say: Okay. Well, here is the position that was presented against VW. We're both automotive manufacturers. Is this position not going to be presented against BMW?

If they say "I don't know," fine. If they say, "yes," "no." But at least we will be able to check off the positions that were made against Volkswagen, NVIDIA, Daimler, all of the others that they have seen in Germany and compare to see if they are planning on bringing those against BMW as well.

**THE COURT:** Okay. So I have two reactions to what you just said.

First is, if what your purpose is to find out why there are gaps and what the explanation is and whether there is something missing that should have been produced, talk to

counsel about that. You need to talk to Mr. Picone and his team about missing documents.

How is Broadcom to prepare a fact witness who will sit there with a pile of paper and have you say: Okay. Why is there not, you know, something in between this document and this document? You're going to get a bunch of "I don't knows," because they are not going know what it is that you're -- that you think you're missing. So why not just raise this with counsel?

**MR. LAVENUE:** It's a simple answer, Your Honor. It's the answer that I've given to some other questions as well.

Counsel for Broadcom is using the so-called agreement to not produce a significant amount of documents and to not produce logged information. Without us going to the Broadcom witness and saying: Do you have this? And they say "yes." And then we go back to Broadcom and we say: You didn't produce it. And these --

**THE COURT:** Okay. Let's just take your example. So, Mr. Lavenue, you have a document. You say: Do you have this? If you already have the document, I don't know why you're asking the question.

So let's say, here is a gap. We're missing a document that seems to be described in this way. Why not -- have you already asked Mr. Picone for that document?

**MR. LAVENUE:** Yes, Your Honor. In both the second

and third 1782 proceedings. We have --

**THE COURT:** In this proceeding -- I'm not -- okay. Judge Westmore and Judge Spero, I think, they are handling whatever they are handling.

**MR. LAVENUE:** Yes, Judge.

**THE COURT:** In this -- in my case have you and Mr. Picone sat down and said: Okay. You know, I'm missing X, Y and Z. Do you have that?

**MR. LAVENUE:** We have specifically indicated these documents are missing. And his response to us was: You agreed we didn't have to search for that, so I'm not going to give it to you. And that's why we're in this situation.

**THE COURT:** Okay. I will let Mr. Picone respond in a moment.

The second thing I'm reacting to in your argument is that asking witnesses about documents that are missing is not part of your topic, which asks about infringement, validity, nullity or standing positions or defenses put forth. It is not a request that says: How did you collect and search for documents relating to these -- I just --

**PLAINTIFF'S COUNSEL:**

**MR. LAVENUE:** It's topic one, Your Honor.

**THE COURT:** Okay. So I'm not talking about topic one. I'm talking about topic 13, which asks about positions taken.

So my concern was initially, why is it that it's appropriate to ask a fact witness questions like that?

**MR. LAVENUE:** Questions like, did you have a document that --

**THE COURT:** No. What position did you take in this case? Why did you take that position? How does it differ from the position you've taken in this case? Is this -- these are the kinds of questions, it seems to me, that are at least a combination of fact and the law. Not like you can't have someone testify about the factual part of those things, but it seems challenging to ask the fact witness to provide deposition testimony about positions taken.

So I'm trying to understand if part of what you said is "I want to know what positions you will take in the future," that kind of falls into the bucket we were talking about before, which is, it doesn't really seem like the appropriate thing to ask a deposition witness.

**MR. LAVENUE:** If they say that to their knowledge they are not planning on making argument X, which was made against Daimler, against BMW, because all the arguments against BMW have been made and they are not adding to it, then the answer -- that's the answer. We move on. It's that simple.

**THE COURT:** Why is that an appropriate fact -- this strikes me as just a very odd thing to ask a fact witness in a deposition, when you have an ongoing proceeding in which the

parties are required to take positions or not take positions before the German court.

And if what you're after is give me a preview of what your legal strategy is and what you will be doing down the road, that gives me pause, too.

**MR. LAVENUE:** I understand, Your Honor. Let me try to explain.

So the first question to the witness is: Do you plan to make any other arguments on infringement other than those that have been made against BMW in this particular German proceeding? And they say "no."

And then we put before them a pleading from the Daimler proceeding, and we say: Okay. Against Daimler, Broadcom made this argument, which has not been made against BMW. So is it your understanding that you're not going to add this new claim against BMW? If they say "that is correct," it's a double check against the first argument, which was we don't have new arguments against you. And I'm just like, okay, I just want to make this crystal clear. So that way in Germany if they say: Oh, we have this new argument we want to present. We're like: Wait. I specifically asked.

**THE COURT:** Why would they be precluded from doing that if they have a good reason to raise a new argument before the German court and the German court let's them? Like, why not? Like, why wouldn't they be -- here, right, if you asked a

judge, "Can I make this new argument that I haven't already disclosed to my adversary or to the Court," the Court would have some process for evaluating whether that was fair or not.

Are you telling me it's just a big free-for-all in Germany, and so this your only way to ensure you're not unfairly surprised?

**MR. LAVENUE:** Yes, yes.

**THE COURT:** Somehow I am slightly skeptical about that.

Okay. Let me give Mr. Picone an opportunity to weigh in on this question, and let me see if I can frame it. I am troubled by the fact that there -- there is a set of documents, allegedly, that reflect prior proceedings having to do with the asserted patents that have obvious gaps. And the assertion by Mr. Lavenue is that BMW has asked specifically: Do you have the documents that go into those gaps and will you please provide them to us? And the response from Broadcom has been: Well, that would require me to search in privileged custodians' files, namely the legal department or outside counsel, and we have an agreement that I won't do that.

So that concerns me because that just seems to be just not cooperative.

**MR. PICONE:** I'm kind of at a loss because I don't know what gaps are being referred to. These are pleadings.

And I know we had some back-and-forth regarding -- I think

it was designation under the protective order, because some German pleadings are not publicly available. So they may not be highly confidential, but they may be confidential. And we had some dispute we were able to resolve because we -- we basically took the confidentiality.

I'm not aware of any gaps in information where we're saying: Oh, no, you can't have these pleadings because they are in our lawyer's files.

I thought we produced everything, and I'm not aware of a specific gap.

**THE COURT:** All right. So if I asked Mr. Lavenue to provide a list of the gaps and you will go and see if you have a file for these -- these cases that has the missing document, that is not otherwise available because it's not public or whatever, but you have the missing document, you will do that? You will go look for that?

**MR. PICONE:** Yes, absolutely. I'm not going to say that just because I put -- I'm not dumb enough to say just because I put a document in a lawyer's files automatically now it becomes privileged or not otherwise accessible.

**THE COURT:** Okay. I get that. But your position has been, I don't have to go search these custodians, period. End of story.

**MR. PICONE:** Right. That was the position because of --

**THE COURT:** Okay. Okay.

**MR. PICONE:** -- of so many other issues.

**THE COURT:** Now, maybe what I'm suggesting is the parties should agree to have a different understanding of what they are going to do here to facilitate some of these thorny issues that are taking up everyone's time. There is really an easier path. This might be one of them.

These are litigations that exist. They have documents. You either have them or you don't. They should be easily found and do not require a search. They should be in a place or not. And it seems like you all could work out if there are things missing.

**MR. PICONE:** Your Honor, I don't disagree with that. I think that you're inviting more letter briefs. That's all I'm saying, because it's not as discrete. It will morph. It will change.

**THE COURT:** Well, you know, I could do this all day. I really could. I like patent law. You all are very fun. But it's just going to take a long time. This is going to take a long time. You're going to spend a lot of money doing it. And, you know, I -- I don't know if your clients are listening, but it seems like that's not a good call for anybody.

So I'm going to encourage some cooperation. I haven't decided this one, but I am -- I am skeptical that deposition testimony is the thing that needs to happen on this point.

**MR. PICONE:** Your Honor, this topic is highly problematic for many different reasons. Asking a lay witness to go through the pleadings for eight different litigations and then, you know, be able to prognosticate as to what the lawyers are thinking and whether they are changed thinking or whether this is consistent with -- that is -- I don't know how you prepare a witness to testify to that.

**THE COURT:** That's why I'm saying I don't think the real problem here is the deposition testimony. I think the real problem here is the missing documents. Okay? So I think there is a solution to that problem.

Let's move on. Concession --

**MR. LAVENUE:** Your Honor, when you're saying that counsel for Broadcom needs to address the document issue, you're not just limiting it to topic 13; right? It's all the documents. Otherwise --

**THE COURT:** No, no, no. No. No. Nobody is going to say: Judge DeMarchi said this word in the transcript.

I am going to issue an order and you will know what I mean from my order. And if not, I'm sure you will not hesitate to seek clarification or reconsideration or whatever. But I'm going to try to be very, very clear about what I mean on a topic-by-topic basis in my guidance to you on what I think is an underlying problem, maybe, about -- that was spawned by this prior agreement between counsel that can now be mitigated in

some way, that addresses both the deposition testimony concerns and this, like, underlying problem, which isn't actually before me.

It may be that I will require you to brief something else, and I won't be able to resolve it, but I'm going to try to give you some guidance on things that I think can be resolved by dealing with the documents. Okay?

But I'm not saying: Oh, Judge DeMarchi has said Broadcom has to do a redo on all of its document production. So don't construe it that way.

Okay. Topic 14 is conception and reduction of practice of the asserted documents. Now, I understand from BMW's opposition that this topic it believes is relevant to questions of inventorship and claim scope, and that Broadcom's position is inventorship is not an issue in the case.

So let's just start with the inventorship, because I -- I don't really see how conception and reduction to practice is relevant to claim scope. Put a pin in that.

Let's talk about inventorship. Is inventorship an issue in the case?

**MR. LAVENUE:** Inventorship is an issue in every German case because of the particularities of inventorship in Germany. So that is the answer to that. Because in Germany not only does -- you have the assignment issue. Only the assignee can sign, and you have to prove in court that the

assignee has properly assigned the rights to file a lawsuit in Germany. We don't have that in the U.S. We have standing, but not assignee proof requirements.

In Germany there is also inventorship, ownership rights, and that the inventors own the patents, not the company, with certain exceptions. And, also, even if the company owns the patent, the inventors have the rights under the patent that are independent of the company.

So all of those issues are highly relevant in Germany, which are completely different in the U.S. And that's why we're entitled not only to the conception and reduction to practice documents for purposes of understanding claim scope and the infringement allegations, but also just as assignability is an issue, inventorship is an issue as well. Very peculiar oddity of German law.

**THE COURT:** Okay. Help me out though. Why is testimony about conception and reduction to practice by a corporate representative relevant to the inventorship question as you framed it?

We already have something dealing with assignments, mergers and the transactions related to the merger that deal with authorization to assign patent rights, but I interpreted your argument as saying there is a question about who really invented these asserted patents. That's why we need conception and reduction to practice information.

So my question is more like, is there an inventorship as in, do we have the right person claimed as the inventor or is there someone else who is not identified as an inventor? So is there such an issue?

**MR. LAVENUE:** I see, Your Honor. What the reason is is because the documents have not been provided that relate to this topic, that is the conception documents, the inventor documents, the prosecution documents, we have nothing. We have zero. Because we need -- other than the public file history. But other than that, none of the other documents we have. Those are the documents that we're focusing on.

So we're not challenging whether or not specifically the inventor is or is not the inventor. We're challenging the fact that we have no documents from the inventor showing that the inventor is a documented inventor under German law.

**THE COURT:** Okay. Topic 14 is the conception and reduction to practice of the alleged inventions disclosed.

**MR. LAVENUE:** Yes.

**THE COURT:** It's not a document request. It is a request for testimony about conception and reduction to practice.

**MR. LAVENUE:** Right.

**THE COURT:** And you are asking for a 30(b)(6) witness who will testify about conception and reduction to practice of the claimed inventions.

**MR. LAVENUE:** Question for a Broadcom witness. How do you --

**THE COURT:** I'm sorry?

**MR. LAVENUE:** -- know the conception date?

Well, I know the conception date because it is in our files.

Which files? Do we have a copy of those files?

**THE COURT:** It's a back door way of getting documents about conception and reduction to practice that you don't have.

**MR. LAVENUE:** I'm sorry. I didn't hear.

**THE COURT:** It's a back door way of getting documents that you don't have about conception and reduction to practice.

You're not really interested in, did this inventor conceive and reduce to practice these documents. You want to find out if there are any documents you don't have.

**MR. LAVENUE:** We won't know that until we see the documents.

**THE COURT:** I don't feel like it's appropriate for us to be using this as a document dispute hearing.

I'm trying to figure out whether I should order Broadcom to produce a corporate representative to testify about topics; and if so, which ones.

**MR. LAVENUE:** They should --

**THE COURT:** And all of them seem to be -- not all of them. That's not fair.

Some of them seem to be coming down to questions that counsel should have addressed to each other about the scope of document production. If there is a document request that asks for conception and reduction to practice documents and the problem is this agreement between you all, then let's deal with it in that way and not in this weird deposition testimony way. It does not make any sense.

**MR. LAVENUE:** Well, to be fair to us, Your Honor, on this issue, I mean, we are entitled to ask what is Broadcom's position on the conception date. What is it?

**THE COURT:** Okay.

**MR. LAVENUE:** What is Broadcom's position on the reduction to practice date? What is it?

Now, would I then say: How do you know this?

**THE COURT:** Okay. But wait a minute. Why is conception and reduction to practice relevant here if, as Broadcom argues the first to file jurisdiction, who cares. Right? Who cares when conception and reduction to practice. That's only relevant for U.S. litigation.

**MR. LAVENUE:** I see. That's a very reasonable question. And the answer is, it's because the conception date is relevant from the filing date because if they have a difference, then that depends on -- that goes back to the topic on the Broadcom product that was sold.

So if they are selling the product, as we think they might

be, prior to the conception date, even if the filing date is only relevant in Europe, it's still a point of fact that we can point out to the German court; that there is a conception date, there is a reduction to practice date, there is a filing date. And before all three of those, there is a sale of the Broadcom product on the market, which breaks novelty.

So it not only breaks novelty from the filing date. It breaks novelty from the reduction to practice date and conception date.

**THE COURT:** I don't see how conception date and reduction to practice matter at all. If your first sale of the product that practices is well before the filing date, why does it matter whether intervening conception and reduction to practice happen? I mean, that doesn't make any sense. Because reduction to practice and conception necessarily would have happened before the first sale of a product that practices, unless there's just -- anyway. It just --

**MR. LAVENUE:** That's exactly the point. Because the --

**THE COURT:** Okay. Is it -- but why do you need evidence about conception and reduction to practice if you have these other pieces? You have a filing date, and you have the information about their first sale of their practicing product. That's all you need; right?

**MR. LAVENUE:** We agree that -- you may say we don't

need it, but they are entirely relevant to --

**THE COURT:** I don't understand why they are entirely relevant. That's my point, is I don't understand from your papers why they are relevant.

**MR. LAVENUE:** Because if they were selling the product using their own patented technology prior to the inventor even claims that he conceived of the invention, then that would show the patent is clearly invalid.

**THE COURT:** Okay. Which would necessarily be the filing date; right?

**MR. LAVENUE:** But it would make it even more --

**THE COURT:** Even more invalid? Okay. All right. This may be where I need Mr. Seitz and the equivalent person on Broadcom's side to let me know about what German law says about conception and reduction to practice, because invalid is invalid, and even more invalid doesn't really make a lot of sense to me.

So I'm just -- I want to give you an opportunity to remedy -- "remedy" is not the right word. To address the question the Court has raised, if it's meaningful to this topic. Because right now it doesn't seem like it's relevant to the question of inventorship.

If there is no dispute about whether you have the right inventor or not, there is no -- I don't hear you saying, Mr. Lavenue, that there is a concern that there is any

information suggesting that the wrong person is named as an inventor on any asserted patent or someone should have been named that isn't. That's not -- that's what I was interpreting as inventorship, a problem.

If it's really more of an invalidity problem based on dates, okay. Maybe there is some basis for this being relevant under German law, and I will give the parties an opportunity to let me know that. That's my inclination.

I don't see how it's relevant to claim scope though, which is the other argument that you need. So could you address that point, how conception and reduction to practice is relevant to claim scope?

**MR. LAVENUE:** Because if the document that the inventor claims that he or she invented is different for conception, reduction to practice and filing and ultimate patenting, all three of those are points in the timeline which there could be a difference in what the terms are construed to mean. The inventor may have understood one thing at conception, another at reduction to practice, another at filing. And the ultimate patent it issued -- I mean, I know from writing patents myself, sometimes what issues the inventor doesn't even understand because the inventor doesn't understand how the law works.

So these are -- that's why by seeing what the inventor understood his or her invention was at the time of conception,

comparing that to what was filed and comparing that to what is issued, that goes directly to claim scope.

**THE COURT:** But by your own logic I don't see how it would, because it seems like whatever got issued and is construed by the Court to be whatever it is to be, that's what you have to deal with for infringement invalidity.

Are you telling me the German court is going to inquire what did the inventor think he or she invented before the filing date of the patent?

**MR. LAVENUE:** It's extrinsic evidence, certainly. Even in the U.S. a judge would consider -- maybe not dispositive, of course, but would consider what the inventor thought from the file history and what the inventor's document said about the invention, the initial invention disclosure. That would be directly relevant. Even in the U.S., not even in Germany, which it would be, too.

**THE COURT:** All right. Mr. Picone, what is your view on that point?

**MR. PICONE:** On that specific point, Your Honor?

**THE COURT:** Conception and reduction to practice evidence, which again is just --

**MR. PICONE:** It's utterly irrelevant --

**THE COURT:** I'm sorry. The specific point about the German court is going to look at what the inventor believed he or she was inventing and how he or she understood the invention

before the day of filing as relevant to claim scope.

**MR. PICONE:** One, the first point I'd make is that anything supporting that argument is not in Mr. Seitz's declaration.

BMW had ample time to think through these arguments and present evidence instead of just, you know, extemporaneously talking about what they -- what they believed German law to require, what issues they believe are -- even though none of us on this call today are German lawyers, they had an opportunity to have Mr. Seitz tell us specifically. They did not. And I don't think it's fair to have a big do-over now so that they can now go back and fix that.

The second issue is, I don't know whether conception and reduction to practice has anything to do with claim scope in Germany. I don't know. It doesn't seem to me particularly relevant.

You know, if I'm looking at it from a U.S. construct, yeah. Is it potential pieces of extrinsic evidence that the Court could look secondarily after they construe the claims? Are you relying primarily on the intrinsic evidence, which is what the Federal Circuit says to do? Perhaps.

I don't necessarily see it as relevant and proportional to the type of activity that we're undertaking here, especially since the idea of this being relevant in Germany, we have no idea and we just have a lot of speculation, and I think so, and

it might be, and it could be.

**THE COURT:** All right. We have been going a really long time. I'm vary grateful to the parties for their endurance in this hearing, but let me just see if I can ask a few more questions about the remaining topics, and then we'll need to wrap it up here.

I had groped together -- let's see. Oh, I had not grouped together. We had this topic meetings and communications between Broadcom's CEO and BMW's senior vice-president. When we had document discovery on this issue, I thought that it would be relevant if there were communications or preparation for communications that involved infringement and invalidity.

I am puzzled by why deposition testimony is relevant, event if the topic were limited to that category, infringement and invalidity. Given that one party of the conversation was BMW's own senior vice-president, who presumably knows what was said and what he said. So as far as communications, it doesn't seem like there was any deposition testimony relevant.

The only thing I could imagine is that if there were some -- some communication that happened that, you know, BMW wanted to know what was meant or whether there was a dispute about some communication, but even that strikes the Court as really sort of far afield from any relevant issue in the case. Because, you know, communications about infringement invalidity are one thing. They may shed light on what individual parties

thought at the time. But your dispute is about whether there is actually infringement and whether the patents are actually invalid. And this seems to me some -- some sideshow.

So I really would like to understand what BMW thinks it will learn, apart from whether there are documents that weren't located, from this deposition topic, topic 16.

**MR. LAVENUE:** The number one thing that we would like to know from topic 16 is why we're missing documents. So that clearly goes to that.

The number two thing that we want to know is once -- there is only two documents that were produced in response to topic 16. If you recall, no documents were produced. We did a joint letter brief. You ordered the documents to be produced. Two documents were produced. And they didn't even include the documents that we knew had already been exchanged.

So we wanted to see other than the emails that we have, do you have emails that relate to this as well, in addition to what we have, to have the complete set of documents? We don't know if we have the complete set. We want to see what they had. And that was a confirmation that they would produce what they had. We have already identified the fact that we have those emails. Why are we missing this production entirely?

So it's not to go through the email and say: What did Mr. Tan believe by this? What did he believe by that? But, do we have the universe of emails of communications between

Mr. Tan and Dr. Grote? That's the number one priority for topic number 16.

**THE COURT:** Okay.

**MR. LAVENUE:** Once we get beyond that, then the next point would be, what about the privilege log? You know, did -- Mr. Tan obviously communicated with people about his communications with Dr. Grote. Why are none of those communications logged?

**THE COURT:** Okay. I'm going to just -- I'm just going to say I appreciate that's the point. I am really feeling like this deposition is not an appropriate vehicle for resolving these kinds of issues.

So I'm going to ask you about the last couple of ones that I have a question about. This is related to the standards essential that I should have asked before. But I just want to make sure I understand the reason for this one. The methods that Broadcom uses to monitor patent portfolios for standard essentiality, is that only going to be relevant to EP '531 for the reasons we already discussed?

**MR. LAVENUE:** That's correct, Your Honor.

**THE COURT:** Okay. All right. Thank you for that clarification.

And then topic 18 is -- sorry, topic 17. It sounded like from your papers BMW was limiting that really to NVIDIA's RIVA -- I don't know if I'm pronouncing this correctly,

R-I-V-A, TNT materials, that in a particular prior art. It says materials produced by third parties to Broadcom in response to Broadcom's own 1782 discovery. It sounds like the focus really is this NVIDIA product; is that fair?

**MR. LAVENUE:** Yes, Your Honor.

**THE COURT:** Okay. And then in terms of the production itself, you have already the production?

**MR. LAVENUE:** We do not know if we have the complete production.

**THE COURT:** Okay. So is the question you want to ask the deposition witness: Do you have -- do we have the complete production? Or are there questions about that NVIDIA product that you expect a fact witness to be prepared to testify on the merits about?

**MR. LAVENUE:** It's what documents did -- did Broadcom have documents on the NVIDIA product other than what was produced from NVIDIA? Because what Broadcom did is they produced documents from NVIDIA that were produced in the 1782. When Broadcom brought a 1782 against NVIDIA, they produced those to us. We want to know beyond that, were there other Broadcom documents? Because, frankly, in the collection we did not see anything.

And then once we find out what they had, then, like you said, the follow-up question will be: Okay. Well, if you're tracking the NVIDIA product, then what other products do you

track? Because if you're tracking NVIDIA and you're tracking what you sell to BMW, then how is that tracking conducted? That would be --

**THE COURT:** What does tracking have to do with topic 17?

**MR. LAVENUE:** 17.

**THE COURT:** Which is where this NVIDIA product comes up in your opposition brief.

**MR. LAVENUE:** Specifically for 17, we're just talking about NVIDIA.

**THE COURT:** Okay. Okay. All right. Those are my questions.

I'm going to very briefly, and with some reservation, invite the parties to share any last thoughts they have on their respective positions. Please don't say anything you've already told me.

But it's Broadcom's motion, so I'm going to let Mr. Picone go first, and then BMW can have the last word.

**MR. PICONE:** I don't have anything further to add, Your Honor.

**THE COURT:** Okay. Mr. Lavenue, any last words?

**MR. LAVENUE:** Just one quick thing, Your Honor.

I know that we filed a lot about topic number one and Broadcom's production and collection. I would just note that when Broadcom did bring its 1782 proceeding against NVIDIA, it

asked for that exact same topic.

**THE COURT:** Yes. I saw that -- that note in your papers as well.

All right. Thank you very much. I appreciate your endurance during this hearing.

I also appreciate the court reporter's endurance during this hearing. Thank you very much.

I will try to get you an -- I will get you an order, if I'm needing more information, telling you exactly what I need. And then after that, if I ask for it, I will then issue a written order on this dispute.

Okay. Thank you very much.

**MR. PICONE:** Thank you, Your Honor.

**MR. LAVENUE:** Thank you.

(Proceedings adjourned.)

**CERTIFICATE OF OFFICIAL REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Debra L. Pas

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Monday, September 28, 2020